FILED
2024 Apr-04  PM 05:26
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

|  |  |
|---|---|
| ALABAMA STATE CONFERENCE OF THE NAACP; LEAGUE OF WOMEN VOTERS OF ALABAMA; LEAGUE OF WOMEN VOTERS OF ALABAMA EDUCATION FUND; GREATER BIRMINGHAM MINISTRIES; and ALABAMA DISABILITIES ADVOCACY PROGRAM, <br><br> *Plaintiffs*, <br><br> vs. <br><br> STEVE MARSHALL in his official capacity as Alabama Attorney General; WILLIAM R. ADAIR in his official capacity as District Attorney for Walker County, T. KIRKE ADAMS in his official capacity as District Attorney for Dale and Geneva Counties, R. SCOTT ANDERSON in his official capacity as District Attorney for Morgan County, DARYL D. BAILEY in his official capacity as District Attorney for Montgomery County, JEFFREY WADE BARKSDALE in his official capacity as District Attorney for Franklin County, STEPHEN M. BILLY in his official capacity as District Attorney for Escambia County, KEITH BLACKWOOD in his official capacity as District Attorney for Mobile County, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

JENNIFER BRAY in her official
capacity as District Attorney for
Marshall County, ROBERT L.
BROUSSARD in his official capacity
as District Attorney for Madison
County, DANNY CARR in his official
capacity as District Attorney for
Jefferson County, Birmingham
Division, MATTHEW CASEY in his
official capacity as District Attorney
for Shelby County, PAMELA L.
CASEY in her official capacity as
District Attorney for Blount County,
RICK CHANCEY in his official
capacity as District Attorney for
Russell County, CHRISTOPHER E.
CONNOLLY in his official capacity as
District Attorney for Lauderdale
County, ROBERT CHAMP
CROCKER in his official capacity as
District Attorney for Cullman County,
JOSEPH D. FICQUETTE in his
official capacity as District Attorney
for Clay and Coosa Counties, STEVEN
D. GIDDENS in his official capacity as
District Attorney for Talladega County,
RUSS GOODMAN in his official
capacity as District Attorney for Henry
and Houston Counties, GREGORY S.
GRIGGERS in his official capacity as
District Attorney for Greene, Marengo,
and Sumter Counties, ANDREW C.
HAMLIN in his official capacity as
District Attorney for Fayette, Lamar,
and Pickens Counties, LYLE
HARMON in his official capacity as
District Attorney for St. Clair County,
HAL HUGHSTON in his official
capacity as District Attorney for
Colbert County, ERREK P. JETT in

his official capacity as District
Attorney for Lawrence County,
BRIAN C.T. JONES in his official
capacity as District Attorney for
Limestone County, CAROL LYNN
HAMMOND in her official capacity as
District Attorney for Calhoun and
Cleburne Counties, WALTER M.
MERRELL, III in his official capacity
as District Attorney for Covington
County, JASON R. PIERCE in his
official capacity as District Attorney
for Jackson County, BEN C. REEVES,
JR. in his official capacity as District
Attorney for Barbour and Bullock
Counties, C.J. ROBINSON in his
official capacity as District Attorney
for Autauga, Chilton, and Elmore
Counties,  MIKE SEGREST in his
official capacity as District Attorney
for Chambers, Macon, Randolph, and
Tallapoosa Counties, SUMMER
MCWHORTER SUMMERFORD in
her official capacity as District
Attorney for Cherokee and Dekalb
Counties, SCOTT A. SLATTON in his
official capacity as District Attorney
for Marion and Winston Counties,
JAMES H. TARBOX in his official
capacity as District Attorney for Coffee
and Pike Counties, CHARLOTTE M.
TESMER in her official capacity as
District Attorney for Butler, Crenshaw,
and Lowndes Counties, ROBERT
TURNER, JR. in his official capacity
as District Attorney for Bibb, Dallas,
Hale, Perry, and Wilcox Counties,
JESSICA VENTIERE in her official
capacity as District Attorney for Lee
County, LYNNEICE OLIVE

3

WASHINGTON in her official
capacity as District Attorney for
Jefferson County, Bessemer Division,
TODD WATSON in his official
capacity as District Attorney for
Conecuh and Monroe Counties,
ROBERT HAYS WEBB in his official
capacity as District Attorney for
Tuscaloosa County, JOSEPH
WILLOUGHBY in his official
capacity as District Attorney for
Etowah County, ROBERT E.
WILTERS in his official capacity as
District Attorney for Baldwin County,
STEPHEN K. WINTERS in his official
capacity as District Attorney for
Choctaw, Clarke, and Washington
Counties; and WES ALLEN in his
official capacity as Alabama Secretary
of State,

*Defendants*.

Plaintiffs Alabama State Conference of the NAACP ("Alabama NAACP"),
League of Women Voters of Alabama and League of Women Voters of Alabama
Education Fund (collectively, "LWVAL" or the "League"), Greater Birmingham
Ministries ("GBM"), and Alabama Disabilities Advocacy Program ("ADAP") are
civic engagement, faith-based, and disability rights organizations that promote broad
civic participation by educating and assisting broad swaths of Alabamians with the
absentee voting process. Plaintiffs bring this action to challenge Alabama Senate Bill

1 ("SB 1"),[1] a new law that restricts and criminalizes absentee ballot application assistance in contravention of the United States Constitution and federal laws protecting the right to vote.

## **INTRODUCTION**

1.     On March 20, 2024, the Alabama Legislature enacted SB 1, a vague and sweeping statute that turns civic and neighborly voter engagement into a serious crime. In doing so, SB 1 criminalizes constitutionally protected speech and expressive conduct and disenfranchises disabled voters, senior citizen voters, voters of color, eligible incarcerated voters, and many other Alabamians who depend on assistance to vote.

2.     Among its defects, SB 1 makes it a crime to provide a postage stamp to a neighbor distributing absentee ballot applications, or for a grandmother to show her appreciation for her grandchild's assistance in completing or delivering her absentee ballot application by giving them gas money or a token gift like a pie. Under SB 1, it is a Class B felony—which carries a sentence up to 20 years—to "pay or provide a gift" to someone for engaging in that kind of routine absentee ballot application assistance.[2] Other Class B felonies in Alabama include first-degree manslaughter and second-degree rape. SB 1 also makes it a Class C felony—which

---

[1] Ala. Code § 17-11-4, as amended March 20, 2024 (Act No. 2024-33). Hereinafter, citations to SB 1 will be preceded by "SB 1 §."
[2] SB 1 § 1(d)(2).

carries a sentence up to 10 years—to "receive a payment or gift" for "distributing, ordering, requesting, collecting, completing, prefilling, obtaining, or delivering" a ballot application for someone else.[3] Other Class C felonies in Alabama include third-degree robbery and first-degree stalking. Finally, SB 1 makes it a Class A misdemeanor—which carries up to a one-year sentence and $6,000 fine—to "prefill[]" or "submit[]" another person's absentee application.[4] Other Class A misdemeanors in Alabama include third-degree domestic violence and cruelty to animals. The statute does not define these criminal statute terms, instead leaving Alabamians to guess—with no guidance or indication—what conduct could lead to decades behind bars.

3.    Voter assistance is a vital means of political expression in Alabama that allows civic leaders to promote and build political power among historically disenfranchised communities. And yet, the State has historically and consistently engaged in efforts to restrict voter assistance, including through criminal prosecutions of groups and individuals seeking to create political change through civic engagement. For almost as long as the Fifteenth Amendment has guaranteed the right to vote for Black people and others regardless of race or color, Alabama has employed restrictions on assisting voters, including imprisoning volunteers and

---

[3] SB 1 § 17-11-4(d)(1).
[4] SB 1 §§ 17-11-4(b)(2), (c)(1)-(c)(2).

organizers for assisting voters, and employing other voter suppression tactics to both silence and punish Black community leaders and disenfranchise Black and other voters of color.

4.      Family, neighbors, and civic engagement, faith, and disability groups, like Plaintiffs, have long played a critical role in assisting voters who are unable to navigate the voting process alone—be it a grandchild who takes their grandparent's absentee ballot application to the mailbox or a church employee who helps someone with low literacy to read and complete the questions on the form. Absentee voters often require third-party assistance in applying for and casting their absentee ballots.

5.      For Plaintiffs, providing absentee ballot application assistance to promote civic engagement is core political speech and expressive conduct as organizations whose missions include the promotion of voting in a state with a deep history of limiting voting options for its most marginalized citizens. This includes the core message that Black voters and voters from other marginalized groups are fully entitled to participate in the political process. Without the availability of such assistance, the right to vote and participate in our democracy for Plaintiffs' members and constituents would be nothing more than an empty promise.

6.      Because of its defects, SB 1 will suppress and discourage voter education and assistance that has been long performed by Plaintiffs and other

organizations and individuals to promote civic participation and help citizens exercise their constitutional right to vote.

7.      SB 1's new restrictions on absentee voting and voter assistance violate the First and Fourteenth Amendments of the United States Constitution,[5] Section 208 of the Voting Rights Act of 1965 (the "VRA"),[6] and the Help America Vote Act of 2002 ("HAVA")[7] and will cause irreparable harm to Plaintiffs and citizens of Alabama more broadly.

8.      Plaintiffs respectfully request that the Court declare the challenged provisions of SB 1 unlawful and preliminarily and permanently enjoin Defendants from enforcing them.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1357 because the claims in this action arise under the Constitution and laws of the United States, as well as under 42 U.S.C. §§ 1983, 1988 and 52 U.S.C. § 10308(d). This Court has jurisdiction to grant declaratory and injunctive relief and all other forms of relief available under federal law, including 28 U.S.C. §§ 2201, 2202 and 52 U.S.C. §§ 10310(e), 10302.

---

[5] U.S. Const. amends. I, XIV.
[6] 52 U.S.C. § 10508.
[7] 52 U.S.C. § 20901.

10.     This Court has personal jurisdiction over the Defendants, who are all elected or appointed officials and citizens of Alabama.

11.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the Defendants engage in their official duties in this District, because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because at least one Defendant resides in this District and all Defendants are Alabama residents.

## PARTIES

### Plaintiffs

#### *Alabama NAACP*

12.     Plaintiff Alabama NAACP is the state conference of the National Association for the Advancement of Colored People, Inc. Alabama NAACP was founded in 1913 and is the oldest and one of the most significant civil rights organizations in Alabama. Alabama NAACP works to ensure the political, educational, social, and economic equality of Black Americans and all other Americans. Alabama NAACP has thousands of members in branches across the state. Most of the members of Alabama NAACP are Black registered voters. Two central goals of Alabama NAACP are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights. Alabama NAACP is committed to empowering Black

citizens' political participation, and its civic engagement activities promote the message that voting should be fully accessible.

