FILED
2024 Jun-10  PM 03:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| ALABAMA STATE CONFERENCE OF THE NAACP, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> STEVE MARSHALL, in his official capacity as Alabama Attorney General, *et al.*, <br><br> *Defendants*. | Civil Action No. 24 Civ. 420 (RDP) |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 1

LEGAL STANDARD ......................................................................................................... 6

ARGUMENT ...................................................................................................................... 6

I.  Plaintiffs' Complaint is Not a Shotgun Pleading. ..................................................... 6

II.  Secretary of State Allen is a Proper Defendant. ...................................................... 9

III. Plaintiffs Have Sufficiently Stated Their Claims Under the First Amendment for Violations of the Freedom of Speech and Association (Counts 1 and 2). ............................................... 10

    A.  SB 1 Restricts Core Political Speech. ........................................................... 11

    B.  Absentee Ballot Application Assistance is Expressive Conduct. .................... 15

    C.  The Challenged Restrictions Severely Burden Associational Rights. ............ 20

    D.  SB 1 Fails Any Standard of First Amendment Scrutiny. ............................... 22

IV. Plaintiffs Have Sufficiently Stated Their First Amendment Void-for-Vagueness Claim (Count 3). ..................................................................................... 27

    A.  SB 1's Terms Fail to Provide Ordinary People with Notice of What Conduct is Prohibited. ........................................................................... 27

    B.  Defendants' Own Arguments Demonstrate That SB 1 Will Subject Plaintiffs' and Others to Arbitrary Enforcement. ........................................ 32

V.  Plaintiffs Have Sufficiently Stated Their Claim Under the First Amendment for Overbreadth (Count 4). ..................................................................... 33

VI. Plaintiffs Have Sufficiently Stated Their Claim Under Section 208 of the VRA (Count 5). .................................................................................... 36

    A.  SB 1 Infringes on Federally Protected Assistance to Disabled, Blind, and Low Literacy Voters Because It Narrows the Universe of Assistors. ..................... 36

    B.  The Text and Legislative History of Section 208 Do Not Permit Defendants to Exclude Additional Assistors. ........................................................ 38

VII. Plaintiffs Have Sufficiently Stated Their Claim Under HAVA (Count 6)............................ 41

CONCLUSION ................................................................................................................. 44

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Alabama Disabilities Advocacy Program v. SafetyNet Youthcare, Inc.*,
    65 F. Supp. 3d 1312 (S.D. Ala. 2014) ...........................................................................42

*American Booksellers v. Webb*, 919 F.2d 1493 (11th Cir. 1990)........................................33

*Arkansas United v. Thurston*, 626 F. Supp. 3d 1064 (W.D. Ark. 2022)............................37

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015).....................................43

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................................6, 7

*Bellitto v. Snipes,* 935 F.3d 1192 (11th Cir. 2019) .............................................................41

*Bickley v. Caremark RX, Inc.*, 461 F.3d 1325 (11th Cir. 2006)...........................................6

*Board of Airport Commissioners of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987) .........35

*Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999)........................22, 23

*Burns v. Town of Palm Beach*, 999 F.3d 1317 (11th Cir. 2021) ...........................................16

*Commissioner of Internal Revenue v. Kelley*, 293 F.2d 904 (5th Cir. 1961).....................................40

*Crawford v. Marion County Election Board*, 553 U.S. 181 (2008) ......................................24

*DCCC v. Ziriax*, 487 F. Supp. 3d 1207 (N.D. Okla. 2020) ...............................................19

*Deeb v. Saati*, No. 17 Civ. 21204, 2017 WL 8890872 (S.D. Fla. Nov. 8, 2017) ........................6

*Disability Rights North Carolina v. North Carolina State Board of Elections*,
    602 F. Supp. 3d 872 (E.D.N.C. 2022).........................................................................40

*Disability Rights Texas v. Hollis*, No. 23-20171, 2024 WL 2836594 (5th Cir. June 5, 2024) ...........42

*Ex parte Young*, 209 U.S. 123 (1908) ...............................................................................43

*Feldman v. Arizona Secretary of State's Office*, 840 F.3d 1057 (9th Cir. 2016) ................................19

*FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290 (11th Cir. 2017) .........................33, 35

*Florida State Conference of NAACP v. Browning*, 863 F. Supp. 3d 1155 (N.D. Fla. 2008)................21

*Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266 (11th Cir. 2021) ..............................19, 22

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
    901 F.3d 1235 (11th Cir. 2018) ...................................................................15, 16, 17

*Gade v. National Solid Wastes Management Association*, 505 U.S. 88 (1992) ...........................37, 43

*Greater Birmingham Ministries v. Secretary of State for State of Alabama*,
    992 F.3d 1299 (11th Cir. 2021) ...............................................................................23

*Hillman v. Maretta*, 569 U.S. 483 (2013) .....................................................................38, 39

*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004) ..............................15, 18, 19

*Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024).....................................12

*K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988) ...............................................................27

*Knox v. Brnovich*, 907 F.3d 1167 (9th Cir. 2018) ..................................................................19

*Kusper v. Pontikes*, 414 U.S. 51 (1973) ................................................................................20

*League of Women Voters of Florida v. Browning*, 575 F. Supp. 2d 1298 (S.D. Fla. 2008) ................19

*League of Women Voters v. Hargett*, 400 F. Supp. 3d 706 (M.D. Tenn. 2019) .......................13, 16, 19

*Lee v. Weisman*, 505 U.S. 577 (1992) ....................................................................................39

*Lewis v. Governor of Alabama*, 944 F.3d 1287 (11th Cir. 2019) ...........................................10

*Lichtenstein v. Hargett*, 83 F.4th 575 (6th Cir. 2023)........................................................13, 14

*Meyer v. Grant*, 486 U.S. 414 (1988) .........................................................................11, 15, 23

*Montanile v. Board of Trustees of National Elevator Industry Health Benefit Plan*, 577 U.S. 136 (2016)...............................................................................................................29

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) .............................................20, 23

*NAACP v. Button*, 371 U.S. 415 (1963) ...........................................................................21, 26

*National Federation of the Blind of Alabama v. Allen*, 661 F. Supp. 3d 1114 (N.D. Ala. 2023) .........10

*New Georgia Project v. Raffensperger*, 484 F. Supp. 3d 1265 (N.D. Ga. 2020) ......................19

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) .............................................38

*PBT Real Estate, LLC v. Town of Palm Beach*, 988 F.3d 1274 (11th Cir. 2021) .................................6

*People First of Alabama v. Merrill*, 467 F. Supp. 3d 1179 (N.D. Ala. 2020) .......................9

*Priorities USA v. Nessel*, 628 F. Supp. 3d 716 (E.D. Mich. 2022)..........................................40

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ....................................................................22

*Reed v. Town of Gilbert,* 576 U.S. 155 (2015) ......................................................................22

*Return Mail, Inc. v. U.S. Postal Service*, 587 U.S. 618 (2019).............................................40

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984).......................................................................20

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) ...........................16

*SE Property Holdings, LLC v. Welch*, 65 F.4th 1335 (11th Cir. 2023)....................................38

*Stalley ex rel. U.S. v. Orlando Regional Healthcare System, Inc.*, 524 F.3d 1229 (11th Cir. 2008) ......6

*Taylor v. Palmer*, No. 21-14070, 2023 WL 4399992 (11th Cir. July 7, 2023)....................................22

*Texas v. Johnson*, 491 U.S. 397 (1989) .................................................................................15

*Transamerica Insurance Company v. South*, 89 F.3d 475 (7th Cir. 1996)............................39

*United States v. Alabama*, 778 F.3d 926 (11th Cir. 2015).....................................................39

*United States v. Brockamp*, 519 U.S. 347 (1997)..................................................................38

*United States v. Franklin*, 435 F.3d 885 (8th Cir. 2006) ......................................................39

*United States v. Hendrickson*, 949 F.3d 95 (3d Cir. 2020) ...................................................40

*United States v. Stevens*, 559 U.S. 460 (2010) .............................................................30, 33

*Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980) ....................11

*VoteAmerica v. Raffensperger*, No. 21 Civ. 1390, 2023 WL 6296928
    (N.D. Ga. Sept. 27, 2023) .................................................................................13, 17

*VoteAmerica v. Schwab*, 576 F. Supp. 3d 862 (D. Kan. 2021) ...........................................20

*VoteAmerica v. Schwab*, 671 F. Supp. 3d 1230 (D. Kan. 2023) ..........................................13

*Voting for America, Inc. v. Andrade*, 488 Fed. App'x 890 (5th Cir. 2012) ...........................19

*Voting for America, Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) ............................13, 18, 19

*Weaver v. Bonner*, 309 F.3d 1312 (11th Cir. 2002) .....................................................22

*Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015) .....................7, 8

*Wilder v. State*, 401 So. 2d 151 (Ala. Crim. App. 1981) ................................................25

*Wollschlaeger v. Governor, Florida*, 848 F.3d 1293 (11th Cir. 2017) .........................27, 28, 30

*Zeller v. Florida Bar*, 909 F. Supp. 1518 (N.D. Fla. 1995) .............................................24

**Statutes, Codes, and Other Authorities**

52 U.S.C. § 10310(c)(1) .................................................................................36, 37

52 U.S.C. § 10508 ...........................................................................................36

52 U.S.C. § 21061 ...........................................................................................44

52 U.S.C.A. § 15043(a) .....................................................................................42

52 U.S.C.A. § 21061(a) .....................................................................................42

52 U.S.C.A. § 21111 ........................................................................................43

52 U.S.C.A. § 21112 ........................................................................................43

Ala Code. § 17-11-4 (c)(1) ..................................................................................9

Ala. Code § 17-11-4(a) ......................................................................................9

Ala. Code § 17-11-4 ..........................................................................................9

Ala. Code § 17-11-4(b)(2) ...................................................................................5

Ala. Code § 17-11-4(d) .....................................................................................37

Ala. Code § 17-11-4(d)(1)–(d)(2) ........................................................................4, 5

Ala. Code § 17-11-4(d)(2) ..................................................................................44

Ala. Code § 17-11-4(e) .....................................................................................37

Ala. Code § 17-1-3(a) ........................................................................................9

Ala. Code § 17-17-26 .......................................................................................29

Ala. Code § 17-17-39 .......................................................................................29

Ala. Code § 17-11-4(c)(1) ...................................................................................5

Ala. Code § 17-11-4(c)(2) ............................................................................................5

Ala. Code § 17-11-4(d)(1) ..........................................................................................30

Ala. Code § 17-17-24 ..................................................................................................29

Capitol Journal, Interview with Secretary Allen (June 7, 2024), https://video.aptv.org/video/june-7-2024-iwjiz1/. ..............................................................................................................9

Fed. R. Civ. P. 10(b) ....................................................................................................7

Fed. R. Civ. P. 10(c) ....................................................................................................7

Mike Cason, *Secretary of State Wes Allen Says Alabama's New Absentee Voting Law in Effect for November Election*, AL.COM (Mar. 23, 2024), https://www.al.com/news/2024/03/secretary-of-state-wes-allen-says-alabamas-new-absentee-voting-law-in-effect-for-november-election.html?outputType=amp. ....................................................................................9

S. Rep. No. 103-120 (1994), *reprinted in* 1994 U.S.C.C.A.N. 164 .....................................42

S. Rep. No. 97-417 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177 ................................36, 39

## INTRODUCTION

Plaintiffs [1] respectfully submit this Response in Opposition to Defendants' Motion to Dismiss (Doc. 42). Plaintiffs' Complaint seeks redress from certain provisions of Alabama SB 1, a sweeping statute which criminalizes constitutionally protected speech and expressive conduct and disenfranchises disabled voters, senior citizen voters, voters of color, eligible incarcerated voters, and many other Alabamians who depend on assistance to vote. Plaintiffs' well-pleaded claims arise under the First and Fourteenth Amendments, Section 208 of the Voting Rights Act of 1965 ("VRA"), and the Help America Vote Act ("HAVA"). Defendants' voluminous efforts to manufacture any cognizable deficiencies in Plaintiffs' claims fall short. Accordingly, as set forth below, Defendants' Motion to Dismiss must be denied.