13.     Toward those ends, Alabama NAACP, in conjunction with its local branches, also encourages Black people and other voters to engage in the political process by assisting them with voter registration, absentee applications, and voting, and turning out to vote on Election Day. Alabama NAACP's individual members include Black registered voters who are senior citizens, disabled, students, undereducated, and others who require assistance with the absentee voting process, including their absentee ballot applications. Alabama NAACP's members also include assistors to such voters.

14.     Among other things, Alabama NAACP conducts in-person and virtual town hall meetings to educate Black voters and other voters about the importance of voting and likewise publishes educational information about voting on its website. Additionally, Alabama NAACP hosts or participates in voter outreach and education events on college campuses where they assist voters with filling out absentee voting applications and provide food and branded materials to assistors and other attendees. Alabama NAACP's voter education and outreach includes assistance for senior citizens, disabled, and eligible incarcerated voters. As part of this, Alabama NAACP regularly assists voters in nursing homes and jails. In assisting with absentee ballot applications, Alabama NAACP provides envelopes and postage for submitting the

application. Alabama NAACP considers its civic engagement and voter education activities to be a core part of its organizational goals of encouraging everyone and especially people of color to vote and participate in the democratic process.

15.    Alabama NAACP would like to continue its work assisting voters with their absentee voting applications. Because of SB 1, however, Alabama NAACP is restricted from carrying on with these efforts for fear of criminal prosecution. SB 1 chills Alabama NAACP's speech and expressive activities because it restricts its ability to assist and engage with voters. In doing so, SB 1 chills vital voter assistance for many of Alabama NAACP's members and constituents.

16.    As a result of SB 1, Alabama NAACP must expend time and resources to understand what conduct is and is not prohibited under the law and provide its local branches and members with guidance regarding the same. Because Alabama NAACP's voter outreach work is conducted by volunteers, Alabama NAACP also will need to devote time and resources into ensuring that its volunteers going forward receive adequate training regarding SB 1's prohibitions to ensure that they do not risk committing a crime. The burdens caused by SB 1 also mean that Alabama NAACP will be required to spend additional time and resources on other activities around voter education, voter registration, and getting out the vote on Election Day rather than absentee application assistance.

*LWVAL*

17.    Plaintiffs League of Women Voters of Alabama and the League of Women Voters of Alabama Education Fund (collectively "LWVAL" or the "League"), formed under Section 501(c)(4) and Section 501(c)(3) of the Internal Revenue Code, respectively, are nonpartisan, nonprofit, grassroots organizations that seek to encourage informed and active participation in government, work to increase understanding of major public policy issues, and influence public policy through education and advocacy. LWVAL is a state chapter of the League of Women Voters, which was founded in 1920 as an outgrowth of the struggle to win voting rights for women and has more than 500,000 members and supporters and is organized in more than 750 communities in all 50 states and the District of Columbia. LWVAL has approximately 475 members across the state of Alabama. Many of LWVAL's members are over 65 years old and may need or prefer assistance with voting, including with completing their absentee ballot application.

18.    LWVAL is comprised of dues-paying members who volunteer in Alabama communities to provide voter services. LWVAL has no paid employees or staff involved with the operation of the League, including voter services. LWVAL provides regular training to its members and to their nonpartisan partners to assist voters in getting registered, applying for an absentee ballot, and voting absentee. LWVAL does this work as a part of its mission to protect the right to vote for

Alabama voters and considers absentee ballot application assistance to be an expression of those core values. Likewise, LWVAL uses absentee ballot application assistance as a part of a larger dialogue about a citizen's voting plan and the importance of voter turnout. Voter services education and direct services events are a means to associate with its members and the larger community, often recruiting members in the process.

19.     LWVAL members and volunteers assist senior citizens, college students, voters with disabilities, residents in assisted living and nursing home facilities, and rural voters in applying for and voting by absentee ballot. Among other assistance, LWVAL members and volunteers print absentee ballot applications for voters and provide detailed instructions on how to fill out the applications. LWVAL members and volunteers also provide envelopes and postage to submit the application, make photocopies of the voters' photo IDs, and spend time with the voter to ensure any errors are corrected. LWVAL members and volunteers do this work as a part of its mission to protect the right to vote for Alabama voters, and LWVAL considers absentee ballot application assistance to be an expression of those core values to the public.

20.     LWVAL's members and volunteers go directly to Alabama college campuses and host voter registration drives, where its members and volunteers also assist college students in completing absentee ballot applications. LWVAL has also

partnered with student organizations to provide voter education, including information about voter registration and absentee voting. At those drives, LWVAL members and volunteers often give away stickers to voters when assisting those voters in completing an absentee ballot application.

21.    LWVAL wants to continue assisting voters in applying for and voting absentee, especially senior citizens and voters with disabilities, but SB 1 threatens LWVAL's ability to do that work. SB 1 has had a chilling effect on LWVAL by restricting LWVAL's communications around absentee voting and by limiting LWVAL from associating with voters. Because SB 1's prohibitions are so unclear about which of LWVAL's absentee ballot application assistance is prohibited, LWVAL will be chilled and discouraged from associating with voters to assist with absentee ballot applications altogether. LWVAL feels threatened by the uncertainty of SB 1's provisions and fears that their members and volunteers will face felony prosecution and conviction of a felony if they continue to help voters with their absentee ballot applications.

22.    Because the criminal penalties are high, LWVAL will have to provide their members and local chapters with guidance before they continue assisting voters with their absentee ballot applications. LWVAL will have to determine what conduct is lawful, then conduct training sessions solely focused on the impact of SB 1 to ensure its members and volunteers are still able to assist voters lawfully. Ultimately,

SB 1 will result in LWVAL having to divert resources to understand which conduct is lawful and train their volunteers to understand it too. Doing this will require LWVAL to divert time and resources that they would otherwise have been spent preparing for other additional voter engagement activities in the upcoming elections. Furthermore, because of the potential criminalization of absentee assistance, LWVAL also will have to divert resources traditionally used for those activities to other forms of voter engagement such as increased efforts towards in-person voting and voter registration. LWVAL is an organization comprised entirely of volunteers and their resources are finite.

*GBM*

23.     Plaintiff GBM was founded in 1969 in response to the challenges posed by the mid-twentieth century Civil Rights movement and its transformative impact in Birmingham, Alabama, and across the United States. GBM seeks to address urgent human rights and social justice needs in the greater Birmingham area. GBM is a multi-faith, multi-racial, non-profit membership organization that provides emergency services to people in need and engages people to build a strong, supportive, engaged community and a more just society for all people. Increased civic participation among historically disenfranchised communities is central to GBM's social justice mission.

24.     To promote civic engagement in the communities it serves, GBM engages in voter education and assistance, including discussing civics with incarcerated individuals and assisting Alabamians to register to vote, restore their voting rights, and encourage them to vote, including by absentee ballot. As part of their voter assistance activities, GBM's paid staff and volunteers assist senior citizens, people with disabilities, shift workers, and eligible incarcerated voters to apply for absentee ballots and vote absentee.

25.     GBM—through paid staff and volunteers—assists individuals in applying for an absentee ballot by printing the application; providing a pen, envelope, and postage; and spending time reviewing the application to ensure all required boxes are marked correctly and completely. GBM hands out snacks, branded pens, and sometimes t-shirts. GBM provides its volunteers with pens, paper, t-shirts, gas stipends, and food at civic education drives hosted at public events and inside Alabama's jails and prisons. GBM also works to reach voters across the state who have past felony convictions to register them to vote, if eligible, or advise them of their path to voting rights restoration. Sometimes, these people will be eligible to vote by absentee ballot, and GBM will assist them in applying for the absentee ballot. GBM does this work as a part of their larger organizational mission to promote civil rights in Alabama, and considers absentee ballot application assistance to be a public expression of their core value that voting is important to advancing civil rights.

26.     GBM wants to assist Alabamians with applying for absentee ballot applications and with casting absentee ballots successfully in the November 2024 general election, as well as in future elections. GBM particularly wishes to provide this assistance for the eligible incarcerated voters it assists—who cannot vote any other way, but SB 1 threatens GBM's ability to do this work. GBM staff and volunteers are scared that they will be prosecuted for their absentee application assistance to Alabamians. GBM assisted incarcerated voters in applying for absentee ballots before the 2024 presidential primary election. GBM was awarded a grant to conduct voter registration, civic education, and absentee assistance to eligible women incarcerated at Julia Tutwiler Prison for Women in 2024. SB 1 threatens GBM's ability to achieve grant objectives (as well as the funder who provided the grant) by threatening its staff and volunteers with felony prosecution if it assists eligible incarcerated individuals with absentee ballot applications and voting. GBM would like to assist eligible incarcerated voters with applying for and casting absentee ballots for the November 2024 general election as well, but its staff and volunteers fear felony prosecution under SB 1 for doing so.

27.     As a result of SB 1, GBM will have to divert time to understand which conduct is lawful versus unlawful because GBM does not want to expose its staff, interns, and volunteers to possible criminal prosecution. Because of SB 1's confusing provisions, GBM will have to cease or severely restrict their absentee ballot

application assistance for incarcerated voters, which comprises a substantial amount of their overall absentee ballot application assistance. For the other voters GBM assists, GBM will have divert resources to compliance with SB 1 and pivoting to other forms of voter participation assistance and get-out-the-vote efforts.

*ADAP*

28.    Plaintiff ADAP is the duly authorized Protection and Advocacy Program ("P&A") of the State of Alabama, as that term is defined under the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 15041 *et seq.*, the Protection and Advocacy for Individuals with Mental Illness Act of 1986, 42 U.S.C. § 10801 *et seq.*, and the Protection and Advocacy of Individual Rights Act, 29 U.S.C. § 794e *et seq. See Dunn v. Dunn*, 219 F. Supp. 3d 1163 (M.D. Ala. 2016). As such, ADAP provides legal services to Alabama residents with disabilities to promote their rights. All Alabama voters with disabilities are constituents of ADAP. As a P&A, ADAP is accountable to members of the disability community and is authorized under federal law to represent the interests of Alabamians with disabilities. ADAP's mission is to achieve equality in opportunity for people with disabilities.