## FACTUAL BACKGROUND

### Passage and Impact of SB 1

Absentee ballot application assistance has long been a critical method of communicating the message of the importance of voting in Alabama. Doc. 1 ¶ 4. Plaintiffs are nonpartisan, nonprofit civil rights and civic organizations who engage in absentee ballot application assistance to express the clear message that voting is important, and that all eligible voters should participate in the political process. *Id.* ¶ 5.

SB 1 was passed despite vocal opposition from Plaintiffs and other members of the public, who feared that SB 1 would cut off necessary voter assistance and suppress absentee ballot application assistance speech and expression. *Id.* ¶¶ 54–60. There are numerous steps in the process

---

[1] Plaintiffs are the Alabama State Conference of the NAACP ("Alabama NAACP"), League of Women Voters of Alabama and League of Women Voters of Alabama Education Fund (collectively, "LWVAL"), Greater Birmingham Ministries ("GBM"), and Alabama Disabilities Advocacy Program ("ADAP").

for applying to vote absentee in Alabama which generally require, *inter alia*, internet access and ability, a printer, mailing supplies, and the ability to read English, complete, and physically submit the required paperwork. *Id.* ¶ 88. Given these numerous steps, many voters require assistance with the absentee application process. *Id.* ¶ 89. This includes significant numbers of blind, disabled, illiterate or low literacy, senior citizen, limited mobility, and incarcerated voters. *Id.*

The proponents of SB 1 characterized the law as targeting purported "ballot harvesting" by "groups or individuals seek[ing] to profit off the absentee voting process." *Id.* ¶ 52. Yet there is no evidence of this occurring, or indeed any widespread voter fraud attributable to absentee ballot application assistance. *Id.* ¶ 53. Since SB 1's passage, Plaintiffs have been chilled in their absentee ballot application assistance due to the tremendous fear and confusion engendered by the law. *Id.* ¶¶ 15, 21, 26, 31.

**Plaintiffs**

**Alabama NAACP.** Plaintiff Alabama NAACP is the state conference of the National Association for the Advancement of Colored People, Inc. *Id.* ¶ 12. Alabama NAACP has thousands of members in branches across the state, most of whom are Black registered voters. *Id.* Among other things, Alabama NAACP hosts or participates in voter outreach and education events on college campuses where they educate, encourage, and have assisted voters with filling out absentee voting applications and provided food and branded materials to assistors and other attendees. *Id.* ¶ 14. Alabama NAACP's voter education and outreach includes assistance for senior citizens, disabled, and eligible incarcerated voters. *Id.* As part of their encouragement of absentee voting, Alabama NAACP has provided envelopes and postage for submitting the applications. *Id.* Alabama NAACP considers its civic engagement and voter education activities to be a core part

of its organizational goals of encouraging everyone, and especially people of color, to vote and participate in the democratic process. *Id.*

**LWVAL.** Plaintiff LWVAL is comprised of grassroots organizations that seek to encourage informed and active participation in government, work to increase understanding of major public policy issues, and influence public policy through education and advocacy. *Id.* ¶ 17. LWVAL's voter services education and direct services events are a means to associate with its members and the larger community, often recruiting members in the process. *Id.* ¶ 18. LWVAL members and volunteers have encouraged and assisted senior citizens, college students, voters with disabilities, residents in assisted living and nursing home facilities, and rural voters in applying for and voting by absentee ballot. *Id.* ¶ 19. Among other assistance, LWVAL members and volunteers have encouraged absentee voting by printing absentee ballot applications for voters and providing detailed instructions on how to fill out the applications. *Id.* LWVAL members and volunteers also have provided envelopes and postage to submit the applications, make photocopies of the voters' photo IDs, and spend time with the voters to ensure any errors are corrected. *Id.* LWVAL members and volunteers do this work as a part of its mission to protect the right to vote for Alabama voters, and LWVAL considers absentee ballot application assistance to be an expression of those core values to the public. *Id.*

**GBM.** Plaintiff GBM was founded in 1969 in response to the challenges posed by the mid-twentieth century Civil Rights movement and its transformative impact in Birmingham, Alabama, and across the United States. *Id.* ¶ 23. GBM, through paid staff and volunteers, has encouraged absentee voting by printing absentee ballot applications for voters, providing pens, envelopes, and postage, and spending time reviewing the applications to ensure all required boxes are marked correctly and completely. *Id.* ¶ 25. GBM hands out snacks, branded pens, and sometimes t-shirts.

*Id.* GBM provides its volunteers with pens, paper, t-shirts, gas stipends, and food at civic education drives hosted at public events and inside Alabama's jails and prisons. *Id.* GBM does this work as a part of its larger organizational mission to promote civil rights in Alabama and considers absentee ballot application assistance to be a public expression of GBM's core value that voting is important to advancing civil rights. *Id.*

**ADAP.** Plaintiff ADAP is the duly authorized Protection and Advocacy Program ("P&A") of the State of Alabama. *Id.* ¶ 28. As such, ADAP provides legal services to Alabama residents with disabilities to promote their rights. All Alabama voters with disabilities are constituents of ADAP. *Id.* As a P&A, ADAP is accountable to members of the disability community and is authorized under federal law to represent the interests of Alabamians with disabilities. *Id.* ADAP has a paid staff member whose primary responsibility is to undertake voter education and promote voting rights for people with disabilities, including by assisting them with applying for absentee ballots. *Id.* ¶ 30. As part of their duties, that paid staff member visits disabled and blind individuals, including in nursing homes and state mental health facilities, educates them about voting and laws relating to the rights of disabled voters, and assists them with the registration and voting process. *Id.* This voter assistance includes helping voters apply for absentee ballots by navigating the Secretary of State's website, printing out the application, and filling it out with them. *Id.* ADAP's voter assistance activities are integral to its mission of serving disabled Alabamians. *Id.*

## Challenged Provisions

**Payment Provisions:** SB 1 makes it "unlawful for a third party to knowingly receive a payment," or "knowingly pay . . . a third party," to "distribute, order, request, collect, prefill, complete, obtain, or deliver a voter's absentee ballot application." Ala. Code § 17-11-4(d)(1)–

(d)(2); Doc. 1 ¶ 65. These provisions carry a Class B or C felony penalty (Class C for assistors who "receive a payment" and Class B for those who "pay" such assistor). *Id.*

**Gift Provisions:** SB 1 makes it "unlawful for a third party to knowingly receive . . . a gift," or "knowingly . . . provide a gift," to a "third party" to "distribute, order, request, collect, prefill, complete, obtain, or deliver a voter's absentee ballot application." Ala. Code § 17-11-4(d)(1)–(d)(2); Doc. 1 ¶ 66. These provisions carry a Class B or C felony penalty (Class C for assistors who "receive a . . . gift" and Class B for those who "provide a gift" to such assistor). *Id.*

**Prefilling Restriction:** SB 1 makes it "unlawful for any person to knowingly distribute an absentee ballot application to a voter that is prefilled with the voter's name or any other information required on the application form." Ala. Code § 17-11-4(b)(2). This provision carries a Class A misdemeanor penalty.  SB 1 § 2; Doc. 1 ¶ 63.

**Submission Restriction:** SB 1 makes it "unlawful for an individual to submit a completed absentee ballot application to the absentee election manager other than his or her own application," unless that person is seeking emergency medical treatment within five days before an election. Ala. Code § 17-11-4(c)(2); Doc. 1 ¶ 64. The application "may be submitted" by personally dropping off one's own application with the Absentee Election Manager or sending one's own application via the mail/commercial carrier. Ala. Code § 17-11-4(c)(1). This provision carries a Class A misdemeanor penalty. SB 1 § 2; Doc. 1 ¶ 64.

Class B or C felonies carry sentences between 366 days to 20 years, and fines up to $30,000. Doc. 1 ¶ 67. Class A misdemeanor liability carries a jail sentence of up to one year and a fine of up to $6,000. *Id.*

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a complaint is sufficiently pleaded where it includes "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable[.]" *Id.* The court must take the alleged facts and "draw all reasonable inferences in the plaintiff's favor." *PBT Real Estate, LLC v. Town of Palm Beach*, 988 F.3d 1274, 1286 (11th Cir. 2021). When considering a motion under Rule 12(b)(6), "[a] court is generally limited to reviewing what is within the four corners of the complaint." *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006). Conclusory arguments that ignore the allegations in the complaint do not support dismissal. *See Deeb v. Saati*, No. 17 Civ. 21204, 2017 WL 8890872, at *1 (S.D. Fla. Nov. 8, 2017).

A motion to dismiss for lack of standing under Rule 12(b)(1) can be either a facial or factual challenge. *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008). When a standing challenge is facial (*i.e.*, not based on any evidence extrinsic to the complaint), "the plaintiff has safeguards similar to those retained [on] a Rule 12(b)(6) motion" and "the court must consider the allegations in the plaintiff's complaint as true." *Id.* (internal quotation marks and citations omitted).

## ARGUMENT

### I.   Plaintiffs' Complaint is Not a Shotgun Pleading.

Defendants first attempt to discredit Plaintiffs' Complaint as a "shotgun pleading." Doc. 42 at 9–13. But tellingly, Defendants do not claim any lack of understanding of Plaintiffs' claims. Nor could they. Plaintiffs' Complaint amply satisfies the pleading requirements of Rules 8(a)(2)

and 10(b). Rule 8(a)(2) "call[s] for sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Likewise, Rule 10(b) requires a party to "state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b).

The purpose of these Rules is to ensure "that [plaintiff's] adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). Plaintiffs more than satisfy that standard here. Plaintiffs' Complaint is expressly designed to give Defendants notice as to each claim and allegations supporting each, including (i) a factual background section dedicated to each type of claim, Doc. 1 ¶¶ 67–86, 106–120; and (ii) a specific section setting out the legal basis for each claim based on the alleged facts, *id.* ¶¶ 121–173.

Defendants' shotgun pleading arguments are baseless. *First*, despite apparently understanding Plaintiffs' claims (as evidenced by their lengthy Motion to Dismiss), Defendants nonetheless complain because "in each separate count," Plaintiffs "reallege and incorporate by reference the relevant allegations contained in the preceding paragraphs, as if fully set forth herein." Doc. 42 at 10. But Rule 10(c) explicitly allows a "statement in a pleading [to] be adopted by reference elsewhere in the same pleading." Fed. R. Civ. P. 10(c). And while the Eleventh Circuit has cautioned against "the incorporation of preceding paragraphs" in a complaint where doing so might lead "to a situation where most of the counts . . . contain irrelevant factual allegations and legal conclusions," dismissal is appropriate only "where it is virtually impossible to know which

allegations of facts are intended to support which claim(s) for relief." *Weiland*, 792 F.3d at 1324–25 (citation omitted). As in *Weiland*, Defendants plainly have no trouble "knowing what they were alleged to have done or why they were liable for doing it." *Id.* at 1324.

*Second*, Defendants suggest that the Complaint "levels accusations of racial discrimination throughout—in varying degrees of directness—despite not raising any claim to which race is relevant." Doc. 42 at 11. As an initial matter—and setting aside the tenor of Defendants' characterization—Defendants' shotgun pleading theory necessarily fails since their own briefing demonstrates that they understand Plaintiffs' claims. *See Weiland*, 792 F.3d at 1324. In any event, the Complaint's allegations regarding the history and persistence of discrimination provide important context to Plaintiffs' expressive activities as well as the passage of and concerns caused by SB 1 and are squarely relevant to Plaintiffs' claims. *See, e.g.*, *infra* Argument III, IV.