29.    ADAP's mission includes a focus on empowering its disabled constituents to vote. ADAP receives a federally funded grant to undertake this work. ADAP conducts trainings about the voting process and laws protecting the voting

rights of persons with disabilities. ADAP also educates residential facility staff and nurses about navigating the voting process for the residents in their care.

30.    ADAP has a paid staff member whose primary responsibility is to undertake voter education and promote voting rights for people with disabilities, including by assisting them with applying for absentee ballots. As part of their duties, that paid staff member visits disabled and blind individuals, including in nursing homes and state mental health facilities, educates them about voting and laws relating to the rights of disabled voters, and assists them with the registration and voting process. This voter assistance includes helping voters apply for absentee ballots by navigating the Secretary of State's website, printing out the application, and filling it out with them. In addition, ADAP's staff assist individual voters, including those in residential facilities or who are homebound, with requesting and completing absentee ballot applications and ballots. ADAP's voter assistance activities are integral to its mission of serving disabled Alabamians.

31.    ADAP would like to continue assisting its disabled and blind constituents with absentee voting, including the absentee application process. Due to the severe criminal penalties imposed by SB 1, which places its staff and community partners like residential facility staff and nurses at risk, ADAP will be required to severely limit its voter outreach work.

32.     As a result of SB 1, ADAP is required to spend staff time and resources to analyze, understand, and change its outreach voter activities in response to the law. Absent the need to respond to SB 1, ADAP would be able to use that staff time and resources to serve its disabled and blind constituents in Alabama with voting and other needs. Due to SB 1, ADAP will be required to devote additional time to other forms of voting assistance, such as educating disabled and blind voters about their legal rights when voting in person.

### Defendants

33.     Defendant Steve Marshall is the Attorney General of Alabama. Under Alabama law, the Attorney General may "at any time he [] deems proper, . . . superintend and direct the prosecution of any criminal case in the courts of the state," Ala. Code § 36-15-14, and "direct any district attorney to aid and assist in the investigation of any case in which the state is interested," *id.* § 36-15-15. As such, Defendant Marshall is responsible for criminal enforcement of SB 1. Defendant Marshall is sued in his official capacity.

34.     Defendants Alabama District Attorneys (the "Defendant District Attorneys") are the District Attorneys for the following Alabama counties:  Autauga County, Baldwin County, Barbour County, Bibb County, Blount County, Bullock County, Butler County, Calhoun County, Chambers County, Cherokee County, Chilton County, Choctaw County, Clarke County, Clay County, Cleburne County, Colbert

County, Coffee County, Conecuh County, Coosa County, Covington County, Crenshaw County, Cullman County, Dale County, Dallas County, DeKalb County, Elmore County, Escambia County, Etowah County, Fayette County, Franklin County, Geneva County, Greene County, Hale County, Henry County, Houston County, Jackson County, Jefferson County/Bessemer Division, Jefferson County/Birmingham Division, Lamar County, Lauderdale County, Lawrence County, Lee County, Limestone County, Lowndes County, Macon County, Madison County, Marengo County, Marion County, Marshall County, Mobile County, Montgomery County, Monroe County, Morgan County, Perry County, Pickens County, Pike County, Randolph County, Russell County, Shelby County, St. Clair County, Sumter County, Talladega County, Tallapoosa County, Tuscaloosa County, Walker County, Washington County, Wilcox County, Winston County. District attorneys have the power to "draw up all indictments and to prosecute all indictable offenses" within their jurisdiction. Ala. Code § 12-17-184(2). As such, the Defendant District Attorneys are responsible for criminal enforcement of SB 1 in their respective Alabama counties. The Defendant District Attorneys are sued in their official capacities.

35.     Defendant Wes Allen is the Alabama Secretary of State. Alabama law prescribes the Secretary of State as "the chief elections official in the state" who "shall provide uniform guidance for election activities." Ala. Code § 17-1-3(a). SB 1 provides that Alabama's application for an absentee ballot "shall be in a form

21

prescribed by the Secretary of State and shall be used throughout the state" and that "completed applications may be submitted to the absentee election manager" in one of the ways specified by SB 1 "as further provided by rule of the Secretary of State." SB 1 § 17-11-4(a), (c). As such, Secretary Allen has the authority, and indeed the obligation, to tell election officials how to implement election laws, including with respect to absentee voting. Defendant Allen is sued in his official capacity.

## FACTUAL ALLEGATIONS

### I. Alabama's History of Enacting Voting Restrictions, Including Its Long History of Criminalizing Voter Assistance

36.     Alabama has a long history of enacting voting restrictions to disenfranchise voters of color, including a long history of specifically targeting voting assistance through criminal prosecutions and other means.

37.     For example, in 1893, in response to increased Black political activism, Alabama passed the Sayre Law. *Harris v. Siegelman*, 695 F. Supp. 517, 525 (M.D. Ala. 1988). Among other restrictions, the Sayre Law required a person seeking assistance with voting to swear an oath to the inspectors that he or she was unable to write the English language; and limited the time that a voter may remain inside the voting booth to five minutes. *Id*. at 525.

38.     In 1901, all-white delegates crafted a new state Constitution, which conditioned the right to vote on land ownership and employment, and instituted a poll tax, literacy test, criminal disenfranchisement rule, and a "grandfather clause"

to keep descendants of enslaved people from voting. *See South Carolina v. Katzenbach*, 383 U.S. 301, 311-12 (1966). By 1909, only 4,000 of the nearly 182,000 Black persons of voting age in Alabama remained on the voter rolls. *Harris*, 695 F. Supp. at 523-24.

39.   Over the next half-century, Alabama passed a series of other laws requiring "black persons who wished to register and vote to satisfy different and more stringent standards and tests than white persons" and constructed discriminatory poll taxes and other barriers to the ballot. *Harris*, 695 F. Supp. at 524. Federal courts repeatedly struck down these restrictions as violating the Fourteenth and Fifteenth Amendments and other civil rights law. *See United States v. Penton*, 212 F. Supp. 193, 196 (M.D. Ala. 1962) (holding that state officials "deliberately and consistently engaged in procedures and practices which [] favored white applicants and discriminated against Negro applicants who were seeking to become registered voters"); *United States v. Parker*, 236 F. Supp. 511, 515 (M.D. Ala. 1964) (holding that Alabama's voter registration application violated the Fourteenth and Fifteenth Amendments and the Civil Rights Act of 1964); *Davis v. Schnell*, 81 F. Supp. 872, 874 (S.D. Ala. 1949) (holding that state constitution amendment requiring prospective voters to "understand and explain" article of U.S. Constitution violated Fifteenth Amendment).

40. Until the passage of the VRA in 1965, Alabama law prohibited voters from receiving any form of assistance with completing their voter registration forms. *See, e.g.*, *United States v. Atkins*, 323 F.2d 733, 735 (5th Cir. 1963); *United States v. Alabama*, 304 F.2d 583, 587 (5th Cir. 1962), *aff'd mem.*, 371 U.S. 37 (1962). Alabama's ban on voter assistance in the completion of registration forms acted as a literacy test. *Atkins*, 323 F.2d at 736. At the time, registration forms included difficult questions about personal details, such as: "If in the last five years, you have been employed by an employer other than your present employer, give name [sic] of all employers and cities and states in which you worked"; and "List the places you have lived in the past five years, giving town or county and state." For voters who were illiterate or otherwise could not read or write well, Alabama's ban on assistance made it impossible for them to understand and accurately complete such registration forms alone. Similarly, in the 1950s and 1960s, Alabama outlawed and criminalized Plaintiff Alabama NAACP for trying to assist Black people with combating racial discrimination in education, voting, and other areas. *See, e.g.*, *NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288 (1964); *NAACP v. Alabama ex rel. Patterson*, 360 U.S. 240 (1959).

41. Even after the VRA was enacted, which subjected Alabama to the pre-clearance provisions of Section 5 thereunder, Alabama's attempts to disenfranchise and dilute the power of voters of color persisted. Between 1965 and 2013, at least

100 voting changes proposed by Alabama state, county, or city officials were either blocked or altered pursuant to the VRA, including changes pertaining to restrictions on absentee voting and in-person voting assistance. In 1970, the U.S. Department of Justice ("DOJ") determined that a state law that barred voters from receiving assistance with completing their absentee voter registration forms violated the VRA's ban on literacy tests. In 1972, the DOJ objected to a state law that permitted people only to assist one voter per election. The DOJ found that "[s]uch restriction could have the effect of severely limiting the availability of persons who might be willing and able to provide assistance to voters as entitled."

42.    In the 1980s, federal and state prosecutors pursued wide-ranging and selective prosecutions of civil rights activists who sought to assist Black people in the Black Belt with absentee voting. In 1979, Maggie Bozeman, a leader of Plaintiff Alabama NAACP, and Julia Wilder, a 69-year-old civil rights worker, in Pickens County, were convicted of three counts of voting fraud for assisting senior citizen and illiterate Black citizens in filling out their absentee applications and ballots. Ms. Wilder and Ms. Bozeman were sentenced to four and five years in prison, respectively. In 1984, a federal court threw out these convictions for constitutional violations because they were tried for offenses for which they were never charged (but only after the two women had served time in prison and had been paroled). Similarly, in 1988, Black activists known as the Marion Three were convicted of

assisting senior citizen and illiterate Black voters in the Black Belt with absentee voting. After the Eleventh Circuit determined that the Marion Three had made a *prima facie* showing that these prosecutions were racially motivated, the convictions were ultimately overturned on various other grounds. The Marion Three later sued the federal government over these prosecutions.

43.     As late as 1988, there continued to be "instances [] where white poll officials abused [Sayre Law] provisions just as they had done almost 100 years ago; [witnesses] told of instances where black voters were harassed with the five-minute rule or were refused clearly needed assistance because they did not meet the state's rigorous assistance standard or because the white poll officials arbitrarily decided that assistance was not needed." *Harris*, 695 F. Supp. at 526. In 1988, a federal court found that the Sayre Law had a discriminatory purpose and result in violation of the Constitution and the VRA. *Id*. at 527-28. The Court ordered the Alabama Secretary of State and Attorney General to permit voters to receive help from anyone of their choice consistent with Section 208 of the VRA. *Harris v. Siegelman*, 700 F. Supp. 1083, 1087-88 (M.D. Ala. 1988).

44.     In the 1990s, the Alabama Legislature continued to target Black voters by enacting the requirement that absentee voters include two witness signatures or a signature in front of a notary for their vote to be counted. This requirement disproportionally disadvantaged rural Black citizens who relied on absentee voting.