Finally, Defendants misleadingly mention that Plaintiffs originally included Alabama's 42 district attorneys as Defendants. This again is not a valid shotgun pleading argument as it has no bearing on the current Defendants' ability to understand the claims against them. Moreover, Plaintiffs were entitled, and in fact compelled, to sue all 42 district attorneys, who are statutorily responsible for prosecuting violations of SB 1. Defendants neglect to mention that the parties then jointly moved to dismiss the district attorneys, *see* Doc. 25, requesting the Court's Order which now provides that the district attorneys "SHALL be bound by the terms of any injunctive . . . relief" in this case, Doc. 30 at 2. That the parties agreed to this order only supports the necessity of including the district attorney Defendants at the outset, especially in light of SB 1's severe penalties and chilling effect.

## II.     Secretary of State Allen is a Proper Defendant.

Defendants argue that Secretary of State Allen is not a proper Defendant because he purportedly did not cause, and cannot redress, Plaintiffs' injuries. Doc. 42 at 13–14. Defendants are wrong, and Secretary Allen is a proper Defendant in this case.

Alabama law prescribes the Secretary of State as "the chief elections official in the state" who "shall provide uniform guidance for election activities." Ala. Code § 17-1-3(a). "As such, [the Secretary of State] has the authority, and indeed the obligation, to tell election officials how to implement election laws." *People First of Ala. v. Merrill*, 467 F. Supp. 3d 1179, 1201 (N.D. Ala. 2020). Moreover, SB 1 specifies that Secretary Allen is responsible for prescribing the absentee application form and making rules about how absentee applications are submitted. Ala Code. §§ 17-11-4(a), (c)(1).

With respect to traceability, Plaintiffs allege that Secretary Allen's role as chief statewide election officer with specific rulemaking duties in the absentee ballot application process, coupled with his authority and obligation to direct election officials in the implementation of election laws (including regarding absentee voting), is sufficiently traceable to SB 1 enforcement to render him subject to suit. *See* Ala. Code §§ 17-1-3(a), 17-11-4; Doc. 1 ¶ 35. Indeed, Secretary Allen already has acted upon his role in implementing SB 1, including issuing guidance to county election officials regarding its effectiveness for the November 2024 elections as well as public education statements about SB 1. Doc. 1 ¶ 61.[2] Days before this filing, Secretary Allen gave a lengthy public interview to the Capitol Journal purporting to explain SB 1.[3]

---

[2] *See* Mike Cason, *Secretary of State Wes Allen Says Alabama's New Absentee Voting Law in Effect for November Election*, AL.COM (Mar. 23, 2024), https://www.al.com/news/2024/03/secretary-of-state-wes-allen-says-alabamas-new-absentee-voting-law-in-effect-for-november-election.html?outputType=amp.
[3] *See* Capitol Journal, Interview with Secretary Allen (June 7, 2024), https://video.aptv.org/video/june-7-2024-iwjiz1/.

Defendants' reliance on *National Federation of the Blind of Alabama v. Allen* is misplaced. 661 F. Supp. 3d 1114 (N.D. Ala. 2023). There, in a challenge over the lack of an electronic voting option for voters with disabilities, the court found that the injuries were not fairly traceable to Secretary Allen because he "lacks authority to promulgate rules to provide an electronic voting option to anyone other than 'eligible overseas voters.'" *Id.* at 1121. Here, by contrast, Secretary Allen has specific authority to promulgate rules to enforce SB 1 and already has taken steps in furtherance of this authority. Doc. 1 ¶ 61; *see Lewis v. Governor of Ala.*, 944 F.3d 1287, 1310 (11th Cir. 2019) (state official is an appropriate defendant where they have "some connection with enforcement of the provision at issue").

For similar reasons, Plaintiffs' injuries would be redressed by enjoining Secretary Allen from exercising his authority over SB 1. Should Secretary Allen be enjoined, the injuries to Plaintiff would undoubtedly be lessened. Therefore, Plaintiffs sufficiently plead that Secretary Allen is a proper Defendant in this action and the claims against him should be sustained.

III. **Plaintiffs Have Sufficiently Stated Their Claims Under the First Amendment for Violations of the Freedom of Speech and Association (Counts 1 and 2).**

Plaintiffs' Complaint plausibly alleges that SB 1 unconstitutionally burdens their rights to freedom of speech and association. The First Amendment protects absentee ballot application assistance for three reasons. *First*, absentee ballot application assistance is communication about voting, and as such is core political speech. Doc. 1 ¶¶ 5, 67, 73. *Second,* absentee ballot application assistance is also expressive conduct conveying a message about the importance of voting. *Id.* ¶¶ 67, 69, 73–74. *Third*, providing this assistance is one of Plaintiffs' chosen means of associating with others in the pursuit of their shared social and political goals. *Id.* ¶¶ 67, 76–77. Because it criminalizes First Amendment protected activity, SB 1 is subject to strict scrutiny. *Id.* ¶ 132. Taking Plaintiffs' well-pleaded allegations as true, it is clear that SB 1 cannot satisfy such scrutiny,

and indeed fails under any level of First Amendment scrutiny. *Id.* Accordingly, Plaintiffs have adequately stated violations of their free speech and associational rights.

### A.  SB 1 Restricts Core Political Speech.

SB 1 restricts core political speech. Activities that "involve[] interactive communication concerning political change" are "appropriately described as 'core political speech'" and receive robust First Amendment protection. *See Meyer v. Grant*, 486 U.S. 414, 421–22 (1988); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 628–32 (1980). Plaintiffs allege that they regularly assist voters with the absentee ballot application process, including by encouraging eligible voters to apply for absentee ballots, disseminating information about the absentee voting process, and by discussing with voters how to obtain and complete their absentee ballot applications. *See, e.g.*, Doc. 1 ¶¶ 69, 76. Plaintiffs engage in this assistance in part to encourage eligible voters to participate in the absentee voting process. *See, e.g.*, *id.* ¶ 77. Taking these well-pleaded allegations as true, SB 1 burdens core political speech because it restricts interactive communication intended to encourage and facilitate participation in the absentee voting process by eligible voters. *See Meyer*, 486 U.S. at 421–22.

Defendants first assert that Plaintiffs do not properly allege that SB 1 interferes with their First Amendment rights because they are not prevented from conveying their core message. Doc. 42 at 16. But Plaintiffs specifically allege that they "communicate the importance of voting" through voter assistance drives by helping voters apply for an absentee ballot. Doc. 1 ¶¶ 69, 76. Such assistance—which includes assistance in distributing the application, helping a voter fill out the application, and helping the voter submit the application—is speech because it conveys the message that voters should participate in their democracy and take advantage of absentee voting if they are eligible. *Id.* ¶¶ 130, 138. SB 1 "apparently proscrib[es] or prohibit[s] the funding of (or even de minimis support for)" this speech by criminalizing payments or gifts to "distribute, order,

request, collect, prefill, complete, obtain, or deliver" a voters' absentee ballot application. *Id.* ¶¶ 65–66, 68. As a result, SB 1 interferes with efforts by Plaintiffs (who have paid staff and compensated volunteers) to communicate "the core message that Black voters and voters from other marginalized groups are fully entitled to participate in the political process." *Id.* ¶ 5.

Defendants muddle the speech analysis by arguing in this section that SB 1 is content neutral. Doc. 42 at 18. As this argument relates to the level of judicial scrutiny triggered by the law, it is discussed further *infra* Argument III(D). However, Plaintiffs specifically allege that SB 1 restricts their speech pertaining to voter assistance. Doc. 1 ¶¶ 68, 73–74, 130–31. The Eleventh Circuit's recent decision in *Honeyfund.com Inc. v. Governor* is further instructive. 94 F.4th 1272, 1278 (11th Cir. 2024). There, the Eleventh Circuit held that Florida's restriction on Diversity, Equity, and Inclusion ("DEI") workshops was a content-based restriction on speech because enforcing the restriction required government officials to look at the content of the curriculum to determine whether the DEI restriction had been violated. Here, Plaintiffs allege that the Challenged Provisions dictate the content of Plaintiffs' voter assistance speech by proscribing a significant topic of their pro-voting speech, *i.e.*, assisting voters with absentee voting. Doc. 1 ¶¶ 68, 77, 79, 130–31, 138–39. In fact, this is not only a content-based restriction but a viewpoint one as well: the law restricts Plaintiffs from speaking about a particular point of view: the importance of applying for an absentee ballot. *Id.*

The enforcement of SB 1 necessarily requires an examination of Plaintiffs' speech and messaging—for example, whether Plaintiffs have provided materials with their logos to volunteers for assisting voters—to determine whether Plaintiffs have violated SB 1. *Id.* ¶¶ 72, 81. And "[w]hen the conduct regulated depends on—and cannot be separated from—the ideas communicated, a law is functionally a regulation of speech." *Honeyfund.com Inc.* 94 F.4th at 1278.

Defendants also argue that SB 1 "does not indirectly target political speech." Doc. 42 at 17. But, tellingly, at no point do Defendants dispute that speaking about absentee ballot applications is core political speech. Nor could they, because communications about voting are at the zenith of core political speech. *See, e.g.*, *VoteAmerica v. Raffensperger*, No. 21 Civ. 1390, 2023 WL 6296928, at *9 (N.D. Ga. Sept. 27, 2023) ("Encouraging others to vote or engage in the political process is the essence of First Amendment expression."); *VoteAmerica v. Schwab*, 671 F. Supp. 3d 1230, 1250 (D. Kan. 2023) (recognizing that absentee ballot application assistance "constitutes 'the expression of a political view' implicating a First Amendment right."). Rather, Defendants wrongly rely on the Sixth Circuit's decision in *Lichtenstein v. Hargett*, 83 F.4th 575 (6th Cir. 2023), to argue that "SB 1 does not limit the supply of money. . . or people. . . used by Plaintiffs to create 'core political speech.'" Doc. 42 at 20. For several reasons, the *Lichtenstein* holding is inapplicable.

The *Lichtenstein* court held that Tennessee's ban on the distribution of absentee ballot applications "does not regulate something that the Plaintiffs use to speak" and therefore does not "target or burden that speech." *Lichtenstein*, 83 F.4th 575 at 586.[4] By contrast, SB 1 broadly criminalizes "distributing, ordering, requesting, collecting, completing, prefilling, obtaining, or delivering" a voter's absentee ballot application, and providing a "payment or gift" for doing so. Doc. 1 ¶ 2. Plaintiffs allege that these wide-ranging prohibitions restrict virtually all Plaintiffs' means of communicating and informing eligible voters about how to access, complete, and submit

---

[4] Plaintiffs note that they disagree with the holding in *Lichtenstein* and believe it was wrongly decided. As the dissent noted, "Plaintiffs' intended distribution activity involves the type of interactive communication concerning political change that is appropriately described as core political speech" under *Meyer*. *Lichtenstein*, 83 F.4th at 609 (White, J., dissenting) (cleaned up). Other courts have long recognized the First Amendment nature of the distribution of voter registration and absentee ballot applications. *See, e.g.*, *VoteAmerica v. Schwab*, 671 F. Supp. 3d at 1243; *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019); *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 390 (5th Cir. 2013). But even if *Lichtenstein* were correctly decided, its facts are so distinguishable as to not control in the present case.

absentee ballot applications. *Id.* ¶¶ 68, 77, 79, 130–31, 138–39. Accordingly, taking these allegations as true, SB 1 burdens Plaintiffs' political speech.