45.     In 2018, then-Alabama Secretary of State John Merrill supported a bill that sought to eliminate the witness requirement for absentee voting. According to Secretary Merrill, white legislators "killed" this bill because it was sponsored by a Black Democrat, which meant "there had to be something wrong with it." In 2020, a federal court issued a final declaratory judgment that the witness requirement violated Section 2 of the VRA during the COVID-19 pandemic. *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076 (2020). The Court found that "some state officials" were "motivated by racial bias" in the enactment of the witness requirement. *Id.* at 1173.

46.     Alabama maintains some of the most restrictive laws on voting, specifically absentee voting, including for vulnerable voters for whom in-person voting is difficult or impossible. Alabama is one of only four states without early in-person voting. It is one of just fourteen states that requires an "excuse" for absentee voting. And even among those fourteen states, Alabama is exceptionally rigid. Unlike nearly every other state, there is no broad right to vote absentee for everyone over 65, nor one for everyone with a disability.

47.     Under Alabama law, with limited emergency exceptions, a voter may cast an absentee ballot only if the voter: (i) will be absent from the county on Election Day; (ii) is ill or has a physical disability that prevents a trip to the polling place; (iii) is a registered Alabama voter living outside the county; (iv) is an appointed

election officer or poll watcher at a polling place other than their regular polling place; (v) is working a required shift of ten hours or more that coincides with polling hours; (vi) is a caregiver for a family member (to the second degree of kinship) and the family member is confined to their home; or (vii) is currently incarcerated in prison or jail, but has not been convicted of a felony involving moral turpitude. Ala. Code § 17-11-3.

48.    For the limited categories of voters who qualify, the absentee voting process is particularly onerous. In broad strokes, to apply for an absentee ballot, voters must download and print an online application, physically pick up an application from their county Absentee Election Manager, or send a written request to their Absentee Election Manager to receive the application by mail. The voter then must complete the application completely and correctly, including by obtaining a witness signature if the application is signed by mark. The application also must include a printed copy of the voter's valid photo identification. Then, the voter must submit it in person or by personally putting it in the mail. Alabama does not provide envelopes or pre-paid postage for sending back applications. Alabama also does not offer its absentee ballot applications in Braille or languages other than English. For every election more than 42 days apart, *e.g.*, a primary election and general election, voters must reapply for an absentee ballot.

49.    In 2021, Alabama outlawed curbside voting even for persons with disabilities.

50.    For those who meet one of the State's limited exceptions, absentee voting is a necessary civic lifeline—providing access to the ballot for many eligible voters for whom in-person voting on Election Day would be very challenging if not impossible. This includes eligible voters who are disabled or blind; people in nursing homes; eligible incarcerated persons who have not been convicted of crimes of moral turpitude; students or others who are out of the county on Election Day; caretakers of homebound family members; or wage workers with long hours.

51.    A direct line can be traced from Alabama's history, including the literacy tests of the recent past and the harrowing convictions of Ms. Bozeman, Ms. Wilder, and the Marion Three for assisting senior citizen and illiterate Black voters, to SB 1's criminalization of absentee assistance today.

## II.    Enactment of SB 1

52.    SB 1 was the first Senate bill filed in advance of the 2024 legislative session. Bill proponents in the Legislature characterized the bill as targeting purported "ballot harvesting" by "groups or individuals seek[ing] to profit off the absentee voting process."

53.    In public hearings, however, legislators could offer no evidence of any widespread voter fraud attributable to absentee voting or so-called ballot harvesting.

29

Rather, the only justifications offered were vague or anecdotal assertions, largely premised on a two-page chart showing absentee voting numbers from the 2022 primary election in which fewer than 25,000 absentee ballots were cast. Before the House Committee, Senator Gudger relied almost entirely on data from that chart indicating that voters in certain counties in the Black Belt[8] (including counties with higher senior citizen and/or disabled populations) had chosen to vote absentee in higher proportion than voters in other parts of the state.

54.     At the same time, legislators heard significant evidence of the ways in which SB 1 would have a detrimental impact on the ability of eligible voters to utilize the absentee voting process and the ability of civic engagement organizations, like Plaintiffs, to continue their crucial pro-political participation advocacy. The Legislature also heard testimony about the vagueness of the terms "payment" and "gift" in the bill and the fear that such vagueness engenders.

55.     For example, LWVAL Vice President Carol Mosely testified:

"Across the state, nonprofit organizations like [LWVAL] as well as caregivers, nurses, church members, and school administrators, teachers, and students, fill a critical gap and provide a needed service to all people to navigate a fundamentally confusing and error-prone

---

[8] The Black Belt includes the core counties of Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike, Russell, Sumter, and Wilcox, as well as Clarke, Conecuh, Escambia, Monroe, and Washington counties. The Black Belt is named for the region's fertile black soil. The region has a substantial Black population because of the many enslaved people brought there to work in the antebellum period. It has been a hotbed of racial discrimination and civil rights activism from the 1860s to today.

absentee voting process. . . . SB 1 is a harmful bill for all the people of Alabama and will only serve to suppress the voting rights of people who have the right to vote absentee. It will also allow innocent people to be criminalized for doing good."

56.    Alabama NAACP representative Norma J. Sanders testified:

"Senate Bill 1 would charge our civic organization employees, volunteers, or individuals with a crime simply for assisting their neighbors and exercising their right to vote by absentee ballot. . . . The NAACP has for many years assisted people with their absentee voting because we want to ensure everyone's vote counts. . . . Senate Bill 1 will have a negative impact on NAACP civic engagement work."

57.    GBM Organizing Director Tari Williams testified:

"Assisting [incarcerated voters] with absentee ballot applications and absentee ballots is a critical step in maintaining their connection to society, aiding in a smoother reentry process, and reducing the likelihood of recidivism. Our role in facilitating their right is not just assistance, it's restoration of their dignity and a reaffirmation of their voice in our democracy. To [] criminalize the act of aiding these individuals as SB 1 proposes is to misunderstand the essence of democracy itself."

58.    Alabama State University student Armani Benson testified:

"If SB 1 passed, it could penalize student organizations, faculty and staff that facilitate voting and stifle civic participation on campuses. This bill will have a negative impact for college students which will result in the decline of young adults voting, overcrowding in prisons . . . and also the records and lives of many young adults will be tarnished as if they're criminals. . . . Example, if a person is disabled therefore, he gives the college student gas money for absentee ballot assistance. He will be charged with the crime."

59.    And Alabama State University student Ashley Griffin asked: "Do you think that is valid for someone to have a Class C felony just for helping out their

senior citizen at their local church or for someone to help their friend out who can't even assist themselves to go vote?"

60.    With respect to the law's harsh implications on civic engagement activity, Senator Gudger himself agreed that providing an absentee voter "a stamp [or] sticker" in connection with absentee voter assistance would violate the law. He also acknowledged that SB 1 raised concerns about criminalizing "the grandfather giving the grandson $5 for gas money," but suggested that Alabamians simply "not . . . worry about [that]."

61.    Nonetheless, SB 1 was passed in both the House and Senate on March 19, 2024, and signed into law by Governor Kay Ivey on March 20, 2024. Secretary of State Allen issued a press release applauding its passage and advised that the law would be effective for the November 2024 general elections.

## III.    Challenged Provisions

62.    This lawsuit challenges the following provisions of SB 1 (collectively, the "Challenged Provisions"): The Prefiling Restriction, Submission Restriction, Payment Provisions, and Gift Provisions.

63.    **<u>Prefiling Restriction</u>**: SB 1 makes it "unlawful for any person to knowingly distribute an absentee ballot application to a voter that is prefilled with the voter's name or any other information required on the application form." SB 1 § 17-11-4(b)(2). This provision carries a Class A misdemeanor penalty.

64. **Submission Restriction**: SB 1 makes it "unlawful for an individual to submit a completed absentee ballot application to the absentee election manager other than his or her own application," unless that person is seeking emergency medical treatment within five days before an election. SB 1 § 17-11-4(c)(2). Submission is defined as personally dropping off one's own application with the county Absentee Election Manager or placing one's own application in the mail/commercial carrier service. *Id.* This provision carries a Class A misdemeanor penalty.

65. **Payment Provisions**: SB 1 makes it "unlawful for a third party to knowingly receive a payment," or "knowingly pay . . . a third party," to "distribute, order, request, collect, prefill, complete, obtain, or deliver a voter's absentee ballot application." SB 1 § 17-11-4(d)(1)-(d)(2). These provisions each carry a Class B or C Felony penalty (Class C for assistors who receive a payment and Class B for those who pay such assistor).

66. **Gift Provisions**: Finally, SB 1 makes it "unlawful for a third party to knowingly receive . . . a gift," or "knowingly . . . provide a gift," to a third party to "distribute, order, request, collect, prefill, complete, obtain, or deliver a voter's absentee ballot application." SB 1 § 17-11-4(d)(1)-(d)(2). These provisions each carry a Class B or C Felony penalty (Class C for assistors who receive a payment and Class B for those who pay such assistor).

IV.   **SB 1 Imposes Significant Burdens on Civic Engagement Groups and Voters Across the State**

A.  **SB 1's Criminalization of Voter Assistance Sharply Restricts Plaintiffs' Free Speech and Associational Rights.**

67.   SB 1 limits Plaintiffs' core political speech, expressive conduct, and associational activities in which Plaintiffs may engage around voting and voter engagement, which are issues of broad social importance. The Payment and Gift Provisions impose Class B or C felony liability, which impose sentences between 366 days and up to 20 years and fines up to $30,000. The Prefilling and Submission Restrictions impose Class A misdemeanor liability, which can carry a jail sentence of up to one year and a fine of up to $6,000.

68.   *First*, SB 1 severely burdens Plaintiffs and other individuals and organizations by apparently proscribing or prohibiting the funding of (or even de minimis support for) certain types of speech—absentee ballot application assistance—that Plaintiffs currently communicate and would plan to communicate to engage, educate, and assist voters. It also diminishes the effectiveness of Plaintiffs' speech and expressive conduct apparently criminalizing Plaintiffs' primary mode of communicating their message to voters, including those who need or seek assistance in obtaining and completing their absentee ballot applications.

69.   The Payment and Gift Provisions go so far as to restrict even the *distribution* of absentee ballot applications, which contain both the qualifications

and necessary instructions to vote absentee. Plaintiffs communicate the importance of voting through voter participation drives and civic engagement outreach where they provide absentee ballot application assistance. Distribution of such applications is core to Plaintiffs' voter education communications and SB 1 cuts off Plaintiffs' most effective means of educating their constituencies on the absentee voting process.