Moreover, the Payment and Gift Provisions explicitly regulate how Plaintiffs spend their money to communicate their support for voting and democratic participation by making it a Class C felony to knowingly "receive a payment" or "pay" to assist a voter with their absentee ballot application, and a Class B felony to knowingly "receive a gift" or "provide a gift" to assist a voter with their absentee ballot application. *Id.* ¶¶ 65–66. Thus, SB 1 has "the inevitable effect of reducing the total quantum" of Plaintiffs' speech by reducing the pool of speakers to only those who can do so without renumeration and "limit[ing] the direct one-on-one communication that all agree is pure political expression." *Lichtenstein*, 83 F.4th at 586 (citing *Meyer*, 486 U.S. at 423–24) (internal quotation marks omitted).

As Plaintiffs allege, SB 1's restrictions prohibit Plaintiffs from using their money to employ staff and pay for provisions such as food, pens, stamps, and stickers when assisting voters with their absentee ballot applications. Doc. 1 ¶¶ 72, 81. Contrary to Defendants' assertions, "those resources" are far from "untouched," for, as Defendants themselves acknowledge, SB 1 is *intended* to prevent Plaintiffs from using their paid staff to provide absentee ballot application assistance. Doc. 42 at 34 ("Plaintiffs' staff are admittedly paid to go into prisons to specifically provide 'absentee application assistance' to 'incarcerated voters,' and to the extent 'this work' involves doling out applications to inmates, it is prohibited."). These limitations implicate Plaintiffs' ability to receive grants and provide messaging to the public, Doc. 1 ¶¶ 26, 68, 72, 77, 79, 120, 130–31, 138–39, and are directly analogous to the restriction on paying petition circulators that was struck down in *Meyer*, where the Supreme Court recognized the severe First Amendment harm in banning the plaintiffs from paying petition circulators to help spread their message, *Meyer*, 486 U.S. at 423.

14

As Defendants note and *Lichtenstein* recognized, "[s]ome laws will trigger strict scrutiny because they burden 'actual oral or written speech by restricting conduct that helps produce it.'" Doc. 42 at 19 (citing *Lichtenstein*, 83 F.4th at 587). SB 1 is one of those laws.

In sum, Plaintiffs have sufficiently pleaded that SB 1 violates their free speech rights because SB 1 restricts Plaintiffs' chosen method of communicating the importance of voting and voting absentee.

### B.  Absentee Ballot Application Assistance is Expressive Conduct.

As Defendants recognize, constitutional protection for political expression "does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989); *see Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018). The Supreme Court and the Eleventh Circuit have held that conduct is sufficiently expressive if (i) there was an "intent to convey a particularized message," and (ii) the "surrounding circumstances" would lead a "reasonable person [to] interpret [the conduct as conveying] *some* sort of message." *Texas v. Johnson*, 491 U.S. 397, 404 (1989); *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (emphasis in original). Plaintiffs' claim satisfies both prongs of this test.

*First*, Plaintiffs' Complaint sufficiently alleges that Plaintiffs intend to convey the message that voting is important and accessible, and that every eligible voter should exercise their right to vote regardless of senior citizen status, disability, or incarceration when they engage in absentee ballot application assistance. Doc. 1 ¶¶ 5–6, 13, 19, 24–25, 29–30. Defendants do not dispute that Plaintiffs' allegations satisfy the first *Holloman* factor.

*Second*, a reasonable person would interpret absentee ballot application assistance as conveying some message. In the Eleventh Circuit, whether a reasonable person would understand conduct as conveying some message depends on several contextual factors, including (1) whether the activity accompanies speech; (2) whether the activity will be open to all; (3) whether the

activity takes place in a traditional public forum or a place "historically associated with the exercise of First Amendment rights"; (4) whether the activity addresses an issue of public concern; and (5) the history of a particular symbol or type of conduct. *See Burns v. Town of Palm Beach*, 999 F.3d 1317, 1343–44 (11th Cir. 2021); *Food Not Bombs*, 901 F.3d at 1242–43. All five factors are present in this case. Doc. 1 ¶¶ 129–30.

As to the first factor, Plaintiffs allege that their absentee ballot application assistance does not merely accompany speech, but "involves providing information to voters and offering provisions to encourage and facilitate absentee voting, among other speech." *Id.* ¶ 125. In their voter assistance activities, Plaintiffs often wear t-shirts with their logos, and provide stickers conveying the importance of voting. *Id.* But "[a]ny 'explanatory speech'—the text and logo contained on the banners—is not needed to convey that message." *Food Not Bombs*, 901 F.3d at 1244; *cf. Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.,* 547 U.S. 47, 66 (2006) ("FAIR") (finding the accompanying speech—a letter advocating against military recruitment—was required to give the conduct its expressive nature because there was no reason to infer any message from off-campus military events absent the letter). Instead, it is self-evident that "the collection and submission of the applications gathered in a voter registration drive is intertwined with speech and association" when the voter participates in one of Plaintiffs' voter assistance drives. *See Hargett*, 400 F. Supp. 3d at 720 (citing *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1334 (S.D. Fla. 2006)) (internal quotation marks omitted). Plaintiffs' absentee assistance, then, is intertwined with direct communication about the importance and accessibility of voting, such that the first *Food Not Bombs* factor is present.

As to the second and third factors, Plaintiffs engage in voter assistance and education events that are open to everyone, and which occur in both traditional public fora and places

"historically associated with the exercise of First Amendment rights," such as public parks. *Food Not Bombs*, 901 F.3d at 1242 (quoting *Carey v. Brown*, 447 U.S. 455, 460 (1980)); Doc. 1 ¶¶ 127–29. As to the fourth factor, Plaintiffs' absentee voter assistance plainly addresses a matter of public concern, which Defendants do not dispute. *See VoteAmerica*, 2023 WL 6296928, at *9 (noting that "discussing the right to vote and urging participation in the political process is a matter of societal concern"); Doc. 1 ¶ 127–29. Finally, as to the fifth factor, Plaintiffs' Complaint alleges that voter assistance is a recognizable political response to Alabama's long history of enacting voter restrictions to disenfranchise voters of color, including by specifically targeting voting assistance through criminal prosecutions and other means. *See id.* ¶¶ 36–51. The Complaint also alleges that well-known accounts of prosecutions of civil rights activists who tried to assist voters with absentee voting in the past provide additional historical context which is "instructive in determining whether the reasonable observer may infer some message when viewing" Plaintiffs' current efforts to assist voters with absentee voting. *Food Not Bombs*, 901 F.3d at 1243; Doc. 1 ¶ 42. Accordingly, Plaintiffs have pled facts plausibly demonstrating that a reasonable observer would understand absentee ballot application assistance as conveying some message.

Thus, despite Defendants' assertions regarding Plaintiffs' "accusations of racial discrimination," Plaintiffs sufficiently plead facts demonstrating how the history of targeting voter assistance activities to suppress racial equity in access to the ballot is relevant to understanding why a reasonable observer would understand some message from Plaintiffs' absentee ballot application assistance. Doc. 1 ¶¶ 36–51.

Defendants, however, argue that "nowhere do Plaintiffs allege that any *specific conduct* prohibited by SB 1 exhibits a great likelihood of being understood by a reasonable person as communicative." Doc. 42 at 22 (emphasis in original). This recitation mangles the test under

*Holloman* that "surrounding circumstances" would lead a "reasonable person [to] interpret [the conduct as conveying] some sort of message." 370 F.3d at 1270. The *Holloman* court clarified that this test does not require an observer to "infer a *specific* message," but rather to understand "some" message to be conveyed through Plaintiffs' work. *Id*. Defendants themselves give four examples of "some" message conveyed through a hypothetical posed regarding an absentee ballot application found by an Alabama resident in their mailbox. Doc. 42 at 22. ("Does it mean he's eligible to vote absentee, that he has a legal obligation or civic duty to vote, that voting absentee is preferable to voting in person, or that the mailer simply had the wrong address?"). Defendants attempt to portray these various interpretations as conveying an "unclear" message, *id.*, but the point is that, in all cases, the voter would understand "some" message. *Holloman*, 370 F.3d at 1270.

Plaintiffs' Complaint contains numerous factual allegations concerning the expressive nature of their absentee ballot assistance activities—including the distribution of the application, and assistance in filling out and submitting the application—that occur at town halls, voter assistance drives, voter registration events, jail-based registration, and via individual assistance. *See, e.g.*, Doc. 1 ¶¶ 14, 19, 20, 25, 26, 30.

Defendants cite to various cases that purportedly support their proposition that "other federal courts have recognized [that] the sort of conduct SB 1 prohibits is unlikely to be understood as conveying any message." Doc. 42 at 22. This is a categorical mischaracterization of these cases. In fact, many of these cases support Plaintiffs' position and *do* explicitly recognize the expressive nature of voter assistance activities like the activities prohibited by SB 1. *See Steen*, 732 F.3d at 389 (Fifth Circuit recognizing that "some voter registration activities involve speech—'urging' citizens to register; 'distributing' voter registration forms; 'helping' voters to fill out their forms; and 'asking' for information to verify that registrations were processed successfully"); *League of*

*Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1321 (S.D. Fla. 2008) ("Undoubtedly, Plaintiffs' interactions with prospective voters in connection with their solicitation of voter registration applications constitutes constitutionally protected activity."); *Voting for Am., Inc. v. Andrade*, 488 Fed. App'x 890, 897 (5th Cir. 2012) (recognizing that the fact that defendant "has repeatedly asserted that she does not and will not seek to enforce the [at-issue law] to prevent any individual or organization from freely handing out voter registration applications and encouraging citizens to vote" was important to understanding First Amendment implications of the law). Other cases are factually distinct, relating to the collection of absentee ballots and not absentee ballot applications or otherwise not necessarily implicating the same type of communication as Plaintiffs' absentee application assistance. *See New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1279 (N.D. Ga. 2020); *Knox v. Brnovich*, 907 F.3d 1167 (9th Cir. 2018); *Feldman v. Ariz. Sec'y of State's Off.*, 840 F.3d 1057, 1084 (9th Cir. 2016); *DCCC v. Ziriax*, 487 F. Supp. 3d 1207, 1235 (N.D. Okla. 2020). Contrary to Defendants' assertions, Plaintiffs' activities at issue are a critical means of expressing the importance of voting. *See* Doc. 1 ¶¶ 69, 75; *see, e.g.*, *Hargett*, 400 F. Supp. 3d at 720); *Steen*, 732 F.3d at 390.

Defendants fail entirely to engage with the Eleventh Circuit's well-established test for determining whether an activity is expressive conduct. Instead, Defendants rely on *Lichtenstein* to buttress their argument, Doc. 42 at 15, 17, but the Sixth Circuit's analysis is wholly inapposite as the Eleventh Circuit has devised its own test that provides a more fulsome consideration of expressive conduct, *see Holloman*, 370 F.3d at 1270; *Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1274–76 (11th Cir. 2021) ("*Food Not Bombs II*"). Furthermore, as discussed, this case can be easily distinguished from *Lichtenstein*. Therefore, Plaintiffs have plausibly alleged that SB 1 restricts expressive conduct.

## C.  The Challenged Restrictions Severely Burden Associational Rights.

Based on Plaintiffs' well-pleaded allegations, application assistance is protected associational activity. The First Amendment broadly protects the "right to associate with others in pursuit of" shared political goals. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Plaintiffs allege that they engage in absentee ballot application assistance to express their mission of ensuring equal access to the right to vote, regardless of race, age, disability, or incarceration status. Doc. 1 ¶¶ 76–77, 138. They also provide this assistance as a means of associating with voters, including those who cannot vote without such assistance, as well as with other civic engagement organizations. *Id.* ¶¶ 79, 138. Accordingly, Plaintiffs' absentee ballot application assistance is protected by the freedom of association. *See VoteAmerica v. Schwab*, 576 F. Supp. 3d 862, 875 (D. Kan. 2021) (Such "[p]ublic endeavors which 'assist people with voter registration'. . . and which expend resources 'to broaden the electorate to include allegedly under-served communities,' qualify as expressive conduct which implicates the First Amendment freedom of association.") (internal citations omitted).