70.    The Prefilling and Submission Restrictions prohibit all individuals from providing assistance in filling out the application for a voter as well as submitting an application on that voters' behalf—eliminating the ability for Plaintiffs to provide critical forms of assistance in their voter assistance drives under threat of a misdemeanor.

71.    Additionally, the Payment Provisions can be interpreted as prohibiting all paid staff of third-party organizations—as well as any individual or entity who is paid or reimbursed to assist voters—from providing the assistance to voters, and doubly criminalizes those voters who accept assistance from third-party organizations.

72.    The Gift Provisions also severely burden communication via absentee ballot application assistance, including because Plaintiffs offer token gifts and provisions, such as t-shirts, pens, and stickers, to volunteers and voters that support their message of voting and voting absentee. This includes token gifts and provisions

35

to volunteers who assist voters with completing absentee ballot applications. These materials often contain Plaintiffs' logos and other messaging that promotes Plaintiffs' respective missions. The Gift Provisions, like the Payment Provisions, could be interpreted as criminalizing the communicator and the recipient of that communication, thereby entirely proscribing Plaintiffs' ability to provide those materials to volunteers who may assist voters with submitting an absentee ballot application.

73.    Plaintiffs' absentee voter assistance activities involve organized campaigns to solicit and assist voters with absentee ballot applications that necessarily involve both the expression of a commitment to the importance of civic engagement and a discussion about the merits of civic participation, generally, and voting by absentee where needed, specifically. *See Meyer v. Grant*, 486 U.S. 421 (1988). Such "interactive communication concerning political change" has been recognized as "core political speech." *Id.* at 422.

74.    Plaintiffs' absentee voter assistance activities are characteristically intertwined with both informative speech about the absentee voter process and persuasive speech about the importance of voting.

75.    Plaintiffs' absentee voter assistance activities are both intended to, and reasonably understood, as promoting civic participation, generally, and the utilization of inclusive methods of voting, including absentee voting, specifically.

76.     *Second*, Plaintiffs associational activities are severely restricted. For Plaintiffs, absentee ballot application assistance is a crucial means of associating with their primary constituencies, and a means to communicate the importance of voting to those constituencies. Plaintiffs often recruit members and support for their causes through absentee ballot application assistance and use that assistance as a means of associating with existing members.

77.     SB 1 severely burdens or eliminates Plaintiffs' ability to associate with members of the community through absentee ballot application assistance. For example, GBM, Alabama NAACP, and LWVAL regularly host voter participation drives or other community events to encourage their members and other Alabamians to register to vote and vote, including assisting voters to apply and vote absentee. GBM, Alabama NAACP, and LWVAL also use these events to convey to the public their messages of voter participation and political engagement and to encourage people to join their organizations to help fulfill their missions. As part of its mandate, ADAP regularly engages with its disabled constituents about voting education and to help them with absentee applications and other voting materials. Many of the voters assisted by Plaintiffs are disabled or otherwise face challenges with personally dropping of their application in a mailbox or with the Absentee Election Manager. The Submission and Prefilling Prohibitions prohibit entire forms of association by prohibiting Plaintiffs from engaging in these activities under threat of a

misdemeanor.

78.     Likewise, the Payment and Gift Provisions severely burden Plaintiffs' ability to associate with the community because Plaintiffs pay their staff, reimburse volunteers for out-of-pocket expenses, and provide materials to the voters they assist.

79.     Additionally, SB 1's restrictions hinder Plaintiffs' ability to associate with each other and work together to assist voters with absentee ballot applications. In their voter engagement work, Plaintiffs often work together or with other civic organizations to host voter participation drives and promote absentee voting. Associating with other organizations in this work is a vital means of spreading their pro-voter message. Because these restrictions, as mentioned above, hinder or prevent Plaintiffs from engaging in those activities, Plaintiffs also cannot associate with each other to engage in those activities.

### B. SB 1's Vague and Overbroad Provisions Criminalize and Chill Plaintiffs' Otherwise Lawful Voter Education and Assistance.

80.     By its terms, SB 1 criminalizes a sweeping amount of speech and conduct, including core political speech, noncommercial expressive conduct, and conduct which impacts the right to vote. SB 1 makes violations of the Prefilling and Submission Restrictions a misdemeanor, and violations of the Payment and Gift Provisions a felony.

81. *First*, SB 1 does not define "gift," which could include the provision of t-shirts, pens, stipends, and other "gifts" provided by Plaintiffs and which implicate core political speech.[9] The very materials required to vote absentee—including postage, envelopes, or a printed, unfilled absentee ballot application—could be considered a "gift." Indeed, SB 1's sponsor noted that a prohibited "gift" could include the provision of gas money or even a "stamp [or] sticker." Nonprofit organizations such as Plaintiffs GBM, LWVAL, and Alabama NAACP regularly provide volunteers with items that include the organizations' message or logo, and/or enable volunteers to provide assistance with absentee ballot applications by providing items like pens, postage, envelopes, and gas cards. The vagueness of the term "gift" is substantial, not only because it imposes steep criminal penalties based on an undefined term but also because it can be read as sweeping in expressive conduct and associational activity that implicates Plaintiffs' core political speech.

82. *Second*, SB 1 does not define "payment," whose potentially broad meaning leaves Plaintiffs to guess what conduct it prohibits. For instance, will Plaintiffs be charged with a felony because their paid staff were assisting a voter in filling out an absentee ballot application during a voter engagement event or during a civics program in prison? Will Plaintiffs' paid employees assume felony liability

---

[9] Additionally, the Alabama Code does not define "gift." Accordingly, Plaintiffs have no guidance—within SB 1 or outside of it—as to what constitutes a "gift."

for doing their jobs if they assist a voter to request an absentee ballot? Will Plaintiffs be charged for providing gas money to their volunteers for driving a voter to their local election office to deliver an absentee ballot application? Will Plaintiffs be charged for providing food to volunteers who assist voters with absentee ballot applications? In general, it is unclear to Plaintiffs and the voters they assist whether the "payment" only includes payment for the express purpose of absentee ballot application assistance, or whether "payment" includes all paid staff who provide such assistance during their working hours.

83.    Moreover, "payment" criminalizes conduct beyond any legitimate state purpose for doing so. In particular, the plain language of SB 1 (*e.g.*, "it shall be unlawful for a third party to knowingly receive a payment. . .") appears to prohibit all payment for assistance with absentee ballot applications, even when such payments come from the government to individuals who are required to assist voters with their applications under state and federal law. For example, the plain language seems to include assistance from ADAP, which receives federal funding and has a full-time staff member primarily dedicated to assisting voters with disabilities (including voters confined to residential care facilities) with absentee applications and other voting needs. It also appears to prohibit voter assistance for people like those confined to jails, prisons, and nursing homes who cannot vote without assistance. This sweeps in assistance from, among other individuals, paid staff in

jails, prisons, and nursing homes who must assist voters with their applications to enable those voters to submit an application. This also includes assistance from organizations like Alabama NAACP, GBM, and LWVAL, who also work in jails and nursing homes to assist eligible incarcerated voters and voters with disabilities. Because jail- and prison-based voters, as well as many voters with disabilities, can *only* vote with assistance, the vagueness of this provision could be a total bar on the right to vote for those individuals. Such vagueness only compounds the First Amendment harms, because the language is likely to result in the per se bar on voting for otherwise eligible individuals, for fear of felony conviction by those tasked with assisting those individuals.

84. *Third*, SB 1 does not define the term "third party," such that individuals who are conducting lawful and required voter assistance activities under state and federal law are swept in under the Payment and Gift Provisions. Again, staff in jails, prisons, and residential care facilities, as well as assistance organizations like Plaintiffs must assist eligible incarcerated or disabled individuals with obtaining and submitting an absentee ballot application; otherwise, the individual likely cannot vote. As potential "third parties" in the absentee ballot application process, any jail, prison, or residential facility staff, as well as those with whom they collaborate, could be considered to be unlawfully receiving a payment for distributing or

collecting absentee ballot applications on behalf of such eligible incarcerated or disabled voters.

85.     *Fourth*, SB 1 does not define "prefill," which could include an amorphous amount of activity. An individual child can be said to "prefill" the application of her senior citizen parent if the child filled out her parent's name and address on the application. Plaintiffs could be said to "prefill" the application of a voter if a volunteer assists a voter who is blind, senior citizen, has low literacy skills, or does not speak English as a first language. For instance, LWVAL regularly hosts registration drives in the community and will encounter voters who are visually impaired and will assist these voters with voter registration and applying for an absentee ballot. This requires assisting visually impaired voters in filling out the absentee ballot application. GBM and Alabama NAACP assist disabled voters or voters with low English literacy skills with completing their absentee ballot applications. ADAP also helps disabled and blind individuals complete absentee applications by typing their answers on the form. The restriction on "prefilling" could even be read to apply even where a voter's information is copied from the state's own voter file or where county or state officials (including election and prison officials) assist a voter by inputting this voter on the form. The undefined term "prefill" results in chilling a broad amount of conduct beyond a legitimate purpose.

86.     Finally, SB 1 does not define the terms "distribute" or "submit." A

person could be prosecuted even where a voter requests an application from Plaintiffs, accurately provides Plaintiffs with the required information, and Plaintiffs merely fill in that information on the application before "distributing" or handing it to the voter. "Submit" could also include, among other things, an amorphous amount of conduct, including delivery via mail and in-person delivery when the voter consents to a third party delivering an application on their behalf. This undefined term could prohibit Plaintiffs from assisting senior citizen voters who require assistance, voters with disabilities, voters confined to nursing homes or jails, or anyone else who has difficulty with personally submitting their application in delivering their absentee ballot applications by dropping the applications off in the mailbox.

### C. SB 1 Places Severe, Undue Burdens on Individual Voters.

87.    SB 1 places severe and undue burdens on individual voters across the state who require assistance with applying for an absentee ballot, including due to blindness, disability, illiteracy or low literacy and/or other reasons such as being a senior citizen and requiring assistance, having limited mobility, or being incarcerated. A substantial number of these affected voters are Black or Latino and are particularly likely to need to vote absentee.

88.    There are numerous steps in the process for applying to vote absentee in Alabama which generally requires, *inter alia*, internet access and ability, a printer,

mailing supplies, and the ability to read English, complete, and physically submit the required paperwork.