Defendants' argument that there is no violation of Plaintiffs' associational rights rests on the incorrect assumption that voter assistance is not expressive conduct protected by the First Amendment. *See* Doc. 42 at 28. But there is no question that "the freedom to associate with others for the common advancement of political beliefs and ideas is a form of orderly group activity protected by the First and Fourteenth Amendments." *Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973) (quotation marks and citation omitted); *see also NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). And when Plaintiffs assist voters with absentee ballot applications, they "act collectively" with their members and volunteers, and seek to do so with voters, "implicating the First Amendment right of association." *Fla. State Conf. of NAACP v. Browning*, 863 F. Supp. 3d 1155, 1158 (N.D. Fla. 2008).

Defendants claim that SB 1 does not "even interfere with Plaintiffs' ability to engage in the vast majority of their absentee application assistance, such as providing detailed instructions, reviewing applications for correctness, photocopying IDs, or sharing a pen." Doc 42 at 30. This is another attempt to invert the pleading standard by disputing a factual allegation. In any event, their effort to limit the law's reach is neither a reasonable nor readily apparent interpretation on the face of the statute. *See infra* Argument IV. Plaintiffs allege that SB 1 implicates a wide array of absentee ballot application assistance because Plaintiffs pay their employees, reimburse volunteers, and provide materials, such as pens, to people whom they assist with absentee ballot applications. Doc. 1 ¶¶ 14, 19, 25. Plaintiffs cannot risk felony prosecution based solely upon Defendants' promises made in legal briefing attempting to cure an unconstitutionally vague law.

Plaintiffs allege that "Plaintiffs regularly host voter participation drives where they provide assistance with applying for absentee ballot applications for eligible registered voters." *Id.* ¶ 138. Those assistance drives take place at public events, campuses, prisons, jails, nursing homes, and other locations. *Id.* Plaintiffs allege that they "specifically aim to meet voters where they are, in order to provide assistance and effectively spread their message that all eligible voters should exercise their right to vote." *Id.* The restrictions in SB 1 necessarily prevent Plaintiffs from associating with voters in order to "distribute, order, request, collect, prefill, complete, obtain, or deliver a voter's absentee ballot application." *Id.* ¶¶ 65–66, 139. Thus, even if the activities were non-expressive, because SB 1 restricts Plaintiffs' ability to associate with voters in order to conduct the restricted activities, Plaintiffs' associational rights are implicated. *NAACP v. Button*, 371 U.S. 415, 430 (1963) ("We need not, in order to find constitutional protection for the kind of cooperative, organizational activity disclosed by this record, whereby Negroes seek through lawful means to achieve legitimate political ends, subsume such activity under a narrow, literal conception of

21

freedom of speech, petition or assembly."). Therefore, the Complaint states a claim for violation of Plaintiffs' First Amendment associational rights.

### D.  SB 1 Fails Any Standard of First Amendment Scrutiny.

Defendants wrongly assert that the lesser scrutiny under *United States v. O'Brien* applies because, according to Defendants, SB 1 imposes "an incidental burden on First Amendment freedoms."[5] Doc 42 at 24. This is another attempt to invert the pleading standard. As discussed, Plaintiffs have alleged specific facts demonstrating that SB 1 imposes a severe First Amendment burden. *See, e.g.*, Doc. 1 ¶ 68. Accepting those factual allegations as true, as this Court must, then SB 1 must be examined under strict scrutiny, because state election laws like SB 1 that burden freedom of speech and association are subject to strict scrutiny.[6] *See Weaver v. Bonner*, 309 F.3d 1312, 1319 (11th Cir. 2002); *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 207 (1999) (Thomas, J., concurring) ("When a State's election law directly regulates core political speech, we have always subjected the challenged restriction to strict scrutiny and required that the legislation be narrowly tailored to serve a compelling governmental interest."); *NAACP v. Alabama*, 357 U.S.

---

[5] Even if *O'Brien* did apply, SB 1 would fail under that standard in light of Plaintiffs' well-pleaded allegations. The Eleventh Circuit has held that under *O'Brien* "[a] government can impose reasonable time, place, and manner restrictions on such a forum but may not regulate speech based on its substantive content or the message it conveys." *Taylor v. Palmer*, No. 21-14070, 2023 WL 4399992, at *3 (11th Cir. July 7, 2023) (citation and internal quotation marks omitted). As Plaintiffs allege, SB 1 does restrict the content of Plaintiffs' message by restricting absentee ballot application communications. *See supra* Argument III(A). However, even if this Court determined that SB 1 was a content neutral time, place, and manner restriction, it is still Defendants' burden to show that the Challenged Provisions are "narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication of the information." *Food Not Bombs II*, 11 F.4th at 1292 (citing *Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 293 (1984)). Because SB 1 restricts all forms of absentee ballot application assistance, it by definition does not leave open alternative channels for communication. *See supra* Argument III(A). Likewise, because SB 1 is substantially vague and overbroad, it is necessarily not narrowly tailored. *See infra* Argument IV. Therefore, SB 1 still fails under *O'Brien*.

[6] As noted, SB 1 is also a content-based restriction subject to strict scrutiny. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Plaintiffs alleged sufficient facts in their Complaint showing that the Challenged Provisions are content based because they apply only to expressive conduct related to a particular topic: absentee ballot applications. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed.").

at 460–61; *Button*, 371 U.S. at 428–31, 37. This is a "well-nigh insurmountable" burden. *Meyer*, 486 U.S. at 425.

Applying strict scrutiny, Defendants bear the burden of establishing that SB 1 is necessary to serve a compelling and narrowly tailored government interest. Defendants cannot meet their burden.

### 1. Defendants Cannot Show That SB 1 Serves a Compelling Governmental Interest.

In their Motion to Dismiss, Defendants contend that SB 1 serves the compelling governmental interests of "combatting voter fraud," "maintaining public confidence in the integrity of the electoral process," and "protecting voters from confusion and undue influence." Doc. 42 at 25 (internal citations and quotation marks omitted). As Plaintiffs allege in their Complaint, SB 1 serves none of those interests.

*First*, Defendants have not established that SB 1 prevents voter fraud as it pertains to absentee ballot *applications*. Doc. 1 ¶ 156. Voter fraud cannot be alleged merely in the abstract when a statute significantly infringes upon speech or associational rights. Defendants bear a burden to demonstrate that "fraud is a real, rather than a conjectural, problem." *Buckley*, 525 U.S. at 210.

Defendants cannot rest upon their bare assertion of voter fraud as a "legitimate policy on which to enact an election law, even in the absence of any record evidence of voter fraud." Doc. 42 at 26 (quoting *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1334 (11th Cir. 2021)). Neither *Greater Birmingham Ministries*, as well as the case it draws on, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 192–97 (2008), concerned significant infringements on speech and associational rights subject to strict scrutiny, let alone at the motion to dismiss stage. Where Plaintiffs bring First Amendment claims, the Eleventh Circuit has held

that the state must "establish a nexus" between the challenged restrictions and the state interests they purport to serve. *Zeller v. Fla. Bar*, 909 F. Supp. 1518, 1526 (N.D. Fla. 1995) (citing *Meyer*, 486 U.S. at 426–27). "In light of the [challenged provision's] restrictions on political expression and association protected under the First Amendment," courts "cannot cavalierly accept without proof that the means being used achieve the legitimate ends being sought." *Zeller*, 909 F. Supp. at 1525–26.

In support of their purported interest in preventing voter fraud, the State claims that SB 1 aims to prevent "ballot harvesting" and the "trafficking of applications." Doc. 42 at 25–27; *cf.* Doc. 1 ¶ 52. But Plaintiffs make specific allegations that legislators failed to offer any evidence of widespread voter fraud attributable to absentee voting or so-called ballot harvesting.[7] Doc. 1 ¶ 53. Defendants' cited (extrinsic) examples are not only improper on a motion to dismiss but are also unavailing. *See* Doc. 42 at 5–6. Defendants tout "high-profile" cases from the 1990s, but these cases involved absentee ballots, not absentee ballot application assistance. *See id.* (citing *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1305 (11th Cir. 2021); *Ala. State Conf. of NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1305 n.51 (M.D. Ala. 2020)). The only incidents Defendants cite that involve absentee ballot applications are from 1981, 1999, and 2000, and none of them involved "groups or individuals seek[ing] to profit off the absentee voting process," SB 1's purported target according to its proponents.[8] Doc. 42 at 6; Doc. 1 ¶ 52.

---

[7] Defendants also claim that "SB1 provides important additional protections against adjacent conduct that may lead to or enable concealment of vote buying and similar abuses," but legislators did not provide any evidence of such "adjacent conduct" during hearings. Doc. 42 at 36 n. 16; *see also* Doc. 1 ¶ 52–3.

[8] As a purported example of absentee ballot application fraud, Defendants cite the prosecution of a Black civil rights worker whose story Plaintiffs already included in their Complaint. *See* Doc. 42 at 6 (citing *Wilder v. State*, 401 So. 2d 151, 162 (Ala. Crim. App. 1981); *see* Doc. 1 ¶ 42. This is the case of Julia Wilder who, along with Maggie Bozeman,

Defendants also misrepresent election irregularities involving signature mismatches, residency problems, and improper witnesses as voter fraud. Doc. 42 at 7.

*Second*, for their assertions that SB 1 furthers the interests of "maintaining public confidence in the integrity of the electoral process," and "protecting voters from confusion and undue influence," Defendants offer no support at all. Doc. 42 at 25–27. Plaintiffs, on the other hand, allege that SB 1 does the opposite. In their Complaint, Plaintiffs allege that SB 1 undermines trust in the elections process because SB 1 follows "a long history of specifically targeting voting assistance through criminal prosecutions and other means." Doc. 1 ¶ 36. Plaintiffs also allege that, during the legislative process, "legislators heard significant evidence of the ways in which SB 1 would have a detrimental impact on the ability of eligible voters to utilize the absentee voting process and the ability of civic engagement organizations, like Plaintiffs, to continue their crucial pro-political participation advocacy." *Id.* ¶ 54. Furthermore, Plaintiffs allege that SB 1 would prevent organizations like Plaintiffs from "fill[ing] a critical gap and provid[ing] a needed service to all people to navigate a fundamentally confusing and error-prone absentee voting process," far from preventing "undue influence." *Id.* ¶ 55. In all, Defendants greet these well-pleaded accusations with naked assertions that bear no resemblance to SB 1's actual impact, falling far short of demonstrating a compelling governmental interest.

---

was convicted of voter fraud for assisting senior citizens and illiterate Black citizens in filling out their absentee applications and ballots. Doc. 1 ¶ 42. These convictions were later thrown out by a federal court. *Id.* Along with the Marion Three, these cases are paradigmatic examples of Alabama's history of enacting voting restrictions, including specifically through the means of restricting voting assistance. *See id.* ¶ 36.

### 2. Defendants Cannot Show That SB 1 is Narrowly Tailored.

Even if Defendants could establish a compelling governmental interest, SB 1 is an overbroad law that restricts free speech and association. *See infra* Argument IV-V. By definition, overbroad and vague laws are not narrowly tailored. *See Button*, 371 U.S. at 432–33.