89.    Given these many steps, many voters require assistance with the absentee application process—for example, because they have physical or other health challenges that make requesting, completing, and submitting the application difficult or impossible, lack the level of literacy required to read and complete the application, do not have internet access or facility with using the internet, lack printing or mailing supplies, or some combination thereof. This includes significant numbers of blind, disabled, illiterate or low literacy, senior citizen, limited mobility, and/or incarcerated voters who have every right to participate in our democracy. And they are the people who are among the least likely to be able to participate in voting except by absentee ballot and who often need the assistance from others to do so.

**Senior Citizen and Disabled Voters**

90.    Approximately 18% of all Alabamians are over 65 years old.

91.    According to data collected by the Centers for Disease Control and Prevention ("CDC"), more than 30% of all eligible voters in Alabama (those 18 years of age or older) have a disability. For older Alabamians, the number rises to nearly half (47.8%) for individuals 65 and older.

92.    Further, according to the CDC, 17% of adults in Alabama have a mobility disability with serious difficulty walking or climbing stairs, compared to

12.1% of adults in the United States. Additionally, nine percent of adults in Alabama have serious difficulty doing errands alone. Disabled individuals are also more likely to suffer from other health issues that make in-person voting even more difficult, such as the 19% of disabled Alabamians with diabetes and the 12% of disabled Alabamians with heart disease.

93.    Counties in Alabama's Black Belt also tend to have higher rates of senior citizen and disabled residents than the statewide average.

94.    Overall, 0.45% of Alabamians are considered fully blind. The prevalence has a significant correlation with age, with 1.37% of individuals between ages 65 and 84 considered blind, and 6.96% of individuals greater than age 85 being considered blind. Individuals who are not blind but have significant vision loss rise to above 1% by age 55. Overall, 2.17% of all Americans are considered to have a vision impairment. Alabama has a higher proportion of individuals with vision impairments and blindness than the nation as a whole.

95.    Voters with disabilities or who are blind disproportionately rely upon absentee voting because of factors such as difficulties with mobility or filling out a ballot in person, limited access to transportation, risks associated with in-person voting, accessibility barriers at polling places, or residency status in a residential care facility. And for many of these and other reasons, they also require assistance with the application process—for example, because they have difficulties with writing,

seeing, and/or physically submitting the application.

**Illiterate and Low Literacy Voters**

96.     According to data compiled by the National Center for Education Statistics, Alabama has the 44th lowest literacy rate in the country.

97.     Black and Latino Alabamians are much more likely to be functionally illiterate than white Alabamians. In 2022, 56% of Black people and 46% of Latino people, as compared to 28% of white people, had "below" basic literacy skills in the eighth grade. In 2022, Black students had an average reading score that was 27 points lower than that for white students. This performance gap was not significantly different from what it was in 1998 (28 points). Also in 2022, Latino students had an average reading score that was 17 points lower than that of white students.

98.     Overall, 24% of Alabama adults have below basic reading skills. In the Alabama counties with the largest Black populations, Macon (80.7% Black), Greene (80.1% Black), and Lowndes (72.5% Black), the percentage of adults with below basic literacy skills were 38%, 44%, and 41%, respectively. In comparison, in the counties with the highest white populations, Winston (93.7% white), Cleburne (92.8% white), and Cullman (91.9% white), people with below basic literacy skills were only 27%, 28%, and 23% of the populations, respectively. Additionally, of Alabamians over age 25, 24.8% of Latino citizens, 9.5% of Black citizens, and 4.8% of whites have not completed high school.

99.    Further, 2.1% of Alabamians speak English "less than very well." Among the State's voting-age population, 27% of the Hispanic citizen voting age population in Alabama speak English "less than very well." Alabama does not provide absentee applications in Spanish.

100.    Alabama's absentee ballot application has a Flesch-Kincaid score of over 20, meaning that it requires more than a 12th grade reading level.

101.    Thus, given the reading comprehension and writing required to apply for an absentee ballot, many illiterate or low literacy Alabamians require assistance from others to complete the application process.

**<u>Incarcerated Voters</u>**

102.    In Alabama, voters who are incarcerated in jail or prison and who have not been convicted of crimes of "moral turpitude," including pretrial detainees, remain eligible to vote. Ala. Const. art. VIII § 177 (2022); Ala. Code § 17-3-30.1(c). But Alabama does not provide jail- or prison-based voting sites so absentee voting is the *only* way that eligible incarcerated voters are able to vote.

103.    Because, *inter alia*, of the number of steps involved in applying for an absentee ballot and restrictions that eligible incarcerated voters are subject to (such as limitations on access to the internet, mailing supplies, or a printer), eligible incarcerated voters likewise depend on assistance from third parties to apply to vote.

104.    And many of these eligible incarcerated voters are Black and Latino. Annually, nearly 90,000 individuals are incarcerated in Alabama's jails. On average, each day—including on an election day—14,322 people are in an Alabama jail. As of January 2024, over 27,000 individuals were incarcerated in Alabama's prisons.

105.    Although they make up only 25.8% of the statewide population, Black individuals comprise 53.7% of Alabama's prison population. In comparison, 64.1% of the statewide population is white, who make up 45.2% of the prison population. Black Alabamians are also overrepresented in Alabama jails compared to their statewide population. Hispanic individuals comprise 4% of the statewide population and nearly just as much of the jail population.

### D. SB 1's Vague Provisions Do Not Sufficiently Protect Disabled, Blind, or Low Literacy/Illiterate Voters.

106.    In addition to the Challenged Provisions, SB 1 includes the following language which copies, without citation, the text of Section 208 of the VRA, 52 U.S.C. § 10508: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by an individual of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." SB 1 § 17-11-4(e).

107.    The VRA has an expansive definition of the terms "vote" and "voting." 52 U.S.C. § 10301(c)(1). The terms include:

all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.

*Id.* Under Section 208, voters are entitled to assistance with completing their absentee ballot application or the absentee ballot itself, submitting or mailing the application or ballot, and any other "action necessary to make a vote effective." *Id.* However, SB 1 contains no such broad definition of voting and, at various points, makes clear that no person shall receive the prohibited forms of assistance. Thus, it is unclear whether SB 1 entitles people who are blind, disabled, or cannot read or write to the assistance from persons for their choice at all stages of the absentee voting process.

108.  Moreover, the legislative history of Section 208 makes clear that it is meant to protect voters who are semi-literate or otherwise have low literacy skills. *See* S. Rep. No. 97-417 at 63 (1982).

109.  The exception purportedly created by SB 1 § 17-11-4(e) also does not explain how this provision should interplay with SB 1's other restrictions on absentee ballot application assistance and leaves both disabled voters needing assistance and potential assistors without guidance on whether SB 1's criminal provisions will apply to them. In other words, while SB 1 theoretically states that a

49

voter can choose an assistor of their choice, in the same breath it criminalizes that assistance if it is in any way compensated or if it extends to "prefilling" or "submission" of applications. Such provisions do not provide voters with disabilities with the meaningful choice of assistance that the VRA mandates.

110.  Indeed, reading all the provisions together, it appears that the disability language in SB 1 § 17-11-4(e) does not override the Challenged Provisions as applied to voters with disabilities since the Challenged Provisions identify more specific exemptions. The Submission Restriction only provides exceptions where another statute (Ala. Code § 17-11-3(f)) applies *or* where an individual is having a medical emergency within five days of an election. SB 1 § 17-11-4(c)(2). The Prefilling Restriction provides no express exception. SB 1 § 17-11-4(b)(2). The Payment and Gift Provisions only provide an exception where Ala. Code § 17-11-3(f), which relates to states of emergency, applies. Finally, SB 1 specifically exempts "[v]oters voting by absentee ballot through the Uniformed and Overseas Citizens Absentee Voting Act," while failing to do so for voters with disabilities or their assistors.

111.  No exception in SB 1 specifies what assistance a third-party organization may provide to a voter who is disabled, blind, or illiterate. As a result, organizations like GBM, LWVAL, and ADAP—all of whom have paid staff and/or provide volunteer provisions for assistance—have no notice as to whether their

assistance of voters in these categories will result in a felony or misdemeanor conviction for themselves or their staff or volunteers.

112.   Voters who are disabled, blind, or illiterate regularly choose to receive assistance from organizations like Plaintiffs. Plaintiffs, however, will limit their assistance as a result of these vague exceptions, fearing criminal liability. Because these organizations may not provide this assistance as a result of SB 1's vague exceptions, voters in these categories will not be able to receive assistance by an individual of the voter's choice.

113.   For the voter, because the Submission and Prefilling Restrictions provide no clear exception for voters who are disabled, blind, low or illiterate, such voters may face criminal liability for submitting a prefilled application or asking someone to submit their application on their behalf. A blind voter may not submit a prefilled application. A voter who cannot walk may not ask a friend to place their application in the mailbox.

114.   SB 1's vague exceptions for people in these categories does not suffice to protect those voters from criminal penalties, nor the organizations or individuals who assist them.

### E. SB 1 Prevents a Federally Mandated Organization from Carrying Out Its Duties.

115.    Plaintiff ADAP receives a federal grant under the Payments for Protection and Advocacy Programs ("PAVA") provisions of the Help America Vote

Act. The PAVA program is a part of an integrated protection and advocacy system whose purpose is to ensure the legal and human rights of individuals across a spectrum of disabilities.

116.   In 2023, ADAP received funds pursuant to PAVA from the United States Secretary of Health and Human Services. ADAP anticipates it will receive a roughly equivalent amount of funds for the calendar year 2024.

117.   Under this grant, ADAP is required to provide voter assistance to people with disabilities. This includes assisting voters with absentee ballot applications.

118.   SB 1's restrictions on the receipt of "payment[s]" or "gift[s]" to assist voters with their absentee ballot application, as well as SB 1's ban on the submission or prefilling of absentee ballot applications, are in direct conflict with ADAP's federal mandate to provide absentee ballot application assistance.

119.   The exceptions to the Payment and Gift Provisions for people with disabilities does not sufficiently provide ADAP the reassurance that they will not be charged with a felony conviction for assisting voters because SB 1 does not make explicit any exceptions for organizations and their staff like ADAP, who are required by law to provide absentee ballot application assistance.

120.   Because of SB 1's vague provisions, ADAP fears prosecution for providing assistance required of them to carry out their PAVA grant.

## COUNTS

### COUNT ONE
**Violation of the First Amendment**
**U.S. Const. amend. I; 42 U.S.C. § 1983**
**(Free Speech)**
All Plaintiffs Against All Defendants

121.   Plaintiffs reallege and incorporate by reference the relevant allegations contained in the preceding paragraphs, as if fully set forth therein.