As Plaintiffs allege in their Complaint, there are far less restrictive means to achieve any interest regarding concerns about alleged "ballot harvesting." Plaintiffs allege that an interest in passing SB 1 was preventing "ballot harvesting," a nebulous term typically employed as political rhetoric. Doc. 1 ¶ 132. Defendants admit that both state and federal law already prevent vote buying. Doc. 42 at 36 n.16; *cf.* Doc. 1 ¶ 132. And Plaintiffs allege that Alabama law already prohibits persons from providing false or inaccurate information in completing a person's absentee ballot application. Doc. 1 ¶ 132. Defendants' attempt to read additional elements into the statute which do not exist in the text—including a *quid pro quo* requirement and an evaluation of the purpose of a "payment" or "gift"—demonstrate SB 1's fatal flaws. Doc. 42 at 34–35; *see infra* Argument IV. SB 1's sponsor acknowledged that SB 1 could be read to go as far as criminalizing "the grandfather giving the grandson $5 for gas money," but suggested that Alabamians simply "not. . . worry about [that]." Doc. 1 ¶ 60. That Defendants must now read in limiting principles beyond SB 1's text betrays any argument that SB 1 is narrowly tailored.

Finally, it is *Defendants'* burden to demonstrate that SB 1 passes strict scrutiny. In their Motion to Dismiss, Defendants offer no cognizable counterargument to Plaintiffs' Complaint, demonstrating that SB 1 fails to further *any* legitimate government interest, much less a compelling one. Likewise, Defendants fail to engage Plaintiffs' well-pleaded allegations that SB 1 is not narrowly tailored. As a result, Defendants fail to meet their burden.

**IV.    Plaintiffs Have Sufficiently Stated Their First Amendment Void-for-Vagueness Claim (Count 3).**

In the First Amendment context, the "government may regulate . . . *only with narrow specificity.*" *Wollschlaeger v. Governor, Florida*, 848 F.3d 1293, 1320 (11th Cir. 2017) (emphasis added). A law is unconstitutionally vague if it fails to provide a person of ordinary intelligence with fair notice of what is prohibited, or if it authorizes or encourages seriously discriminatory enforcement. *See id.* The Complaint alleges facts demonstrating the existence of both circumstances.

**A. SB 1's Terms Fail to Provide Ordinary People with Notice of What Conduct is Prohibited.**

Defendants' assertion that "Plaintiffs fail to identify any confusing or misleading terms," Doc. 42 at 30, is patently false. *See, e.g.*, Doc. 1 ¶¶ 54, 81–86. Plaintiffs explicitly allege that the terms "gift," "payment," "third party," "prefill," "distribute," or "submit" fail to give reasonable notice as to what activities are prohibited. *Id.* ¶¶ 81–86. As the Complaint alleges, SB 1 provides no meaningful context for the terms "gift" and "payment," which could therefore implicate assistance by nonprofits and prison staff alike (including Plaintiff ADAP's federally funded and mandated assistance), and/or criminalize the provision of the very materials required to vote absentee. *Id.* Likewise, "prefill," "distribute," or "submit" are all indefinite terms which could be read to criminalize assistors of people with disabilities or myriad other assistance requested by a voter. *Id.* ¶¶ 85–86. Finally, the limitless term "third party" could encompass anyone at all, from a grandmother giving her grandchild gas money, to the federally mandated assistance organization, to prison or nursing home staff. *Id.* ¶ 84.

Attempting to mask these obvious deficiencies, Defendants resort to extraneous explanations that cannot solve SB 1's vagueness. As Defendants concede, "the particular statutory language at issue, as well as the language and design of the statute as a whole," must be considered

in "ascertaining the plain meaning of the statute." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); *see also Wollschlaeger*, 848 F.3d at 1320–21 (holding Florida's Firearm Owners' Privacy Act, which banned a form of "harassment," was unconstitutionally vague where there was no "guidance regarding the specific conduct or speech that is banned" and the word had "a common meaning standing alone").

Nonetheless, Defendants attempt to blanket SB 1's actual wording with references to "ballot harvesting," "harvesting conduct," and "payee harvester" as explanations for what SB 1 means, *see generally* Doc. 42 at 20–25, 32–41—terms which appear nowhere in SB 1 or any other Alabama law.[9] It cannot be reasonably expected that a person of ordinary intelligence is provided with fair notice as to what conduct they may be prosecuted for when Defendants must resort to terms not found in the statute in an effort to interpret and justify it.

Defendants further attempt to impose their extraneous interpretation here by arguing that "the consistent use of the word *third party* establishes the *third party* as the *payee-harvester*," who, according to Defendants, is someone being paid to *harvest* an absentee ballot application, and therefore requires no statutory definition. *Id.* at 32–33. This convoluted explanation, however, is not in the statute's text and still does not provide any clarity as to the criminal liability of someone like "a grandmother [who] show[s] her appreciation for her grandchild's assistance in completing or delivering her absentee ballot application by giving them gas money or a token gift like a pie." *See* Doc. 1 ¶ 2.

---

[9] The term "harvesting" appears only in the following Alabama statute titles: Code of Alabama Title 2 Agriculture; Title 7 Commercial Code; Title 9 Conservation and Natural Resources; Title 19 Fiduciaries and Trusts; Title 22 Health, Mental Health, and Environmental Control; Title 23 Highways, Roads, Bridges, and Ferries; Title 40 Revenue and Taxation; Title 45 Local Laws.

Defendants also take issue with Plaintiffs' "splitting the Compensation Provision into separate 'Payment' and 'Gift' provisions." Doc. 42 at 32. But Defendants' argument merely underscores the myriad ways that this law could be read. Most importantly, even reading the provisions as Defendants do, Defendants still fail to explain *who* the third party is in the supposed "third-party harvesting of voters' applications in return for compensation." *Id.* at 34. "Compensation" is also not a word found in SB 1. And, as stated above, this interpretation could still allow for a grandmother's gift to result in years of prison time. Any way you slice it, the Payment and Gift Provisions are unconstitutionally vague.

In Defendants' attempt to define the phrase "payment or gift," they inadvertently illustrate the vagueness and overbreadth of SB 1's provisions. *Id.* at 33. Defendants argue that "the phrase *payment or gift* is equally self-explanatory—[i]t refers to something of value (whether a $100 bill or $100 gas card) provided or received in exchange for enumerated harvesting services." *Id.* But "something of value" could be a wide array of things for which SB 1 provides no definition or guidance.[10] Defendants then argue that "payment or gift covers any form of compensation," but this term again is not in the statute. *Id.* And "vague notions of a statute's basic purpose are… inadequate to overcome the words of its text regarding the specific issue under consideration."

---

[10] Other provisions of Alabama election law do provide a definition within the language itself, demonstrating that the definition could be amorphous. For example, Ala. Code § 17-17-39 provides a criminal penalty for "any person who buys or offers to buy any vote of any qualified elector at any election by the payment of money or the promise to pay the same at any future time, or by the gift of intoxicating liquors or other thing of value." *Id. See also e.g.*, Ala. Code § 17-17-24 ("any person who willfully changes an absentee voter's ballot to the extent that it does not reflect the voter's true ballot,... shall be guilty, upon conviction, of a Class C felony"); Ala. Code § 17-17-26 ("any person who knowingly and willfully prepares or assists in preparing the absentee ballot of a person who is comatose or who otherwise cannot communicate his or her voting preferences for an absentee ballot shall be guilty, upon conviction, of a Class C felony").

*Montanile v. Bd. of Trustees of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 150 (2016) (citation omitted).

Likewise, Defendants' attempts to distinguish nonprofit staff from prison staff in the context of assisting with an absentee voting application are completely untethered to the statute. They assert that a prison staffer could not be liable for application assistance because they would have to partake "in a quid pro quo involving harvesting" to violate SB 1. Doc. 42 at 34. But nowhere in SB 1 is a *quid pro quo* relationship an element of criminal liability. *See* Ala. Code § 17-11-4(d)(1). Defendants further assert that "[e]ven during election season, no one would say the Alabama prison staffer is paid to provide absentee ballot assistance for eligible voters who are incarcerated." Doc. 42 at 34. But a prison staffer distributing absentee ballot applications to individuals in prison interested in voting, as is part of their job, is certainly engaging in a service related to absentee voting. *Cf. id.* at 34–36 (creating an arbitrary distinction where a prison staffer "has received a general salary for professional services unrelated to absentee voting."); Doc. 1 ¶¶ 83–86. Moreover, nowhere does SB 1 immunize a paid staffer who "has received a general salary for professional services unrelated to voting," where that paid staffer undertakes the proscribed activity in their professional capacity. Doc. 42 at 34; *cf.* Doc. 1 ¶¶ 71, 82–86. Nonprofit staffers, like those of Plaintiffs, are individuals receiving general salaries for professional services, which include but are not limited to voter services. *See* Doc. 1 ¶¶ 24–25, 30.[11]

Clarity cannot be found "in a wholly ambiguous statute simply by relying on the benevolence or good faith of those enforcing it." *Wollschlaeger*, 848 F.3d at 1322–23*; see, e.g.*,

---

[11] That the statute requires that payments or gifts must "knowingly" be given/received does not provide any clarity, as it still does not provide guidance as to whether a general salary runs afoul of the law or why prison staff would be different from nonprofit staff in this regard.

*United States v. Stevens*, 559 U.S. 460, 480 (2010) ("[T]he First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."). Defendants' arbitrary distinction does not suffice to shield either prison staff or nonprofit staff from criminal liability.

Finally, Defendants argue that the Prefilling and Submission Restrictions "are sufficiently clear without statutory definitions for the verbs 'prefill,' 'distribute,' and 'submit.'" Doc. 42 at 36. But this argument fails to engage with the full scope of the statute. As Plaintiffs point out, SB 1 does not indicate whether "submit" includes, among other amorphous activities, "delivery via mail and in-person delivery when the voter consents to a third party delivering an application on their behalf." Doc. 1 ¶ 86. Likewise, does "distribute" include the provision of an application when the voter asks a third party to send them an application? *Id.* Defendants' representations about the type of mail carrier do not suffice to answer these questions with respect to "submit" and "distribute."

Defendants' characterization of "prefill" undermines their position even more. Defendants assert that "[o]f course, 'prefilled' means 'filled in advance.'" Doc. 42 at 37. Even accepting the meaning of "filled in advance," "pre-fill" has no temporal limitation and could encompass virtually any assistance in completing another person's form. Could a grandmother and her grandson be prosecuted if the grandmother pays her grandson to fill out her personal information on the application while sitting next to her before handing it to her for signature? SB 1 provides no notice as to whether or not this is the case.

Finally, Defendants wrongly contends that SB 1 "allow[s] a disabled voter to obtain assistance from a broad array of people, save those categories the federal government or State have reasonably determined might exert undue influence." *Id.* at 35. As noted *infra,* SB 1's exceptions

do not suffice to provide assistance to the voter where the assistor could still face felony criminal liability. *See infra* Argument VI. Plaintiffs cannot simply rely on Defendants' non-binding litigation assertion that SB 1's exceptions apply to them as assistors for disabled or illiterate voters.

Ultimately, Defendants' arguments rely entirely on reading words into the statute that do not exist. Defendants inappropriately insert definitions that simply are not in the plain language of SB 1, and, even if they were, invite more vagaries than eliminate them.

### B. Defendants' Own Arguments Demonstrate That SB 1 Will Subject Plaintiffs' and Others to Arbitrary Enforcement.

In any event, Defendants do not appear to contest that Plaintiffs will be subject to arbitrary and discriminatory enforcement under SB 1. As Plaintiffs allege, SB 1's sponsor himself conceded the risk of selective enforcement, for example acknowledging that SB 1 raised concerns about criminalizing "the grandfather giving the grandson $5 for gas money," but suggested that Alabamians simply "not . . . worry about [that]." Doc. 1 ¶ 60. Plaintiffs also provide factual allegations showing that numerous Alabama residents, including Plaintiffs, expressed fear during legislative testimony that SB 1 would invite confusion and arbitrary enforcement. *Id.* ¶¶ 54–59.