122.   The First Amendment to the United States Constitution prohibits the government's abridgment of freedom of speech.

123.   The First Amendment is applied to the States through the Fourteenth Amendment.

124.   Encouraging others to vote or engage in the political process is the essence of First Amendment expression. At a minimum, discussing the right to vote and urging participation in the political process is a matter of societal concern because voting brings about "political and social changes desired by the people." *Meyer v. Grant*, 486 U.S. 414, 421 (1988).

125.   Plaintiffs' absentee ballot activities are characteristically intertwined with informational and persuasive speech. Plaintiffs' absentee ballot application assistance involves providing information to voters and offering provisions to encourage and facilitate absentee voting, among other speech. SB 1 directly and

severely burdens Plaintiffs' freedom of speech, by restricting core political speech and expressive activities designed to encourage absentee voting.

126.   Likewise, Plaintiffs plan their organizational activities around absentee ballot application assistance. SB 1 restricts how Plaintiffs can use their money for political engagement and political persuasion.

127.   Like the circulation of an initiative petition for signatures, engaging and assisting voters with the absentee ballot application process is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 421-22. Whether a citizen should participate in an election and exercise their right to vote by absentee ballot is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking" sanctions or other penalties. *See id.* at 421; *see also Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 186-87 (1999) (quoting *Meyer*, 486 U.S. at 422).

128.   Additionally, the act of assisting voters with absentee ballot activities is expressive conduct. "Constitutional protection for freedom of speech does not end at the spoken or written word. The First Amendment guarantees all people the right to engage not only in pure speech, but expressive conduct as well." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (citing *Texas v. Johnson*, 491 U.S. 397, 404 (1989)); *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (internal quotation marks omitted).

129.   Plaintiffs' absentee ballot application assistance is sufficiently expressive and intended to convey the importance of voting, and the reasonable observer *understands* that Plaintiffs intend to express their pro-voting message through absentee ballot application assistance. *See Fort Lauderdale Food Not Bombs*, 901 F.3d at 1242; *Johnson*, 491 U.S. at 404.

130.   Plaintiffs promote civic participation by, among other things, educating and assisting voters with submitting absentee ballot applications as an expression of their core values that every eligible voter should be able to cast their ballot. By assisting voters with their absentee ballot applications, Plaintiffs are expressing the message that political participation is worth the effort and that voters should take advantage of the voting options available to them. The individuals they assist, likewise, understand Plaintiffs' assistance to convey the message that voting is important and that they should use the means of voting available to them. Accordingly, the act of assisting voters with absentee ballot applications is a form of expressive political speech which is entirely eliminated by the terms of SB 1.

131.   SB 1 severely restricts Plaintiffs' core political speech and expressive activities because SB 1 prohibits them from engaging in absentee ballot application assistance. Specifically, the Prefilling and Submission Restrictions ban Plaintiffs from engaging in forms of absentee ballot application assistance by threat of a misdemeanor. The Payment and Gift Provisions target the very conduct protected by

the First Amendment: employing staff or reimbursing volunteers to offer expressive provisions to voters while spreading their pro-voter message via voter participation drives and other events where they assist voters with absentee ballot applications.

132.   When a state's election law restricts core political speech and expressive conduct, that regulation is subject to strict scrutiny. *See, e.g.*, *Buckley*, 525 U.S. at 207. The only interest the State has offered is its interest in preventing "ballot harvesting." But Plaintiffs' absentee ballot *application* assistance has no bearing on the purported illegal collection or submission of absentee ballots. As such, Defendant cannot identify *any* interest in restricting Plaintiffs' core political speech or expressive activities, much less a compelling interest. Alabama law already sufficiently prohibits persons from providing false or inaccurate information in completing a person's absentee ballot application.

133.   Under the exacting scrutiny standard applied in *Meyer* and *Buckley*, or any other level of judicial scrutiny, SB 1 violates Plaintiffs' First Amendment free speech rights.

**COUNT TWO**
**Violation of the First Amendment**
**U.S. Const. amend. I; 42 U.S.C. § 1983**
**(Freedom of Association)**
All Plaintiffs Against All Defendants

134.   Plaintiffs reallege and incorporate by reference the relevant allegations contained in the preceding paragraphs, as if fully set forth therein.

135.   The First Amendment to the United States Constitution prohibits government abridgment of the freedom of association. *NAACP v. Button*, 371 U.S. 415, 430 (1963).

136.   SB 1 directly and severely burdens Plaintiffs' associational rights by restricting or preventing Plaintiffs from banding together with others to engage potential voters and assist community members to further participate in the civic community through absentee voting.

137.   Restrictions on distributing absentee ballot applications "bear[] directly on the expressive and associational aspects" at the core of get-out-the-vote work. *League of Women Voters of Tenn. v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019). This is because "[a]n organization's attempt to broaden the base of public participation in and support for its activities is conduct undeniably central to the exercise of the right of association." *VoteAmerica v. Schwab*, 576 F. Supp. 3d 862, 875 (D. Kan. 2021).

138.   SB 1 restricts Plaintiffs' chosen mode of associating with voters for the purpose of promoting the importance of voting: absentee ballot application assistance. Specifically, Plaintiffs regularly host voter participation drives where they provide assistance with applying for absentee ballot applications for eligible registered voters. Those registration drives take place at public events, college campuses, prisons, jails, nursing homes, and other locations. Plaintiffs specifically aim to meet voters where they are, in order to provide assistance and effectively spread their message that all eligible voters should exercise their right to vote. Absentee ballot application assistance, then, is intertwined with Plaintiffs' associational activities.

139.   All of SB 1's provisions restrict Plaintiffs' associational rights because the provisions chill Plaintiffs' association with voters whom they seek to assist, as well as Plaintiffs' association with each other and other civic engagement groups. The Prefilling and Submission Restrictions prohibit an entire form of ballot application assistance. The Payment and Gift Provisions can be understood as prohibiting every form of absentee ballot application assistance if accompanied by any renumeration. The Payment and Gift Provisions target the very conduct protected by the First Amendment: employing staff or reimbursing volunteers associating with voters in the course of spreading their pro-voter message via voter

education and assistance drives and other events where they assist voters with absentee ballot applications.

140.   Restrictions on associational rights are subject to strict scrutiny. *Button*, 371 U.S. at 438. SB 1 is not narrowly tailored to serve any compelling state interest. Indeed, the only interest the State has offered is its interest in preventing "ballot harvesting." But Plaintiffs' absentee ballot *application* assistance has no bearing on the purported illegal collection or submission of absentee ballots. As such, these restrictions serve little purpose other than to hinder civic organizations from associating with voters concerning absentee ballot applications and other engagement in the political process.

141.   For the same reasons, these requirements which impinge on Plaintiffs' associational rights are also not rationally related to any legitimate government interests.

142.   Under any level of judicial scrutiny, SB 1 fails.

**<u>COUNT THREE</u>**
**Violation of the First and Fourteenth Amendments**
**U.S. Const. amend. XIV; 42 U.S.C. § 1983**
**(Void for Vagueness, Denial of Due Process)**
All Plaintiffs Against All Defendants

143.   Plaintiffs reallege and incorporate by reference the relevant allegations contained in the preceding paragraphs, as if fully set forth therein.

144.   The First Amendment to the United States Constitution prohibits the government's abridgment of freedom of speech due to the enactment of unconstitutionally vague restrictions. *See Board of Airport Comm'rs of City of L.A. v. Jews for Jesus, Inc*., 482 U.S. 569, 576 (1987).

145.   Additionally, the Due Process Clause of the Fourteenth Amendment prohibits punitive sanctions for activities that are "so vague that [they] fail[] to give ordinary people fair notice of the conduct [they] punish, or so standardless that [they] invite arbitrary enforcement." *See Johnson v. United States*, 576 U.S. 591, 595 (2015). When penalties affect political expression, the "standards of permissible statutory vagueness are strict." *Button*, 371 U.S. at 432.

146.   The Payment and Gift Provisions are unconstitutionally vague laws because they regulate a sweeping amount of noncommercial political speech and constitutionally protected expressive conduct.

147.   Because the Payment or Gift Provisions do not define "payment," "gift," or "third party," these provisions impede all of Plaintiffs' absentee ballot application activities in Alabama, who employ paid staff and volunteers to assist voters with absentee ballot applications. These provisions could also be interpreted to include the most commonplace activities such as providing gas money or stamps to submit an absentee ballot application. They could be interpreted to prevent paid

jail and prison-staff from assisting voters who are eligible and incarcerated, which would foreclose those voters from obtaining an absentee ballot.

148.   Due to these vague provisions, SB 1 fails to give reasonable notice of what constitutes prohibited conduct to civic organizations and persons that participate in First Amendment protected activities concerning absentee ballot applications, including Plaintiffs. SB 1's vague provisions leave Plaintiffs subject to capricious and arbitrary enforcement of its prohibitions.

149.   The State has no compelling interest or even rational basis for prohibiting conduct on such confusing and misleading terms, which prohibits Plaintiffs' ability to speak.

150.   SB 1 is therefore unconstitutionally vague and violates the First and Fourteenth Amendments.

**COUNT FOUR**
**Violation of the First Amendment**
**U.S. Const. amend. I; 42 U.S.C. § 1983**
**(Overbreadth)**
All Plaintiffs Against All Defendants

151.   Plaintiffs reallege and incorporate by reference the relevant allegations contained in the preceding paragraphs as if fully set forth herein.

152.   The First Amendment to the United States Constitution prohibits government abridgment of the freedom of speech through the enactment of substantially overbroad laws. *See FF Cosmetics FL, Inc. v. City of Miami Beach*, 866

F.3d 1290, 1304 (11th Cir. 2017) (citing *Board of Airport Comm'rs of City of L.A.*, 482 U.S. at 574-75).

153.   SB 1 is unconstitutionally overbroad because it regulates a sweeping amount of noncommercial political speech and constitutionally protected expressive conduct. The Payment and Gift Provisions, in particular, lack any reasonable bounds for the conduct they regulate. Under the Payment and Gift Provisions, any individual or organization simply providing a "stamp [or] sticker" to their neighbor or community member in exchange for assisting voters with the absentee voting process, or for simply distributing an application to a voter, could be charged with a felony conviction. Plaintiffs could be charged for simply associating with their members and constituencies for the purpose of informing them about voting absentee.