And perhaps most concerning, SB 1's sponsor touted the bill as responding to higher rates of absentee voting in certain Black Belt counties during the 2022 primary election, though he offered no cogent argument suggesting there was any wrongdoing connected with the higher usage rate of absentee ballots in those counties. *Id.* ¶ 53. These allegations all indicate a serious risk that enforcement under SB 1 could be selectively focused on certain areas and certain pro-voting advocates, including Plaintiffs and others who especially encourage and assist voters in certain parts of the state. Given this legislative history, and the extensive ambiguity of the statute, Plaintiffs have plausibly alleged that the danger that the Challenged Provisions will be selectively enforced is substantial.

Further, these are not "hypothetical edge cases." Doc. 42 at 32. Defendants underscore the very real risk of enforcement against Plaintiffs, referring to their voter assistance activities as "dubious ballot harvesting" and "trafficking applications." *Id.* at 40. Indeed, Defendants' attempt to distinguish nonprofit staffers from prison staffers and their improper characterization of Plaintiffs' activities demonstrates that SB 1's enforcement could easily be targeted toward nonprofit organizations like Plaintiffs. *See id.* at 34; Doc. 1 ¶¶ 6, 36–51. As stated above, Plaintiffs are like prison staff in that they receive a salary for general services, some of which includes voter assistance activities. That Defendants describe Plaintiffs' activities as "prohibited," despite providing the same service as a prison staffer, shows that Defendants risk selectively enforcing SB 1 against Plaintiffs and organizations like Plaintiffs. Finally, in describing SB 1's inadequate exceptions for voters with disabilities, Defendants refer to third-party assistance as "undue influence." Doc. 42 at 35. These representations are consistent with Plaintiffs' fears that SB 1 is simply an attempt to intimidate civic organizations from assisting voters in applying for absentee ballots, as they allege has long been the history in Alabama. Doc. 1 ¶¶ 36–51.

## V.   Plaintiffs Have Sufficiently Stated Their Claim Under the First Amendment for Overbreadth (Count 4).

Laws restricting First Amendment freedoms "may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473 (citation and internal quotations omitted); *see FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1304 (11th Cir. 2017). While overbreadth claims do not necessarily turn on vague language, *see Am. Booksellers v. Webb*, 919 F.2d 1493, 1505–06 (11th Cir. 1990), Plaintiffs' overbreadth claim is closely tied to its vagueness claim because "SB 1's language is full of uncertainties . . . that will make Plaintiffs' compliance

potentially impossible and are therefore unconstitutional infringements on Plaintiffs' protected speech that do not survive First Amendment scrutiny." Doc. 1 ¶ 157.

Plaintiffs allege that, in part as a result of SB 1's vagueness, the law regulates a sweeping amount of political speech and constitutionally protected expressive conduct and lacks any reasonable bounds in doing so. *Id.* ¶ 153. Defendants' primary argument against Plaintiffs' claim of overbreadth boils down to a repeated assertion that SB 1 only criminalizes non-expressive conduct. Doc. 42 at 38. Plaintiffs have sufficiently alleged facts showing that their ballot absentee assistance activities are expressive conduct subject to First Amendment protection and that the Challenged Provisions of SB 1 prohibit an overbroad amount of expressive conduct. Doc. 1 ¶¶ 153–54; *see supra* Argument III(B), V. Under the Payment and Gift Provisions, any individual could be prosecuted for simply distributing an absentee ballot application to a voter. Doc. 1 ¶ 153. Under the Submission and Prefiling Restrictions, any individual risks being charged with a misdemeanor for simply placing another person's application in the mailbox, or writing down the name of an individual before the individual finishes filling out the rest of the application. *Id.* ¶ 154. Plaintiffs also allege that SB 1 sweeps in conduct where individuals are lawfully—and, in some cases, required—to assist voters with absentee ballot applications, as is the case with assisting jail and prison-based voters or ADAP's responsibilities under HAVA. *Id.* ¶¶ 83, 85, 115–120, 156.

Plaintiffs' Complaint sufficiently alleges the scant evidence and justification surrounding SB 1's passage. *See id.* ¶¶ 52–61. Defendants' argument regarding SB 1's "plainly legitimate sweep" rests on unsupported assertions of voter fraud involving absentee ballot applications. *See* Doc. 42 at 40. As discussed, Defendants claim supposed "ballot harvesting" concerns justify SB 1, but the law only relates to absentee applications and does not advance any governmental interest in regulating absentee ballots. *See supra* Argument III(D).

Moreover, Defendants' representations of what SB 1's provisions cover only underscore that SB 1 "burdens substantially more speech than necessary to further the [state's] interests." *FF Cosms.*, 866 F.3d at 1304. Defendants first represent that the Payment and Gift Provisions include a prohibition on "the 'Get Out The Vote' t-shirt knowingly provided and received as compensation for harvesting services." Doc. 42 at 41. Taking Plaintiffs' allegations as true, this prohibition goes to the heart of Plaintiffs' constitutionally protected activities and bears no relation to the prevention of voter fraud stemming from improperly submitted absentee ballots. Doc. 1 ¶¶ 153, 156. Defendants further argue that the Prefilling Restriction is not overbroad because it applies "only if done prior to distributing the application to a voter who has neither input his own information nor obtained the application for himself." Doc. 42 at 40. But the text of the statute is silent as to this supposed temporal limitation, and "[s]uch a limiting construction. . . is of little assistance in substantially reducing the overbreadth of the resolution." *Bd. of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987).

Finally, while Defendants express doubt as to whether SB 1 will apply to Plaintiffs' provision of a stamp or sticker, Doc. 42 at 41, Plaintiffs' Complaint identifies legitimate questions about the wide scope of SB 1's reach, supported by Defendants' own representations, Doc. 42 at 42, the representations of SB 1's sponsor, Doc. 1 ¶¶ 60, 81, and Alabama's long history of criminalizing the same activities, Doc. 1 ¶¶ 36–51. These are real threats of harm, not "fanciful," and their "very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *FF Cosms.*, 866 F.3d at 1303 (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)).

**VI.     Plaintiffs Have Sufficiently Stated Their Claim Under Section 208 of the VRA (Count 5).**

Plaintiffs have stated their claim under Section 208 of the VRA, which provides: "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.[12]

In other words, Section 208 permits the voter to receive assistance from *any* voter of their choosing, except the explicit exceptions of the voters' employer or union. SB 1, meanwhile, provides an additional exception not found in Section 208: namely, those voters receiving assistance by assistors who receive a "payment or gift" to assist that voter.

Although SB 1 § 17-11-4(e) recites the same language of Section 208, Defendants themselves concede that SB 1 at least narrows the universe of those who can assist voters so entitled to such assistance. Doc. 42 at 41–43. This is a violation of Section 208 and SB 1 is preempted by that federal law.

**A.     SB 1 Infringes on Federally Protected Assistance to Disabled, Blind, and Low Literacy Voters Because It Narrows the Universe of Assistors.**

The plain language and legislative history of Section 208 and the VRA establish that Congress unambiguously empowered certain voters with the right to decide for themselves whom to choose to assist them with voting, because it was "the only way to assure meaningful voting assistance." S. Rep. No. 97-417, 62 (1982). Thus, state statutes that curtail or obstruct the ability of disabled, blind, and low-literacy voters to receive assistance from persons of their choice

---

[12] The term "vote" as it appears in the VRA encompasses "all action necessary to make a vote effective in any . . . election, including, but not limited to . . . [an] action required by law prerequisite to voting . . . ." 52 U.S.C. § 10310(c)(1).

conflict with Section 208 and must be invalidated. A state law is preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade v. Nat'l. Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (internal quotation marks and citations omitted). Here, SB 1 undermines Congress's purpose by placing myriad obstacles between voters and the assistance to which they are entitled under Section 208. Doc. 1 ¶¶ 83–84.

Plaintiffs allege that they regularly assist disabled and low-literacy voters with the voting process, including the absentee ballot application process. *See, e.g.*, *id.* ¶ 85. These voters regularly choose to receive absentee application assistance from members and volunteers of organizational Plaintiffs. *Id.* ¶ 112. Paid staff or members and volunteers of Plaintiff organizations often receive token gifts, like stickers, while providing voters with absentee application assistance. *Id.* ¶ 81.

Although SB 1 recites the language of Section 208, its criminal scheme stands in direct conflict with Section 208. Ala. Code § 17-11-4(e). This is because SB 1's severe criminal penalties hinder (by Defendants' own admission) Plaintiffs' ability to assist Section 208-eligible voters, Doc. 1 ¶ 112, and, in turn, prevents such voters from being assisted by a person of their choosing. This is textbook conflict preemption. *See Arkansas United v. Thurston*, 626 F. Supp. 3d 1064, 1085 (W.D. Ark. 2022) (finding that Section 208 preempted state law limiting assistors' conduct).

Indeed, by criminalizing a broad swath of assistance activities, *see* § 17-11-4(d), SB 1 conflicts with the broad scope of lawful assistance under Section 208 which extends to "all action necessary to make a vote effective," 52 U.S.C. § 10310(c)(1). Absentee ballot applications are a prerequisite to receive and vote absentee. SB 1, however, criminalizes the very assistance activities necessary to apply to vote absentee and upon which 208 voters depend. Here, Alabama flouts that protection by creating new crimes that threaten voters' chosen assistors. Thus, SB 1's far-reaching scheme criminal conflicts with the broad right to assistance Section 208 guarantees.

To be clear, the recitation of Section 208's text in SB 1 does not insulate its violation of federal law. In *OCA-Greater Houston v. Texas*, the Fifth Circuit held that "a state cannot restrict this federally guaranteed right [under Section 208] by enacting a statute tracking its language, then defining terms more restrictively." 867 F.3d 604, 615 (5th Cir. 2017). Defendants do precisely what the Fifth Circuit forbade. Doc. 42 at 41. While SB 1 recites the VRA's language, it simultaneously narrows who may assist a voter by garnishing penalties on "third-party" assistors who receive payment or a gift—restrictions that do not exist in the VRA—and threatens such assistors with criminal prosecution. Doc. 1 ¶¶ 84, 109, 112.

**B. The Text and Legislative History of Section 208 Do Not Permit Defendants to Exclude Additional Assistors.**

Nonetheless, Defendants contend that Alabama can limit assistance required by Section 208, an argument they hinge on the fact that Section 208 refers to "a" instead of "any" assistor in its statutory language. This position is contrary to the weight of authority, and Defendants fail to identify a single other statute that has been interpreted in this manner.

For starters, Congress already stated its exemptions under Section 208: assistance may be given by "a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voters union." 52 U.S.C. 10508. "[W]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Hillman v. Maretta*, 569 U.S. 483, 496 (2013); *see also United States v. Brockamp*, 519 U.S. 347, 352 (1997) (The "explicit listing of exceptions . . . indicate[s] to us that Congress did not intend courts to read other unmentioned, open-ended . . . . exceptions into the statute that it wrote"). "Under the principle of statutory construction, *expressio unius est exclusio alterius*, the mention of one thing implies the exclusion of another." *SE Prop. Holdings, LLC v. Welch*, 65 F.4th 1335, 1344 (11th Cir. 2023) (cleaned up). The Supreme Court's

application of the *expressio unius* canon requires that the "other than" clause excluding employers or union officers from providing assistance be read to forbid all other limitations, and Section 208's two enumerated restrictions on assistance are exhaustive.