154.   Likewise, the Submission and Prefilling Restrictions go beyond a reasonable limit. Under these restrictions, any individual may be charged with a misdemeanor for simply placing another person's application in the mailbox, or writing down the name of an individual before the individual finishes filling out the rest of the application. Plaintiffs are severely chilled from assisting voters who have limited English proficiency or simply cannot read because of the limitless applications of the Submission and Prefilling Restrictions. Indeed, SB 1 even subjects people to potential prosecution for sending or completing a personalized

ballot application at the specific request of a voter. It appears to apply where the absentee ballot application is solicited by the voter, the voter provides Plaintiffs with the required information in order for Plaintiffs to write it on the application form, and that information is accurate. The provision also applies even where paid county or state employees, including prison officials or election workers—help voters with prefilling or completing applications.

155.   The threat of penalties for violations of SB 1's ambiguous and overbroad provisions will impermissibly chill or present the substantial risk of chilling Plaintiffs' protected speech and expressive conduct.

156.   SB 1 is not narrowly tailored because the overbreadth of its terms sweeps in a wide variety of conduct which is not related to any governmental interest. Specifically, SB 1 is purported to prevent absentee ballot fraud, but sweeps in conduct where individuals are lawfully—and indeed, required—to assist voters with absentee ballot applications.

157.   SB 1's language is full of uncertainties and risk a degree of capricious enforcement that will make Plaintiffs' compliance potentially impossible and are therefore unconstitutional infringements on Plaintiffs' protected speech that do not survive First Amendment scrutiny.

**COUNT FIVE**
**Violation of Section 208 of the Voting Rights Act of 1965,**
**52 U.S.C. § 10508; 42 U.S.C. § 1983**
**(Section 208)**
All Plaintiffs Against All Defendants

158.   Plaintiffs reallege and incorporate by reference the relevant allegations contained in the preceding paragraphs, as if fully set forth herein.

159.   Section 208 of the VRA provides: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write" in English "may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.

160.   Section 208, including as enforceable directly and pursuant to 42 U.S.C. § 1983, establishes the right of a voter with a disability or a voter with limited English proficiency or limited literacy to an assistor of their choice. Congress enacted Section 208 specifically for these "groups of citizens [who] are unable to exercise their rights to vote without obtaining assistance in voting" to "limit the risks of discrimination against voters in these specified groups and avoid denial or infringement on their right to vote." S. Rep. No. 97-417, 62 (1982). Section 208's protections extend to the absentee application process. *See* 52 U.S.C. § 10310(c)(1) (defining "vote" and "voting" under the VRA as encompassing "all action necessary to make a vote effective . . . , including, but not limited to, . . . action required by law

prerequisite to voting, casting a ballot, and having such ballot counted properly. . .

."); *see also OCA-Greater Houston v. Texas*, 867 F.3d 604, 607 (5th Cir. 2017)

(explaining that Section 208 "plainly contemplates more than the mechanical act of

filling out the ballot sheet" and "includes steps in the voting process before entering

the ballot box" (discussing 52 U.S.C. § 10310(c)(1)).

161.   Congress enacted Section 208 to reinforce and bolster the VRA's

nationwide literacy test ban. *See* S. Rep. No. 97-417 at 63. As the Senate Report

explains, "a denial of assistance to illiterate voters in any jurisdiction is now in

conflict with the Voting Rights Act"; thus, Section 208 serves to "implement an

existing right [under the VRA] by prescribing minimal requirements as to the

manner in which voters may choose to receive assistance." *Id*.

162.   Although SB 1 § 17-11-4(d) repeats the text of Section 208, it does not

obviate the unlawful restrictions placed by SB 1 on the right of disabled, blind, and

illiterate voters to receive voting assistance from an assistor of their choice under

Section 208.

163.   *First*, SB 1 does not state that engaging in conduct pursuant to SB 1

§ 17-11-4(d) removes liability under any of the Challenged Provisions. Thus, for

assistors acting pursuant to Section 208, SB 1 leaves open the possibility that voter-

assistance conduct deemed to run afoul of the Prefiling or Submission Restrictions

or Payment or Gift Provisions could still be prosecuted. The Prefiling Restriction

provides no express exception at all. Likewise, for disabled, blind, and illiterate voters entitled to assistance under Section 208, it leaves open the possibility that giving a thing of value to their helper (*e.g.*, gas money or a token of appreciation) could run afoul of the Payment or Gift Provisions and likewise subject them to criminal prosecution.

164.    *Second*, SB 1 does not include any citation to Section 208 and therefore does not expressly incorporate its protections and the broad definitions of "vote" and "voting" which extend to assistance with the completing absentee application ballots, as well as submitting absentee application forms and absentee ballots.

165.    *Third*, SB 1 unduly and impermissibly burdens the rights of blind, disabled, and illiterate people to vote. As alleged *supra* ¶¶ 90-101, substantial numbers of Alabama voters are disabled, blind, or illiterate. Given the many steps involved in applying to vote absentee in Alabama and the challenges for such voters in completing these steps, *see, e.g.*, *supra* ¶¶ 48, 95, 100-01, many of these voters are "unable to exercise their rights to vote without obtaining [the] assistance in voting" that is now criminalized under SB 1. Further, to the extent SB 1 prevents voters who are illiterate or semi-literate from receiving the assistance necessary to vote, SB 1 is *per se* a prohibited literacy test under the VRA. *See* 52 U.S.C. §§ 10302(b), 10501; *see also United States v. Louisiana*, 265 F. Supp. 703, 708 (E.D. La. 1966) (three-judge court), *aff'd mem.*, 386 U.S. 270 (1967).

166.    Accordingly, SB 1 impermissibly violates Section 208 because it infringes on the right of blind, disabled, and illiterate voters to voting assistance from an assistor of their choice. Further, because of its restrictions on assistance for blind, disabled, and illiterate voters, SB 1 would criminalize conduct expressly protected and authorized under the VRA. SB 1 thus creates an impermissible barrier to accomplishing the full purposes and goals of Congress under the statute. *See Hines v. Davidowitz*, 312 U.S. 52, 66-67 (1941). Accordingly, SB 1 is federally preempted by 52 U.S.C. § 10508 under the Supremacy Clause of the United States Constitution. U.S. Const. art. VI, cl. 2.

## COUNT SIX
**Violation of the Supremacy Clause and the Help America Vote Act of 2002**
**U.S. Const. art. VI, cl. 2; 52 U.S.C. § 20901, *et seq.***
**(HAVA Preemption)**
Plaintiff ADAP Against All Defendants

167.    Plaintiff ADAP realleges and incorporates by reference the relevant allegations contained in the preceding paragraphs, as if fully set forth herein.

168.    ADAP is the duly authorized Protection and Advocacy Program of the State of Alabama. *See Dunn v. Dunn*, 219 F. Supp. 3d 1163 (M.D. Ala. 2016). In this capacity, ADAP receives certain funds from the United States Government as part of the Help America Vote Act of 2002 ("HAVA"). 42 U.S.C. § 15301, *et seq.* Specifically, ADAP receives federal funds under 52 U.S.C. § 21061, Payments for protection and advocacy systems ("PAVA").

169.    Under 52 U.S.C. § 21061(a), the protection and advocacy program who is the recipient of the money must use the sums to "ensure full participation in the electoral process for individuals with disabilities, including registering to vote, casting a vote and accessing polling locations." All of the absentee assistance prohibited by SB 1 falls into one of these enumerated protected categories.

170.    Because of its restrictions on the receipt of "payment[s]" or "gift[s]" to conduct voter assistance work, SB 1 could criminalize conduct expressly protected and authorized under federal law as applied to ADAP. SB 1 thus makes it impossible for ADAP to exercise its duties under 52 U.S.C. § 21061 without risk of criminal prosecution, *see Florida Lime & Avocado Growers Inc. v. Paul*, 373 U.S. 133 (1963), and/or creates an impermissible barrier to accomplishing the full purposes and goals of Congress under the statute, *see Hines*, 312 U.S. at 66-67.

171.    As a court of equity, this Court has the inherent power to review and enjoin violations of federal law by state officials.

172.    It is well established that "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). Congress has not evinced any "intent to foreclose" equitable relief under the PAVA provisions of HAVA.

173.   Accordingly, enforcement of SB 1 as applied to ADAP is federally preempted by 52 U.S.C. § 21061 under the Supremacy Clause of the United States Constitution and ADAP is entitled to injunctive relief barring enforcement of SB 1 against it. U.S. Const. art. VI, cl. 2.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare that the Challenged Provisions of SB 1 violate the First and Fourteenth Amendments of the United States Constitution, Section 208 of the VRA, and the Supremacy Clause of the United States Constitution and Help America Vote Act;

B. Preliminarily and permanently enjoin Defendants, along with their respective agents, officers, employees, and successors, from enforcing the Challenged Provisions of SB 1;

C. Award Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to the VRA, 52 U.S.C. § 10310(e), and the Civil Rights Attorneys Fees Awards Act of 1976, 42 U.S.C. § 1988;

D. Retain jurisdiction to ensure ongoing compliance with the foregoing orders; and

E. Grant such other equitable and further relief that this Court deems just and proper.

DATED: April 4, 2024

Respectfully submitted,

/s/ Alison Mollman
Alison Mollman
Laurel Hattix
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106
(510) 909-8908
amollman@aclualabama.org
lhattix@aclualabama.org

/s/Valencia Richardson
Valencia Richardson*
Danielle Lang*
Alice Huling*
Molly Danahy*
Ellen Boettcher*
Reginald Thedford*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
(202) 736-2200
vrichardson@campaignlegalcenter.org
dlang@campaignlegalcenter.org
ahuling@campaignlegalcenter.org
mdanahy@campaignlegalcenter.org
eboettcher@campaignlegalcenter.org
rthedford@campaignlegalcenter.org

/s/ William Van Der Pol
William Van Der Pol, Jr.
Larry G. Canada
ALABAMA DISABILITIES
ADVOCACY PROGRAM
University of Alabama
Box 870395
Tuscaloosa, AL 35487

/s/ Anuja D. Thatte
Anuja D. Thatte*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20009
(202) 249-2170
athatte@naacpldf.org

Amir Badat*
Uruj Sheikh*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
abadat@naacpldf.org
usheikh@naacpldf.org

/s/ Jess Unger
Bradley E. Heard*
Sabrina Khan*
Jess Unger*
Ahmed Soussi*
SOUTHERN POVERTY LAW
CENTER
150 E. Ponce de Leon Avenue,
Suite 340
Decatur, GA 30030
(470) 521-6700
bradley.heard@splcenter.org
sabrina.khan@splcenter.org
jess.unger@splcenter.org
ahmed.soussi@splcenter.org

(205) 348-4928
wvanderpoljr@adap.ua.edu
lcanada@adap.ua.edu

*Motions for admission or pro hac vice participation forthcoming.*