The legislative history of Section 208 also supports the conclusion that Congress intended to create an expansive right for eligible voters to receive assistance from a person of their own choosing, with only these two exceptions (for a voter's employer or union). *See* S. Rep. No. 97-417, 2 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 179 (the "purpose" of Section 208 is to prescribe "the method by which voters who are blind, disabled, or illiterate are entitled to have assistance in a polling booth from a person of their own choosing, with two exceptions"). Congress granted eligible voters a nearly unfettered choice of assistors to enable them to receive assistance from a person that they trust. *See, e.g.*, *id.* at 240 ("Specifically, it is only natural that many such voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice . . . The Committee is concerned that some people in this situation do in fact elect to forfeit their right to vote."). Nothing in the congressional record indicates a "legislative intent" that "additional exceptions [may] be implied." *Hillman*, 569 U.S. at 496.

Furthermore, courts have consistently held that the indefinite article "a" ordinarily means "any." *See, e.g.*, *United States v. Alabama*, 778 F.3d 926, 932–33 (11th Cir. 2015) (holding that "[t]he plain meaning of the term 'an election' is 'any election.'") (collecting Fifth and Eleventh Circuit cases); *United States* v. *Naranjo*, 259 F.3d 379, 382 (5th Cir 2001). *See also Lee v. Weisman*, 505 U.S. 577, 614 n.2 (1992) (Souter, J., concurring) ("[T]he indefinite article before the word 'establishment' is better seen as evidence that the [Establishment] Clause forbids any kind of establishment."); *United States v. Franklin*, 435 F.3d 885, 889 (8th Cir. 2006) ("[T]he use

of the indefinite article 'an' . . . to describe the condition . . . implies that other conditions also are authorized."); *Transamerica Ins. Co. v. South*, 89 F.3d 475, 482 (7th Cir. 1996) (characterizing "any" as a "variant" of "a" and "an"). The Fifth Circuit has even traced the etymology of the word "any" back to "aenig," which is a historical variant of "an." *Comm'r of Internal Revenue v. Kelley*, 293 F.2d 904, 912 n.18 (5th Cir. 1961).

And courts broadly interpret the word "person" in federal statutes to include any individual or entity, except governments. *See Return Mail, Inc. v. U.S. Postal Serv.*, 587 U.S. 618, 627 (2019) (citing the Dictionary Act, 1 U.S.C. § 1). The placement of the word "a" in front of "person" preserves that breadth. *See, e.g.*, *United States v. Hendrickson*, 949 F.3d 95, 98 (3d Cir. 2020) ("The indefinite article has a 'generalizing force' on the noun that follows it." (citation omitted)). Within that broad universe of "persons" in Section 208, "Congress only included two categories of excluded assistants in the statutory text, and if Congress intended to exclude more categories, or to allow states to exclude more categories, it could have said so." *Disability Rts. N. Carolina v. N. Carolina State Bd. of Elections*, 602 F. Supp. 3d 872, 878 (E.D.N.C. 2022) ("[T]he use of the indefinite article "a" does not show intent by Congress to allow states to restrict a federally created right.").[13] This does not mean that a state cannot appropriately regulate voting-related conduct (*e.g.*, by criminalizing election bribery as Alabama already does)—but SB 1's whole cloth exclusion of additional categories of assistors beyond those specified by Congress is in direct conflict with Section 208 and therefore preempted by federal law.

---

[13] Defendants cite a single outlier case to support their position, *Priorities USA v. Nessel*, 628 F. Supp. 3d 716 (E.D. Mich. 2022), despite the weight of authority compelling the conclusion that a voter must be allowed assistance from "any" person.

**VII.    Plaintiffs Have Sufficiently Stated Their Claim Under HAVA (Count 6).**

SB 1's restrictions on the receipt of "payment[s]" or "gift[s]" to assist voters with their absentee ballot applications, as well as SB 1's ban on the submission or "prefill[ing]" of absentee ballot applications, are in direct conflict with ADAP's federal mandate to provide that assistance. Doc. 1 ¶¶ 115–18. Indeed, SB 1 specifically prohibits the very assistance that ADAP's paid staff provides. *Id.* ¶¶ 30, 117–19. None of Defendants' three responses resolve, excuse, or mitigate this fundamental conflict. Doc. 42 at 44–46.

*First*, Defendants' argument that ADAP is excepted from SB 1's provisions because SB 1 provides an exception for individuals with disabilities to "receive assistance" falls flat for the same reasons why the argument fails under Section 208. As Plaintiffs allege in their Complaint, the exception for people with disabilities does not clearly extend to their assistors. Doc. 1 ¶¶ 163–66. As a result, ADAP risks criminal liability for providing federally mandated absentee ballot application assistance, even if those they assist may be shielded from criminal liability under SB 1. *Id.* ¶ 170. ADAP simply cannot risk that their staff, who are paid to provide absentee ballot application assistance, be subject to felony prosecution for undertaking their work. *Id.* ¶ 31.

*Second*, Defendants assert that Plaintiffs lack a private right of action to bring their claims, citing a single case for the proposition that there is not an individual right to sue under HAVA. *See* Doc. 42 at 45 (citing *Bellitto v. Snipes,* 935 F.3d 1192, 1202 (11th Cir. 2019)). But the *Snipes* case is readily distinguishable from Plaintiffs' claims as it addressed requirements for list maintenance claims under Section 21083 of HAVA, not the law's provision for voter-assistance activities. *Id*. at 1199. The Eleventh Circuit found no private right of action under HAVA to enforce the list maintenance provisions at issue in *Snipes*, noting that HAVA requires that those specific provisions be enforced by the Attorney General or through administrative procedures. *Id.* However, under the Protection and Advocacy for Voting Access Program Inclusion Act of 2002 ("PAVA"),

HAVA expressly grants and mandates that designated Protection and Advocacy (P&A) programs[14] take action necessary "to ensure full participation in the electoral process for individuals with disabilities, including registering to vote, casting a vote and accessing polling places," including through litigation. 52 U.S.C.A. § 21061(a). And PAVA expressly provides that P&A agencies "shall have the same general authorities as they are afforded under subtitle C of title I of the Developmental Disabilities Assistance and Bill of Rights Act of 2000" ("DDA"). *Id.* The relevant provisions of the DDA grant P&A programs extraordinary powers not normally assigned to a non-governmental agency, including, among other things, the right to bring suit to enforce rights protected by the DDA. 52 U.S.C.A. § 15043(a). As a result, "[c]ourts have recognized that . . . P&A agencies have almost universally prevailed in litigation based on access." *Ala. Disabilities Advoc. Program v. SafetyNet Youthcare, Inc.*, 65 F. Supp. 3d 1312, 1324 & n.7 (S.D. Ala. 2014) (collecting cases); *see also* S. Rep. 103-120, 39 (1994), *reprinted in* 1994 U.S.C.C.A.N. 164, 202 (recognizing that it "is clear that P&A systems have standing to pursue legal remedies to ensure the protection of and advocacy for the rights of individuals with developmental disabilities within the State."); *Disability Rts. Tex. v. Hollis*, No. 23-20171, 2024 WL 2836594, at *2 (5th Cir. June 5, 2024) (recognizing that the DDA authorizes P&A organizations to pursue legal, administrative, and other appropriate remedies or approaches to ensure that individuals with disabilities are protected) (internal quotation marks omitted).

*Third*, Defendants' argument regarding the availability of equitable remedies is similarly unavailing. The Supreme Court has held that "if an individual claims federal law immunizes him

---

[14] Plaintiffs allege that ADAP is a designated P&A agency, a factual allegation which Defendants do not dispute in their Motion to Dismiss. Doc. 1 ¶ 28.

from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015); Doc. 1 ¶ 172. Defendants nevertheless rely on *Armstrong* to argue that preemption does not apply in this case, but that reliance is misplaced. While in *Armstrong* the Court found a case against Idaho Medicaid providers that could not proceed in equity because of the availability of administrative avenues for relief and judicially un-administrable standards for enforcing the Medicaid provision, 575 U.S. at 328, neither of those factors are present here. ADAP does not have an alternative avenue for relief to prevent Defendants from prosecuting their staff under SB 1. HAVA provides no administrative avenue for relief from state law for P&A agencies. *Cf.* 52 U.S.C.A. § 21111 (providing a cause of action for the U.S. Attorney General to remedy violations of HAVA's list maintenance provisions); 52 U.S.C.A. § 21112 (requiring states to set up administrative complaint process for violations of HAVA's list maintenance provisions). And, unlike *Armstrong*, this Court is simply tasked with enjoining a law which conflicts with a direct mandate of the federal government, a judicially manageable standard and the express provenance of federal courts. *Armstrong*, 575 U.S. at 326; *see Ex parte Young*, 209 U.S. 123, 144 (1908).

Defendants contend that if Plaintiffs are allowed to proceed, "ADAP could argue that any State statute or regulation with the most marginal impact on its efforts to 'ensure full participation' is preempted." Doc. 42 at 47. But the preemption doctrine makes clear that it applies only when state law stands directly in conflict with federal law. *Gade*, 505 U.S. at 98; *Armstrong*, 575 U.S. at 324. Thus, states may still set the contours of permissible conduct regarding elections, including

imposing criminal liability on paying people to vote. *See* Doc. 42 at 47.[15] SB 1, by contrast, goes beyond banning payments for votes and prohibits ADAP from providing the voter assistance that HAVA explicitly funds it to provide. *Compare* Ala. Code § 17-11-4(d)(2) (criminalizing ADAP's assistance to "distribute, order, request, collect, prefill, complete, obtain, or deliver a voter's absentee ballot application") *with* 52 U.S.C. § 21061 (mandating ADAP "to ensure full participation in the electoral process for individuals with disabilities, *including registering to vote, casting a vote and accessing polling places*") (emphasis added). Where, as here, the State bans conduct expressly provided for by Congress, federal law must prevail.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

DATED: June 10, 2024

Respectfully submitted,

/s/ Laurel Hattix
Alison Mollman
Laurel Hattix
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106
(510) 909-8908
amollman@aclualabama.org
lhattix@aclualabama.org

/s/Valencia Richardson
Valencia Richardson*
Alice Huling*
Molly Danahy*
Ellen Boettcher*
Reginald Thedford*

/s/ Anuja D. Thatte
Anuja D. Thatte*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20009
(202) 249-2170
athatte@naacpldf.org

Tiffani Burgess*
Uruj Sheikh*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

---

[15] Alabama's anti-vote-buying statute has been in effect for many years and Plaintiffs do not challenge it now. *See* Ala. Code § 17-17-34.

CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
(202) 736-2200
vrichardson@campaignlegalcenter.org
ahuling@campaignlegalcenter.org
mdanahy@campaignlegalcenter.org
eboettcher@campaignlegalcenter.org
rthedford@campaignlegalcenter.org

*/s/ William Van Der Pol, Jr.*
William Van Der Pol, Jr.
Larry G. Canada
ALABAMA DISABILITIES
ADVOCACY PROGRAM
University of Alabama
Box 870395
Tuscaloosa, AL 35487
(205) 348-4928
wvanderpoljr@adap.ua.edu
lcanada@adap.ua.edu

*Admitted pro hac vice

tburgess@naacpldf.org
usheikh@naacpldf.org

/s/ Jess Unger
Bradley E. Heard*
Sabrina Khan*
Jess Unger*
Ahmed Soussi*
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Avenue,
Suite 340
Decatur, GA 30030
(470) 521-6700
bradley.heard@splcenter.org
sabrina.khan@splcenter.org
jess.unger@splcenter.org
ahmed.soussi@splcenter.org

**CERTIFICATE OF SERVICE**

I hereby certify that I have electronically filed a copy of the foregoing and accompanying

documents with the Clerk of Court using the CM/ECF system which provides electronic notice of

filing to all counsel of record.

DATED: June 10, 2024


*/s/ Laurel Hattix*
Laurel Hattix
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106
(510) 909-8908
lhattix@aclualabama.org

***Counsel for Plaintiffs***