FILED

2024 Aug-09  PM 12:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| ALABAMA STATE CONFERENCE OF THE NAACP, *et al.*, | |
| *Plaintiffs*, | Civil Action No. 24 Civ. 420 (RDP) |
| v. | |
| STEVE MARSHALL, in his official capacity as Alabama Attorney General, *et al.*, | |
| *Defendants*. | |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

SELECTED FACTUAL BACKGROUND ........................................................................ 1

SUPPLEMENTAL LEGAL ARGUMENT ....................................................................... 3

    I.    PLAINTIFFS HAVE SUFFICIENTLY STATED CONSTITUTIONAL CLAIMS. ........ 3

      A.    Plaintiffs Have Plausibly Alleged that SB 1 Infringes Their Speech. ........................... 4

          1.    Plaintiffs Plausibly Allege that their Absentee Application Assistance is Core
              Political Speech. .............................................................................................. 4

          2.    Plaintiffs Have Plausibly Alleged that their Absentee Ballot Application Assistance
              is Expressive Conduct. .................................................................................... 9

          3.    Plaintiffs Have Plausibly Alleged that SB 1 Is Subject to and Fails Strict Scrutiny. 11

      B.    Plaintiffs Have Plausibly Alleged that SB 1 Infringes Their Associational Rights ...... 13

      C.    Plaintiffs Have Plausibly Alleged that SB 1 Is Void for Vagueness. ........................... 15

      D.    Plaintiffs Have Plausibly Alleged that SB 1 is Substantially Overbroad. .................... 18

    II.    PLAINTIFFS HAVE SUFFICIENTLY STATED A CLAIM UNDER THE VOTING
RIGHTS ACT. ............................................................................................................... 19

    III.    PLAINTIFFS HAVE SUFFICIENTLY STATED A PREEMPTION CLAIM. ........... 23

    IV.    PLAINTIFFS HAVE SUFFICIENTLY PLEADED STANDING AGAINST
SECRETARY ALLEN. .................................................................................................. 24

CONCLUSION ................................................................................................................ 25

TABLE OF AUTHORITIES

**Cases**                                                               **Page**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................6

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 1992)..............................................27

*Buckley v. American Constitutional Law Foundation Inc.*, 525 U.S. 182 (1999).........................15

*Corbett v. Transportation Security Administration*, 930 F.3d 1225 (11th Cir. 2019) ....................27

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266 (11th Cir. 2021) ("*Food Not Bombs II*")..............................................................15

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235 (11th Cir. 2018) ("*Food Not Bombs I*")..........................................................12, 13, 14

*Gade v. National Solid Wastes Management Association*, 505 U.S. 88 (1992)......................24, 25

*Gonzales v. Carhart*, 550 U.S. 124 (2007)...................................................19

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .........................................18

*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004) ....................12

*Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024)..........................15, 16

*League of Women Voters of Florida v. Browning*, 575 F. Supp. 2d 1298 (S.D. Fla. 2008) ("*Browning I*") ................................................................10

*League of Women Voters of Florida v. Browning*, 863 F. Supp. 2d 1155 (N.D. Fla. 2012) ("*Browing II*")...............................................................11

*League of Women Voters of Florida v. Cobb*, 447 F. Supp. 2d 1314 (S.D. Fla. 2006)...........10, 11

*League of Women Voters of Ohio v. LaRose*, No. 1:23-cv-2414, 2024 WL 3495332 (N.D. Ohio July 22, 2024) ........................................................24

*League of Women Voters v. Hargett*, 400 F. Supp. 3d 706 (M.D. Tenn. 2019) .............10

*Lichtenstein v. Hargett*, 83 F.4th 575 (6th Cir. 2023)....................................10

*McGuire v. Marshall*, No. 2:19-CV-174-WKW, 2024 WL 2401833 (M.D. Ala. May 23, 2024)..19

*McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995) ..................................8, 9

*Meyer v. Grant*, 486 U.S. 414 (1988) ...............................9, 10, 11, 12, 14, 15

*National Federation of the Blind of Alabama v. Allen*, 661 F. Supp. 3d 1114 (N.D. Ala. 2023)...28

Order Denying Motion to Dismiss, *VoteAmerica v. Raffensperger*, No. 1:21-cv-01390-JPB (N.D. Ga. Dec. 9, 2021), Doc. 57 ....................................................7, 22

*Priorities USA v. Nessel*, 628 F. Supp. 3d 716 (E.D. Mich. 2022) ..............................24

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ..............................................15

*Smith v. Goguen*, 415 U.S. 566 (1974) ....................................................20

*Tennessee State Conference of the N.A.A.C.P. v. Hargett*, 441 F. Supp. 3d 609 (M.D. Tenn. 2019) ................................................................................................................7

*Texas v. Johnson*, 491 U.S. 397 (1989) ...............................................................12, 15

*United States v. Houser*, No. 4:10-CR-012-HLM-WEJ, 2011 WL 2007497 (N.D. Ga. March 18, 2011) ......................................................................................19

*United States v. Stevens*, 559 U.S. 460 (2010) ............................................................21

*Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980) .......................9

*VoteAmerica v. Raffensperger*, 696 F. Supp. 3d 1217 (N.D. Ga. 2023) ..................14, 16

*VoteAmerica v. Schwab*, 576 F. Supp. 3d 862 (D. Kan. 2021) ................................7, 16

*Voting for America, Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) ..................................8

*Wollschlaeger v. Governor, Florida*, 848 F.3d 1293 (11th Cir. 2017) ..........................20

**Statutes, Codes, and Other Authorities**

42 U.S.C.A. § 15043(a) ............................................................................................26

Ala. Code § 17-11-3 ................................................................................................28

Ala. Code § 17-11-4(b)(2) .......................................................................................23

Ala. Code § 17-11-4(c)(2) ...............................................................................20, 23

Ala. Code § 17-1-3(a) ..............................................................................................28

S. Rep. No. 97-417 (1982) .......................................................................................22

## INTRODUCTION

Plaintiffs respectfully submit this Supplement to their Response in Opposition to Defendants' Motion to Dismiss. Plaintiffs' well-pleaded allegations that SB 1 infringes on Plaintiffs' constitutional and statutory rights by restricting how they express the importance of voting through their absentee ballot application assistance were further bolstered by oral argument. Because Plaintiffs have more than plausibly alleged factual allegations sufficient to state their claims, Defendants' Motion to Dismiss should be denied.

## SELECTED FACTUAL BACKGROUND

Plaintiff organizations are part of the firmament of Alabama's civic culture. Contrary to Defendants' veritable fountain of hypotheticals about "fraudsters," "paid political operatives," or other somehow tarnished persons "inserting themselves" into voters' lives out of nowhere, Hearing Tr. at 4:12, 121:8-122:23, 128:21-25, 137:6-18, Plaintiffs are civic, faith-based, and disability rights organizations in Alabama who have, collectively, served for generations as a reliable support system for Alabama voters seeking help, including those voters who may be uniquely and severely burdened by SB 1. Doc. 1 ¶¶ 87-105. This assistance, in turn, is core political speech because it is the foundation of Plaintiffs' encouragement of lawful, eligible participation in the political process, and has long been understood as such. *Id*. ¶¶ 73-75, 124-127. Through their pro-voting speech and assistance activities, Plaintiffs advance a message that all eligible voters can and should participate in Alabama's election process. *Id.* ¶¶ 12-32.

Plaintiff ADAP is Alabama's designated Protection and Advocacy ("P&A") system that advocates on behalf of Alabamians with disabilities, including Alabama's voters with disabilities, and is specifically mandated by its PAVA grant to ensure the full participation of voters with disabilities in the electoral process. Hearing Tr. at 40:14-21; Doc. 1 ¶¶ 28-32. ADAP promotes and

encourages the importance of voting to people with disabilities through assistance which has included helping voters apply for absentee ballots by navigating the Secretary of State's website, printing out the application, and filling it out alongside them. Doc. 1 ¶¶ 29-30. ADAP's constituency includes all voters with disabilities in Alabama, including disabilities affecting motor function, vision, mobility, and other challenges which may compel a need for assistance in applying to vote absentee. *Id.* ¶¶ 28, 87-95.

Plaintiff Alabama NAACP has advocated for the political, educational, social, and economic equality of Black Alabamians and all other Alabamians for over a century. Doc. 1 ¶ 12. AL NAACP promotes and encourages voting through town halls, educational materials, outreach events, and direct voter assistance: including providing materials such as postage and envelopes for absentee ballot applications *Id.* ¶¶ 13-16. Alabama NAACP's statewide membership includes both assistors and voters in need of assistance, including voters residing in nursing homes, confined in jails, studying at Alabama universities and colleges, and in other circumstances necessitating help with Alabama's absentee ballot application process. *Id.* Alabama NAACP nevertheless believes these Alabamians should participate and encourages them to do so by offering their assistance. *Id.*

Founded in 1969, GBM is an organization with roots in Alabama's twentieth century civil rights movement. Their congregational membership is multi-religious and multi-racial, unified around a mission of service in furtherance of supportive community, civic engagement, and justice for all. Doc. 1 ¶ 23. GBM carries out this mission by encouraging and promoting the right to vote through direct voter assistance and education. *Id.* ¶ 24. Consistent with its mission, GBM ministers to those in need, specifically returning citizens and eligible voters in prisons and jails, who lack "access to the internet, mailing supplies, or a printer" of their own while confined. *Id.* ¶¶ 25, 102-

05.  To communicate the importance of voting to these eligible Alabamians, GBM has offered its assistance in applying for an absentee ballot, "printing the application; providing a pen, envelope, and postage; and spending time reviewing the application to ensure all required boxes are marked correctly and completely." Doc. 1 ¶ 25.

Plaintiff LWVAL and its dues-paying members promote "informed and active participation in government, work to increase understanding of major public policy issues, and influence public policy through education and advocacy," building on the American suffrage movement's success in expanding the franchise and civic culture in America. Doc. 1 ¶¶ 17-18. LWVAL promotes and encourages equal suffrage though helping each citizen form and execute an individualized voting plan and grasp their unique place in contributing to healthy voter turnout and civic culture in Alabama. *Id.* ¶¶ 17-20.  LWVAL's guidance and assistance seeks to transform cumbersome ministerial steps into fluid motions to facilitate each voter's participation: LWVAL volunteers "provide envelopes and postage to submit the [absentee ballot] application, make photocopies of the voters' photo IDs, and spend time with the voter to ensure any errors are corrected." *Id.* ¶ 19. In turn, their outreach can often spur member recruitment as well. *Id.* ¶ 18.

## SUPPLEMENTAL LEGAL ARGUMENT

## I.    PLAINTIFFS HAVE SUFFICIENTLY STATED CONSTITUTIONAL CLAIMS.

Defendants in briefing and argument have attempted to impose a summary judgment or trial standard on Plaintiffs, imagine alternative facts beyond the four corners of the Complaint, and ignore the Complaint's copious factual allegations that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But at the pleading stage, it is more than enough that Plaintiffs allege "that the challenged provisions limit their ability to convey their message [and] prohibit them from

associating with certain categories of voters" to state plausible free speech and associational claims. Order Denying Motion to Dismiss at 12-13, *VoteAmerica v. Raffensperger*, No. 1:21-cv-01390-JPB (N.D. Ga. Dec. 9, 2021), Doc. 57; *cf.* Doc. 1 ¶¶ 67-86.  "State Defendants' arguments to the contrary . . . requires the type of substantive, merits inquiry that is not appropriate on a motion to dismiss." *Id.*  Indeed, voter application and registration assistance cases almost always survive the motion to dismiss stage, precisely because they require a substantive, merits-based inquiry about the scope of the constitutional infringement. *E.g.*, *VoteAmerica v. Schwab*, 576 F. Supp. 3d 862 (D. Kan. 2021) (denying motion to dismiss plaintiffs' free speech and association claims); *Tennessee State Conf. of the N.A.A.C.P. v. Hargett*, 441 F. Supp. 3d 609 (M.D. Tenn. 2019) (same); *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1315 (S.D. Fla. 2006) (same).

Likewise, Plaintiffs' Complaint "show[s] above a speculative level that the challenged provisions could be vague and do not provide fair notice of what conduct is prohibited. That is all Plaintiffs are required to do at this stage of the litigation." Order Denying Motion to Dismiss at 15-16, *VoteAmerica v. Raffensperger*, No. 1:21-cv-01390-JPB (N.D. Ga. Dec. 9, 2021), Doc. 57. And regarding overbreadth, "answering the question of whether the conduct regulated by the challenged provisions implicates a constitutional interest requires analysis of facts outside the complaint, which is inappropriate on a motion to dismiss." *Id.* As further explained below (in addition to prior briefing and at argument), Plaintiffs have done more than enough to allege plausible constitutional violations sufficient to survive a Motion to Dismiss.

### A.  Plaintiffs Have Plausibly Alleged that SB 1 Infringes Their Speech.

#### 1.  Plaintiffs Plausibly Allege that their Absentee Application Assistance is Core Political Speech.

As stated at argument, Plaintiffs plausibly allege that each activity proscribed by SB 1 restricts actual speech: Plaintiffs cannot "request," "order," or "complete" absentee ballot

applications without speaking. Indeed, Plaintiffs, who are understood to promote the importance

of voting throughout Alabama, Doc. 1 ¶ 129, would *only* be submitting or "distributing, ordering,

requesting, collecting, completing, prefilling, obtaining, or delivering" another's application to

encourage them to vote. Doc. 1 ¶ 2. When GBM assists incarcerated individuals with requesting

or ordering an absentee ballot, Doc. 1 ¶ 25, or when the League review applications for completion,

Doc. 1 ¶¶ 19-20, they must literally speak to do so.  But all of SB 1's restrictions implicate

Plaintiffs' pure speech because they restrict how Plaintiffs convey their message about voting.

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (recognizing that the *distribution*

of political documents implicates pure speech); *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 389

(5th Cir. 2013) (holding that "'urging' citizens to register; 'distributing' voter registration forms;

'helping' voters to fill out their forms; and 'asking' for information to verify that registrations were

processed successfully [is] constitutionally protected speech"). For example, a core part of GBM's

assistance to incarcerated voters, who do not have access to the internet or printers, is to distribute

blank absentee ballot applications, Doc. 1 ¶ 25, conduct which has been repeatedly found to be

"constitutionally protected speech." *See Voting for Am., Inc.*, 732 F.3d at 389.

These activities are also core political speech because Plaintiffs accomplish their assistance

through interactive communications that encourage others to vote.[1] Doc. 1 ¶¶ 73-76. As Plaintiffs

pleaded, activities that "involve[] interactive communication concerning political change" are

"appropriately described as 'core political speech'" and receive robust First Amendment

---

[1] Defendants made an unavailing point at argument that finding Plaintiffs' voter assistance as intertwined with speech has no "limiting principle" because "by that same logic, [] mishandling the absentee ballot itself would be okay or paying someone to vote or paying someone to apply for an absentee ballot . . . would be triggering of the First Amendment." Hearing Tr. at 13:25-14:12. At best, this is a merits determination inappropriate at the motion to dismiss stage. At worst, this argument insinuates malign intent on the part of Plaintiffs that is contrary to their missions and reputations. Plaintiffs do not contend that the intentional "mishandling" of absentee ballot applications is speech, and, in any event, SB 1 does not narrowly prevent this "mishandling," but broadly prohibits all activities, including the good-faith speech of Plaintiffs.

protection. *See Meyer v. Grant*, 486 U.S. 414, 421-22 (1988); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 628-32 (1980). LWVAL, for example, "uses absentee ballot application assistance as a part of a larger dialogue about a citizen's voting plan and the importance of voter turnout." Doc. 1 ¶ 18. Likewise, GBM "discuss[es] civics with incarcerated individuals" when they assist them with applying for an absentee ballot. Doc. 1 ¶ 24.

*Meyer v. Grant* did not concern a ban on paying people to knock on doors and verbally advocate for a petition initiative. *See* 486 U.S. at 416. Rather, it considered a prohibition on paying petition circulators as they collected signatures. *Id.* Nevertheless, the *Meyer* court recognized the prohibition must be undertaken with "due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease." *Id.* at 422 n.5.  This is true regardless of whether the petition itself is speech, because the speech at issue was the *distribution* of the petition and the *collection* of signatures for the petition, separate from the petition itself. In any event, *Meyer* does not countenance a narrow view of the underlying speech: as mentioned above, speech is imbued in the dissemination of political documents—including government forms like voter registration or absentee ballot applications. *Id.* at 424 (rejecting the state's attempt to reduce the petition to a "state-created right"); *accord McIntyre*, 514 U.S. 334. Likewise, while SB 1 may permit Plaintiffs to meet with people to say the words "apply for an absentee ballot," Plaintiffs allege that assisting the voter is so intertwined with their "informative" and "persuasive" speech encouraging absentee voting that SB 1's prohibitions would largely cause "the flow of such information and advocacy . . . [to] cease." *Compare Meyer*, 486 U.S. at 422 n.5 *and* Doc. 1 at ¶¶ 68, 69, 71, 74, 75. 125. Thus, Plaintiffs have plausibly alleged a severe burden on

their pure speech. *See also League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) ("As the plaintiffs point out, a voter registration drive involves more than just accepting and delivering a form like a neutral courier. A voter registration drive, as described by the plaintiffs and as the term is ordinarily used, involves 'encourag[ing] . . . citizens to register to vote.'") (internal citations omitted); *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d at 1334; *accord Lichtenstein v. Hargett*, 83 F.4th 575, 588-89 (6th Cir. 2023) (noting that "distribution" could be speech itself).

Other courts within the Eleventh Circuit have similarly analogized the restriction on paid petition circulation under *Meyer* to restrictions on the solicitation of voter registration applications, which are directly analogous to absentee ballot applications. Despite Defendants' assertion that Plaintiffs could communicate in other ways, "[b]ecause the collection and submission of [absentee ballot applications] is intertwined with speech and association, the question is not whether Plaintiffs' conduct comes within the protections of the First Amendment, but whether Defendants have regulated such conduct in a permissible way." *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d at 1334. The *League of Women Voters of Fla. v. Cobb* court held that penalties regulating voter registration activities burdened speech under *Meyer,* noting that "as in *Meyer*, [the restriction on collection and submission of voter registration applications] has reduced the total quantum of speech" because the restrictions shut down voter registration drives.[2] 447 F. Supp. 2d at 1332-33. Likewise, the *League of Women Voters of Fla. v. Browning* ("*Browning I*") court noted that "[u]ndoubtedly, Plaintiffs' interactions with prospective voters in connection with their solicitation of voter registration applications constitutes constitutionally protected activity." 575 F. Supp. 2d 1298, 1321 (S.D. Fla. 2008). Finally, *League of Women Voters of Fla. v. Browning*

---

[2] SB 1 goes much further than the law in *Cobb*, which did not restrict Plaintiffs from "assisting in the filling out of applications." *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d at 1333.

("*Browing II*"), held that such restrictions burden "pure speech," and, because that speech is political in nature, it is a "core First Amendment activity." 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012). Here, Plaintiffs have alleged that their voter assistance drives and events in which they provide absentee ballot application assistance have all but ceased as a result of SB 1.[3] Doc. 1 ¶¶ 15, 21, 26-27, 31.  Those events are a primary means of communicating their voter encouragement message and convey the importance of voting if eligible. *Id.* ¶ 77.

Finally, as Plaintiffs noted at argument, even if it were binding on this Court, the Sixth Circuit's decision in *Lichtenstein* is not dispositive here for several reasons and indeed weighs in Plaintiffs' favor. *Lichtenstein* held that to fall within *Meyer*'s test, Plaintiffs need to show that a law burdens their speech by restricting "inputs" that help produce it; or reduces the total quantum of speech. *Lichtenstein*, 83 F.4th at 585; *accord League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d at 1334 ("[T]he First Amendment protects the instant Plaintiffs' right to select what they believe to be the most effective means of conducting their voter registration drives to ensure their voices are heard in the political process."). In keeping with that, Plaintiffs allege that SB 1 reduces the total quantum of speech by prohibiting Plaintiffs' paid employees—and even volunteers who receive gas cards or other potential "gifts"—from engaging in absentee ballot application assistance aimed at encouraging voter participation. Doc. 1 ¶ 68.[4] Plaintiffs' employees and most of their volunteers simply cannot risk the high penalties imposed by SB 1, and so have ceased virtually all of their absentee ballot application activities, severely reducing the total quantum of speech encouraging absentee voting and participation by those who can only vote absentee. Doc. 1 ¶¶ 69-72.  By restricting *who* may speak—prohibiting certain volunteers and paid employees

---

[3] In *Cobb*, Plaintiffs' activities ceased "because of the Law's combination of significant, strict, joint and several liability fines," 447 F. Supp. 2d at 1333, whereas SB 1 imposes felony penalties – not merely monetary.

[4] Indeed, the *Lichtenstein* court specifically noted that if "Tennessee barred the Plaintiffs from paying their employees to promote absentee voting, they may have a strong case for strict scrutiny." *Lichtenstein*, 83 F.4th at 587.

from engaging in the activities—SB 1 "limits the size of the audience [Plaintiffs] can reach." *Meyer*, 486 U.S. at 423. Plaintiffs also allege that SB 1 restricts inputs: specifically, it prohibits the acceptance or provision of a "gift" to "distribute, order, request, collect, prefill, complete, obtain, or deliver a voter's absentee ballot application." Doc. 1 ¶¶ 65-66, 68, 126. Plaintiffs allege that they provide gifts—including pens, stamps, envelopes and other provisions necessary to complete the application—to volunteers and voters at those events. *E.g.*, Doc. 1 ¶¶ 25, 30, 71, 72. By restricting these putative "gifts," SB 1 restricts the inputs by which Plaintiffs facilitate their voter assistance communications. *See Lichtenstein*, 83 F.4th at 586 (recognizing that "*Meyer* applied heightened scrutiny because the Colorado statute targeted speech by restricting the conduct that created the speech."). As such, Plaintiffs have sufficiently alleged a pure speech claim under *Meyer.*

### 2. Plaintiffs Have Plausibly Alleged that their Absentee Ballot Application Assistance is Expressive Conduct.

Plaintiffs sufficiently state that their absentee ballot application assistance is expressive conduct subject to strict scrutiny.[5] Satisfaction of the first *Holloman* factor—whether there was an intent to convey a particularized message—is not in dispute and Plaintiffs have sufficiently plead under the second factor that a reasonable person would interpret absentee ballot application assistance as conveying "*some* sort of message." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004). Whether a reasonable observer would understand some message from this assistance is a question of fact, and at this stage this Court must take Plaintiffs' well-pleaded

---

[5] As Plaintiffs have argued, constitutional protections for freedom speech "does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989); *see Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) ("*Food Not Bombs I*"). As such, Plaintiffs allege that the specific activities proscribed by SB 1 are pure speech, but also that absentee ballot application assistance is expressive conduct. As discussed at argument, this Court need only reach the merits of one of these bases to find a constitutional violation. But Plaintiffs aver that at the motion to dismiss stage, both the speech and expressive conduct claims have been sufficiently pleaded for both to move forward.

factual allegations as true. As discussed at argument, the Eleventh Circuit has articulated five factors to determine whether a reasonable person would understand some message, which are neither non-exhaustive nor non-exclusive. *See Food Not Bombs I*, 901 F.3d at 1242-42. That Plaintiffs sufficiently alleged facts showing the presence of all five factors, then, is more than enough to state a claim. Doc. 1 ¶¶ 14, 19-20, 24-26, 30, 67-75, 125, 128, 129-30.

Plaintiffs' absentee ballot application assistance is analogous to the activities of the nonprofit Fort Lauderdale Food Not Bombs ("FLFNB") in *Food Not Bombs I*. FLFNB set up tables and banners (including one with its logo) and distributed informative literature at its events. *Food Not Bombs I*, 903 F.3d at 1242. Similarly, Plaintiffs, who are known and trusted community organizations, host public voter assistance drives to inform voters of the voting process, encourage engagement, and distribute the necessary tools for engagement. Doc. 1 ¶ 25. Community members explicitly seek out Plaintiffs assistance because of message they convey. Doc. 1 ¶¶ 55-58.  Just as FNBFL brandishes banners and passes out food to the homeless, Plaintiffs wear t-shirts with their logos and hand out snacks, branded pens, and stickers, and provide the materials necessary to fill out applications, including pens, envelopes and stamps. *Id.* ¶ 20, 25, 30. Contrary to Defendants' arguments, Plaintiffs' conduct does not lose its expressive nature simply because it is accompanied by other speech. *Food Not Bombs I*, 901 F.3d at 1243-44. "The critical question is whether the explanatory speech is *necessary* for the reasonable observer to perceive a message from the conduct." *Id.* at 1244 (emphasis in original). As Plaintiffs have argued, that they wear branded t-shirts or hang banners "adds nothing of legal significance" where, as here, the underlying activity is expressive. *Id.* at 1244. As explained above, Plaintiffs' activities proscribed by SB 1 *themselves* are expressive, because Plaintiffs would only undertake them to convey a message about voting. Therefore, the banners and t-shirts accompanying Plaintiffs' voter assistance activities, as with the

banners accompanying FLFNB's food sharing events, merely provide "context" to the underlying absentee ballot application assistance expression. *Id.* at 1244.

Like the food-sharing events organized by FLFNB in public parks, Plaintiffs sufficiently allege that they engage in voter assistance and education events that are open to everyone, including Alabama NAACP's town halls, Doc. 1 ¶ 14, LWVAL's college campus drives, *id.* ¶ 20, and other voter registration drives hosted by Plaintiffs which occur in public parks, college campuses, and sidewalks. *Compare Food Not Bombs I*, 901 F.3d at 1242 *with* Doc. 1 ¶¶ 127-29.[6] Plaintiffs also sufficiently allege that Alabama's long history of enacting voter restrictions to disenfranchise voters of color, including by specifically targeting voter assistance through targeted criminal prosecutions and other means, is "instructive in determining whether the reasonable observer may infer some message when viewing" Plaintiffs' current efforts to assist voters with absentee voting. *Food Not Bombs I*, 901 F.3d at 1243; Doc. 1 ¶¶ 12, 23-24, 28, 36-51. [7]

### 3. Plaintiffs Have Plausibly Alleged that SB 1 Is Subject to and Fails Strict Scrutiny.

Oral argument illuminated that the parties agree that strict scrutiny applies to Plaintiffs' pure speech and associational claims but disagree about the level of scrutiny that applies to Plaintiffs' expressive conduct allegations. Hearing Tr. at 20:10-19, 140:1-4, 141:20-24. Because Plaintiffs have sufficiently alleged severe burdens on expressive conduct, at least at this stage of the litigation where Plaintiffs' allegations must be taken as true, strict scrutiny applies.

In general, severe burdens on expressive conduct are subject to strict scrutiny. *See Meyer*,

---

[6] Defendants' baseless speculation at argument that "you could have somebody prefilling a thousand applications in a windowless office at GBM" that would fail to convey a message makes a mockery of the facts Plaintiffs allege about their long-standing public voter events. Hearing Tr. at 17:13-19; Doc. 1 ¶¶ 14, 20, 24.

[7] Defendants do not dispute the sufficiency of Plaintiffs' allegations that their voter assistance addresses a matter of public concern. *See* Doc. 1 ¶¶ 127-29. Similarly, the record in *Food Not Bombs I* demonstrated "without dispute" that the treatment of the city's homeless population was a matter of public concern. 901 F.3d at 1242; *see also VoteAmerica v. Raffensperger*, 696 F. Supp. 3d 1217, 1232 (N.D. Ga. 2023) (noting that "discussing the right to vote and urging participation in the political process is a matter of societal concern.").

486 U.S. at 423; *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1281 (11th Cir. 2024). Burdens on core political expression, such as absentee ballot application assistance, are severe burdens on expressive conduct subject to strict scrutiny. *Buckley v. Am. Const. Law Found. Inc.*, 525 U.S. 182, 207 (1999); *Texas v. Johnson*, 491 U.S. 397, 403 (1989); *Meyer*, 486 U.S. at 423; *see also Lichtenstein*, 83 F.4th at 586 (recognizing that "*Meyer* applied heightened scrutiny because the Colorado statute targeted speech by restricting the conduct that created the speech."). Likewise, content-based restrictions on expressive conduct are also severe burdens subject to strict scrutiny. *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1291-2 (11th Cir. 2021) ("*Food Not Bombs II*"); *Honeyfund.com*, 94 F.4th at 1278.[8]

Where government regulations "hid[e] speech restrictions in conduct rules . . . [o]ne 'reliable way' to sort them out is to 'ask whether enforcement authorities must examine the content of the message that is conveyed to know whether the law has been violated.'" *Honeyfund.com*, 94 F.4th at 1278 (internal citations omitted). In *Honeyfund*, Florida's DEI restriction impermissibly required government officials to look at the content of the curriculum to determine whether the DEI restriction had been violated. Here, Plaintiffs allege government officials are required to examine the content of Plaintiffs' voter education materials, for example, to understand whether their materials include a distribution link to the application or a written order for an absentee ballot

---

[8] In *Food Not Bombs II* the Eleventh Circuit held that the restriction on the food-sharing events were content neutral because it applied not just to food-sharing events but also other social services. 11 F.4th at 1292. SB 1 is easily distinguishable; Plaintiffs allege the Challenged Provisions are content-based because they apply only to expressive conduct related to a particular topic: absentee ballot applications. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed."). Even where the court determined the restriction was content-neutral in *Food Not Bombs II*, it noted it reached substantially the same result as if it were content-based because it is Defendants' burden to show that the Challenged Provisions are "'narrowly tailored to serve a significant governmental interest' and 'leave open ample alternative channels for communication of the information.'" *Food Not Bombs II*, 11 F.4th at 1292 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)); *United States v. O'Brien*, 391 U.S. 367, 377 (1968). SB 1 would still fail under this standard because it restricts all forms of absentee ballot application assistance, which by its definition does not leave open alternative channels for communication. *See* Doc. 50 at 22 n.5.

application, Doc. 1 ¶¶ 72, 81, in violation of SB 1. As a result, SB 1 is content-based restriction on Plaintiffs' voter-assistance activities.

Viewpoint-based restrictions are also severe burdens on expressive conduct subject to strict scrutiny. *Honeyfund*, 94 F.4th at 1278. Plaintiffs have also sufficiently alleged facts showing that SB 1 is a viewpoint-based restriction where the government targets "not just a subject matter, but 'particular views taken by speakers.'" *Honeyfund.com Inc.*, 94 F.4th at 1278. In *Honeyfund,* the DEI restriction was also viewpoint-based because the law required examining "the viewpoint expressed…to determine whether the Act applies. *Id.* (internal citations omitted). Similarly, SB 1 would not restrict anyone who *discouraged* absentee ballot application assistance. Plaintiffs have sufficiently alleged facts that SB 1 is a "direct penalty on certain viewpoints–because the conduct and the speech are so intertwined, regulating the former means restricting the latter." *Id*. Thus, SB 1's severe burdens on expressive conduct subject SB 1 to strict scrutiny.

**B.  Plaintiffs Have** Plausibly Alleged that SB 1 Infringes Their Associational Rights.

As multiple courts have recognized, "[p]ublic endeavors which 'assist people with voter registration'. . . and which expend resources 'to broaden the electorate to include allegedly under-served communities,' qualify as expressive conduct which implicates the First Amendment freedom of association." *VoteAmerica v. Schwab*, 576 F. Supp. 3d 862, 875 (D. Kan. 2021); *VoteAmerica v. Raffensperger*, 696 F. Supp. 3d 1217, 1235 (N.D. Ga. 2023) (recognizing that "courts must give deference to an association's assertions regarding the nature of its expression as well as to an association's view of what would impair its expression.") (internal quotation marks omitted). Even the *Lichtenstein* court recognized that "[t]he Supreme Court's expressive-association cases apply most obviously to [p]olitical advocacy groups whose raison d'être is speaking." 83 F.4th at 602 (internal quotation marks omitted).

Plaintiffs—who exist to increase voter participation—allege that they "specifically aim to meet voters where they are, in order to provide assistance and effectively spread their message that all eligible voters should exercise their right to vote." Doc. 1 ¶ 138. Plaintiffs allege that the restrictions in SB 1 necessarily prevent them from associating with voters to submit or "distribute, order, request, collect, prefill, complete, obtain, or deliver a voter's absentee ballot application." *Id.* ¶¶ 65-66, 139. That Defendants assert that Plaintiffs can still gather with voters for other reasons does not pertain to the plausibility of Plaintiffs' allegations that SB 1 makes it virtually impossible for Plaintiffs to effectively gather with voters to assist them with absentee ballot applications by proscribing the means of assisting them. Doc. 1 ¶ 77, 79.

Contrary to Defendants' assertion, Hearing Tr. at 22:14-25, Plaintiffs' associational claim does not hinge on Plaintiffs' free speech claim, because SB 1 restricts Plaintiffs' ability to associate with voters regardless of whether the restricted activities constitute speech or expressive conduct. For example, the prohibition on "distributing" or "completing" an application necessarily implicates Plaintiffs ability to associate with other voters because those activities require gathering with another individual. Doc. 1 ¶ 77. Moreover, Plaintiffs allege that they use these activities to associate with *each other.* "GBM, Alabama NAACP, and LWVAL regularly host voter participation drives or other community events to encourage their members and other Alabamians to register to vote and vote, including assisting voters to apply and vote absentee." Doc. 1 ¶ 77. As a result, "SB 1's restrictions hinder Plaintiffs' ability to associate with each other and work together to assist voters with absentee ballot applications. In their voter engagement work, Plaintiffs often work together or with other civic organizations to host voter participation drives and promote absentee voting." Doc. 1 ¶ 79. By restricting *who* may engage in these activities, Plaintiffs allege that SB 1 prevents them from associating with one another to spread their common message

encouraging others to vote. As such, Plaintiffs have plausibly alleged a severe burden on their associational rights.

### C.  Plaintiffs Have Plausibly Alleged that SB 1 Is Void for Vagueness.

No matter what Defendants speculate may be prosecuted in practice, *see* Hearing Tr. at 138:6-16, at this stage it only matters that Plaintiffs' concerns are at least as plausible.  "Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) (internal quotations omitted). SB 1 leaves Plaintiffs to guess what aspects of their events are subject to serious criminal liability and thereby chills critical aspects of their civic engagement programing. Plaintiffs' town halls and voter assistance events at college campuses include providing voter education and absentee ballot application assistance. *See* Doc. 1 ¶¶ 14, 20, 138. The uncertainty of the terms "gift," "payment," "third party," "prefill," "distribute," and "submit" raise serious questions for, *e.g.*, an Alabama NAACP volunteer at a voter assistance drive who is approached by a voter and is asked to send the voter a link to the application online or put the application in the mail. *See* Doc. 1 ¶¶ 13-14, 86. Would the volunteer violate the Submission Restriction when the applicant specifically requested the volunteer put her application in the mail? Doc. 1 ¶ 86. Would the volunteer "distribute" the application by sending the link via text message? Could the volunteer be subject to criminal liability for receiving a "gift" because she wore a t-shirt given to her by NAACP for volunteering? Doc. 1 ¶¶ 14, 81.

Similarly, Plaintiffs plausibly and sufficiently allege that SB 1 is completely silent as to whom a payment must come from, to whom a payment must be made to, and for what purpose a payment must be made to be subject to criminal prosecution. Does the "payment" provision in SB 1 subject a LWVAL member to criminal liability for donating $20 to LWVAL because LWVAL conducts civic engagement programing that includes assisting with completing, submitting, and distributing applications? Doc. 1 ¶ 18. Are GBM's paid staff subject to criminal prosecution

15

because part of their job is providing voter services, including assistance with absentee ballot applications? Doc. 1 ¶¶ 82-83. The text of SB 1 provides no clear answers to these questions which bear directly on Plaintiffs' assistance communications.

Further, as discussed at argument, while a specific intent requirement may "alleviate vagueness concerns," *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007), inserting "knowingly" does not eliminate vagueness concerns where knowingly does not modify the vague terms nor where the scienter requirement fails to protect the party from being convicted for good-faith mistakes. *See United States v. Houser*, No. 4:10-CR-012-HLM-WEJ, 2011 WL 2007497, at *9 (N.D. Ga. March 18, 2011) (noting that "a scienter requirement does not necessarily validate a criminal statute against all vagueness challenges"); *compare with McGuire v. Marshall*, No. 2:19-CV-174-WKW, 2024 WL 2401833, at *52 (M.D. Ala. May 23, 2024) (upholding a statute where it included "a scienter element that protects [sex offender] registrants from being convicted for good-faith mistakes.").

"Knowingly" modifies "pay" or "gift" in the Payment and Gift Provisions, but this does not clarify whether someone is "knowingly" receiving a payment if they are taking a salary, or "knowingly" receiving a gift for taking their grandfather's gas money, taking their neighbor's tea, or taking a volunteer's stamp to mail their application. Doc. 1 ¶¶ 65-6, 81-2. "Knowingly" also modifies "distribute" in the Prefiling Restriction. Doc. 1 ¶ 63. But "knowingly distribute" does not tell LWVAL whether they are violating SB 1 if they send a link to the application. Doc. 1 ¶ 86; Hearing Tr. at 85:17-86:3. And, as Defendants emphasize, another provision in SB 1 states that "[a]ny applicant may receive assistance in filling out the application as he or she desires." Doc. 42 at 4 (quoting Ala. Code § 17-11-4(b)(1)). Read in conjunction with the Prefiling Restriction, "knowingly" does not tell Plaintiffs if they are violating the Prefiling Restriction by

knowingly distributing an application that was filled out ahead of time at the voter's request under the separate filling provision. There is no intent element at all in the Submission Restriction. Doc. 1 ¶ 64; Ala. Code § 17-11-4(c)(2).

Plaintiffs and their volunteers are left to guess how much they may assist a voter in completing or filling out their application before triggering criminal liability, ultimately chilling Plaintiffs' ability to encourage and assist senior citizens, voters with disabilities, eligible incarcerated voters, and voters with low literacy levels cast their ballots. *See* Doc. 1 ¶¶ 14, 19, 30, 83, 138.  The seriousness of the criminal liability— including a felony conviction that carries a sentence of up to 20 years in prison—cannot be overstated and Plaintiffs' vagueness claim does not turn on their other claims because there are separate due process considerations. Doc. 1 ¶ 145. Specifically, "[d]ue process requires that all be informed as to what the State commands or forbids, . . . and that men of common intelligence not be forced to guess at the meaning of the criminal law." *Smith v. Goguen*, 415 U.S. 566, 574 (1974) (internal quotations omitted). Plaintiffs are resource-limited, civil rights and faith-based organizations. Doc. 1 ¶¶ 22, 27. SB 1's vagueness, coupled with its significant criminal consequences, has caused Plaintiffs to severely limit their civic engagement activity and cease with absentee application assistance entirely. *See* Doc. 1 ¶¶ 14, 21, 26. Plaintiffs plausibly plead that SB 1 is vague because the answers to the aforementioned questions are not clear on the face of the statute, which infringes on Plaintiffs' due process rights. Doc. 1 ¶¶ 143-50; *see also Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1320 (11th Cir. 2017) (recognizing the separate due process concerns and noting that when speech is involved, there are First Amendment concerns and the requirements for due process are stricter). The criminal penalties are too high for the vague provisions of SB 1 to serve as adequate notice for Plaintiffs.

17

**D.  Plaintiffs Have Plausibly Alleged that SB 1 is Substantially Overbroad.**

As previously argued, laws restricting First Amendment freedoms "may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation and internal quotations omitted). Additionally, as discussed at oral argument, Plaintiffs plead allegations of SB 1's overbreadth that are independent of Plaintiffs' other claims. Specifically, Plaintiffs plead that absentee ballot application assistance is a necessary prerequisite for certain voters to cast their ballot, such that restricting that assistance improperly sweeps in the fundamental right to vote of those individuals. Doc. 1 ¶¶ 80, 83, 87-9, 95, 106-7, 118-9. Defendants' retort at argument that these voters may simply send a letter to their election officials, Hearing Tr. at 138:9-11, is simply an irrelevant response to Plaintiffs' allegations, which specifically describe *why* a voter cannot merely assist themselves and requires the assistance of others. Doc. 1 ¶¶ 102-3. The scope of the assistance required to overcome an overbreadth claim is—at best—a question of fact. It is enough that Defendants do not dispute that certain voters require assistance to buttress the plausibility of Plaintiffs' overbreadth allegations and overcome a Motion to Dismiss.

Plaintiffs have been providing civic engagement to their community for years. *See* Doc. 1 ¶¶ 12, 17-18, 23-24, 28-29. Since the enactment of SB 1, however, Plaintiffs have had to cease the vast majority of their civic engagement work concerning absentee voting. Doc. 1 ¶¶ 15, 21, 27, 31. As Plaintiffs previously and sufficiently alleged, SB 1 criminalizes a substantially overbroad amount of speech and expressive conduct subject to First Amendment protections. Doc. 1 ¶¶ 151-57.

At argument, Defendants cited examples of purported voter fraud and fear of "ballot harvesting" as justification for the bill's "legitimate sweep" of prohibited actions. But Plaintiffs allege that SB 1 does not fill any gaps within Alabama's election laws, Doc. 1 ¶¶ 53, 132, and

Defendants' purported examples do not undermine the sufficiency of Plaintiffs' allegations, especially when none of those examples would have been addressed by SB 1.[9] In any event, "the Court must take the allegations in the Complaint at face value and is not permitted to weigh and decide the disputed factual considerations necessary to answer the substantial overbreadth question." Order Denying Motion to Dismiss at 15-16, *VoteAmerica v. Raffensperger*, No. 1:21-cv-01390-JPB (N.D. Ga. Dec. 9, 2021), Doc. 57.

## II.   PLAINTIFFS HAVE SUFFICIENTLY STATED A CLAIM UNDER THE VOTING RIGHTS ACT.

Plaintiffs also have amply stated their claim under Section 208 of the Voting Rights Act (the "VRA"), which guarantees the right of disabled, blind, and low literacy voters to "assistance by a person of the voter's choice," other than from two enumerated exceptions (the voter's employer or union representative). Congress enacted Section 208 specifically out of concern that such voters faced barriers in voting and were at risk of undue influence if they could not choose who assisted them with the process, explaining its determination that they "must be permitted to have the assistance of a person of their own choice" because "*this is the only way to assure meaningful voting assistance and to avoid possible intimidation or manipulation of the voter.*" S. Rep. No. 97-417, 62 (1982) (emphasis added). As discussed, Plaintiffs are civic, faith-based, and disability rights organizations who have long assisted 208-eligible voters—including mobility-impaired voters, blind voters, and others who would be unable to vote without such help —who ask them to do so, including with their absentee applications. *See, e.g.*, Doc. 1 ¶¶ 12-32, 85, 112. In other words, Plaintiffs are organizations to whom many of the state's most vulnerable voters turn for assistance. There can be no doubt that Plaintiffs have stated a claim that the Challenged

---

[9] Alabama election law already prohibits voter intimidation, manipulation, and bribery. *See, e.g*., Ala. Code §§ 17-17-14; 17-17-15; 17-17-26; 17-17-46.

Provisions of SB 1—which prohibit certain forms of basic voting assistance altogether and exclude broad categories of assistors like Plaintiffs—conflict with the broad and unequivocal right to such assistance guaranteed by Section 208.

*First*, Defendants agree that Section 208's protections extend to all aspects of the voting process, including absentee application assistance, *See* Doc. 42 at 43, but SB 1 is devoid of any protection for assistors that would otherwise engage in this basic 208-protected assistance *and instead expressly provides that such assistance would be a crime*. For example, the Submission Restriction appears to criminalize an assistor who takes an application to the mailbox for a mobility-impaired voter who asks, notwithstanding that such mailing is an essential step in the process of applying to vote absentee. Ala. Code § 17-11-4(c)(2). The Prefilling Restriction also appears to criminalize assistance such as inputting a blind voter's information on the application form at their request before handing it to them—without which a blind voter would not be able to apply for an application because Alabama does not provide electronic or Braille versions of the form. *Id.* § 17-11-4(b)(2); Doc. 1 ¶ 48.

Tellingly, at argument, Defendants had no response to this. To the extent Defendants contend that the recitation of Section 208's language in Ala. Code § 17-11-4(e) that "any *voter* is entitled to assistance . . . " suffices to protect 208 *assistors*, this argument must be rejected: nowhere in SB 1 does it state that 208 assistors cannot be prosecuted. Any suggestion to the contrary only underscores the fundamental vagueness of this law. Indeed, the Legislature could have specified protections for 208 assistors in SB 1 but did not do so. *Compare* Ala. Code § 17-11-4(b)(2), (c)(2) (making submission and prefilling "unlawful" for anyone, except under the Submission Restriction for someone receiving emergency medical treatment within five days of an election) *with* Ala. Code § 17-11-4(f) (specifying that voters subject to the Uniformed and

Overseas Citizens Absentee Voting Act are "not subject" to SB 1). Thus, Plaintiffs have more than sufficiently pleaded that the Submission and Prefilling Restrictions directly conflict with 208's requirements.

*Second*, Plaintiffs have alleged that the Payment and Gift Provisions unequivocally narrow the universe of assistors beyond that which is permitted by the plain text of Section 208 because they apparently criminalize Plaintiffs and many others who would otherwise be able to provide assistance requested by 208 voters. Defendants themselves concede that if a blind or disabled voter requested ballot application assistance at one of Plaintiffs' assistance drives, SB 1 would prohibit compensated employees and volunteers from providing that assistance. Hearing Tr. at 28:12-25. Moreover, SB 1 excludes many other categories of potential assistors who may receive pay, including home health aides, interpreters, and other service professionals. Other state laws that have similarly sought to narrow the universe of assistors have almost uniformly been struck down. *See* Doc. 50 at 37-40; United States' Statement of Interest, Doc. 51 at 7-9.[10] In addition to the authorities set forth in Plaintiffs' Opposition and the United States' Statement of Interest, the recent *League of Women Voters of Ohio v. LaRose* decision discussed at argument is further instructive. No. 1:23-cv-2414, 2024 WL 3495332 (N.D. Ohio July 22, 2024). At issue there was an Ohio law that made it a felony for anyone but certain relatives of a voter, employees or contractors of the

---

[10] The *Priorities USA v. Nessel* case cited by Defendants is not only nonbinding but also cannot be squared with the text of Section 208. 628 F. Supp. 3d 716 (E.D. Mich. 2022). Fatally, *Priorities* fails to give vitality to the "of the voter's choice" clause in Section 208; its conclusion that Michigan could further restrict the universe of assistors beyond what Section 208 specifies renders the "of the voter's choice" clause meaningless, in direct contravention of both Section 208's text and basic principles of statutory construction. *See, e.g.*, *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 99 (1992) ("We must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law.") (cleaned up); *see also League of Women Voters of Ohio*, 2024 WL 3495332, at *14 (explaining that "*Priorities USA* discusses 'a person' but does not address 'of the voter's choice'" and observing that "[h]olding that anytime Congress uses an indefinite article in a statute, it implies that state law limitations are permissible, is not supported by case law or any existing doctrine" and "it seems unlikely that Congress meant to allow states to restrict a federally created right—particularly one as crucial as a voting right—simply by the use of an indefinite article").

United States Postal Service, or a private carrier to return the voter's absentee ballot. *Id.* at *2. The court concluded: "[l]ooking simply at the text of the statute and applying the ordinary meaning of 'a person of the voter's choice,' Section 208 gives disabled voter[s] the right to choose who will facilitate the submission of their absentee ballot without further restriction by the state." *Id.* at *9-*15. In so doing, the court considered and rejected defendants' argument (analogous to that advanced by Defendants here) that Congress's use of "a" instead of "any" somehow permits states to further narrow the universe of available assistors beyond that which is specified in Section 208. *Id.* (explaining on this point that "[t]he Court's analysis is rooted in the text of the statute.").

Defendants' nebulous asserted interest in prohibiting "undue influence" cannot, and does not, immunize SB 1's violation of federal law. It is well settled that even if Defendants might prefer a different approach (*i.e.*, by excluding anyone who receives compensation from providing any such assistance as SB 1 does), this preference does not circumvent the conflict. *See, e.g.*, *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992) ("[It] is not enough to say that the ultimate goal of both federal and state law is the same" because "[a] state law is pre-empted if it interferes with methods by which the federal statute was designed to reach that goal.") (cleaned up); *see also, e.g.*, *League of Women Voters of Ohio*, 2024 WL 3495332, at *11 ("The State Defendants and Intervenors assert election integrity concerns and other policy arguments in support of their interpretation of Section 208 and their subsequent legislative efforts. But such election integrity and policy arguments should be put to Congress, not the courts.").[11] Thus, under

---

[11] Relatedly, Defendants suggested at argument that there is no conflict because SB 1 does not remove all potential assistors, Hearing Tr. at 29-31—but again, Congress was crystal clear that Section 208 guarantees 208 voters with the right to assistance to anyone of "the voter's choice" except for its two enumerated exceptions. Under Defendants' theory, and in direct conflict with what Section 208 provides, states could nonetheless elect to eliminate 99.9% of would-be assistors and still not run afoul of federal law. This is plainly contrary to both the text and purpose of Section 208 and only underscores the untenableness of Defendants' arguments.

our constitutional structure, the balance that Congress struck—that voters must have the broadest possible right to assistance from "a person of [their] choice" and no less—must be respected.

Finally, and for the avoidance of doubt, at the heart of Section 208 is the right to "*assistance of . . . the voter's choice.*" Misconduct such as voter coercion or intimidation is neither "assistance" nor "of . . . the voter's choice" and therefore not protected under Section 208. Alabama criminalizes such misconduct in numerous statutes which Plaintiffs do not (and would not) challenge under Section 208. Plaintiffs do not engage in such conduct and unequivocally condemn it. Plaintiffs are organizations that have long worked in Alabama to encourage and empower eligible voters to exercise their right to the franchise should they wish to do so. Doc. 1 ¶¶ 12-32. Plaintiffs do not intimidate, bribe, or otherwise coerce anyone to vote, and such misconduct is antithetical to their missions and work, as well as an insult to their long legacy of civic empowerment in the State. What Section 208 does not permit, as numerous other courts have recognized, is SB 1's categorical exclusion of assistors or assistance of the voter's choice.

## III.   PLAINTIFFS HAVE SUFFICIENTLY STATED A PREEMPTION CLAIM.

Contrary to Defendants' assertions at oral argument, Hearing Tr. at 135:17-24, the fact that no other P&A—unsurprising given that only 57 entities are authorized to sue under the Act[12]— has invoked PAVA to state a preemption claim against a state law which infringes on the right of assistance to voters with disabilities does not support Defendant's Motion to Dismiss. Likewise, 52 U.S.C. § 210602 does not save Defendants' arguments because ADAP is not using PAVA funds to initiate this suit. *Cf.* Hearing Tr. at 135:9-15; 144:11-15. That PAVA provides a basis to sue does not mean ADAP is initiating the litigation using PAVA funds.

---

[12] There is one such organization for each state, the territories of Guam, the Virgin Islands, Puerto Rico, American Samoa, the Northern Mariana Islands, Washington D.C., and the Native American Nation.

As Plaintiffs noted in both their briefing and at oral argument, Defendant expands *Bellitto v. Snipes* beyond the unique set of facts presented in that case. 935 F.3d 1192 (11th Cir. 1992). *Bellitto* asked whether there was a private right of action to sue under HAVA's list maintenance provisions.[13] This cannot be reasonably expanded to PAVA, which specifically provides that the P&A "shall have the same general authorities as they are afforded under Subtitle C of title I of the Developmental Disabilities Assistance and Bill of Rights Act of 2000." Defendants do not dispute Plaintiffs' allegation that these rights under the DDA include the right to bring suit to enforce and protect the rights of their constitutes and their own rights to pursue their required duties. *See also* 42 U.S.C.A. § 15043(a).

## IV.    PLAINTIFFS HAVE SUFFICIENTLY PLEADED STANDING AGAINST SECRETARY ALLEN.

Finally, Plaintiffs provide the Court with three additional materials relevant to standing against Secretary of State Allen.[14] *First*, as referenced during the argument, Secretary Allen recently issued additional detailed guidance regarding his interpretation of SB 1, including a detailed explanation of his view of each of the Challenged Provisions in this case. Exhibit A to the Declaration of Laurel Hattix (the "Hattix Decl."). *Second*, as also discussed during argument, Secretary Allen advertises a robust apparatus regarding his investigatory and referral process regarding suspected violations of elections laws. Exhibit B to the Hattix Decl. *Third*, the day before the argument and unbeknownst to counsel at the time, Secretary Allen sent correspondence to

---

[13] The Court also noted that Plaintiffs in *Belitto* conceded that "ACRU does not – and indeed could not reasonably – argue that Congress intended to create a private right of action in HAVA." Noting that it is the Court's duty to "interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." 935 F.3d at 1203-4. Plaintiffs in this case make no such concession as to PAVA.

[14] Although materials provided herein were not referenced in the Complaint (including because at least two of them were generated by Secretary Allen only after the Complaint was filed), they are nonetheless able to be considered at this juncture because they pertain to the standing inquiry. *See Corbett v. Transp. Security Admin.*, 930 F.3d 1225, 1228 (11th Cir. 2019) ("[I]f we have been presented with 'facts beyond the four corners' of the pleading that are relevant to the question of standing, we may consider them.").

Plaintiff GBM and various Federal Bureau of Prisons officials. Exhibit C to the Hattix Decl. In that correspondence, Secretary Allen appears to take issue with efforts to register eligible federal inmates to vote[15]—identifying no potential legal violation committed by either Plaintiff GBM or the Federal Bureau of Prisons but nonetheless invoking a litany of laws including SB 1. *See* Ex. C at 4. Specifically, they further support that Secretary Allen has assumed and acted on his responsibility to "provide uniform guidance for election activities" as to the interpretation and implementation of SB 1, including directly to Plaintiff GBM last week. Ala. Code § 17-1-3(a). This only bolsters Plaintiffs' allegations that the fear and chilling effect of SB 1 are traceable to Secretary Allen with respect to Plaintiffs' constitutionally- and federally-protected voter assistance. Similarly, enjoining Secretary Allen from issuing guidance or taking other steps inconsistent with the Constitution and federal law would plausibly lessen the harm to Plaintiffs.[16] This is directly distinguishable from the circumstances in *National Federation of the Blind of Alabama v. Allen*, where Secretary Allen had no statutory authority over at-issue challenge, let alone taken any steps in furtherance of such authority. 661 F. Supp. 3d 1114, 1121 (N.D. Ala. 2023). Secretary Allen cannot both act upon his authority vis-à-vis SB 1 and at the same time disclaim his role in its enforcement and its harm to Plaintiffs, particularly not at the pleading stage.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

---

[15] Alabama permits eligible incarcerated persons who have not been convicted of crimes of moral turpitude to vote. Ala. Code § 17-11-3; Doc. 1 ¶ 47. SB 1 concerns absentee applications only and does not contain any provisions regarding voter registration; however, absentee voting is the only way that eligible incarcerated inmates are able to vote in Alabama. Doc. 1 ¶ 102.

[16] Defendants have incorrectly suggested that Plaintiffs are seeking to force Secretary Allen to exercise his authority in a particular way and "it is doubtful that a federal court would have authority to order it." Doc. 58 at 3. However, Plaintiffs' requested relief is simply an injunction against enforcement, which this Court is of course authorized to issue.

Dated this 9th day of August, 2024.

Respectfully submitted,

/s/ Laurel Hattix
Laurel Hattix (ASB-4592-E20I)
Alison Mollman
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 420-1756
amollman@aclualabama.org
lhattix@aclualabama.org

/s/Valencia Richardson
Valencia Richardson*
Alice Huling*
Ellen Boettcher*
Reginald Thedford*
Shilpa Jindia*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
(202) 736-2200
vrichardson@campaignlegalcenter.org
ahuling@campaignlegalcenter.org
eboettcher@campaignlegalcenter.org
rthedford@campaignlegalcenter.org
sjindia@campaignlegalcenter.org

/s/ William Van Der Pol, Jr.
William Van Der Pol, Jr.
Larry G. Canada
ALABAMA DISABILITIES
ADVOCACY PROGRAM
University of Alabama
Box 870395
Tuscaloosa, AL 35487
(205) 348-4928
wvanderpoljr@adap.ua.edu
lcanada@adap.ua.edu

/s/ Anuja D. Thatte
Anuja D. Thatte*
NAACP LEGAL DEFENSE & EDUCATIONAL
FUND, INC.

700 14th Street NW, Suite 600
Washington, DC 20009
(202) 249-2170
athatte@naacpldf.org

Tiffani Burgess*
Uruj Sheikh*
NAACP LEGAL DEFENSE & EDUCATIONAL
FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
tburgess@naacpldf.org
usheikh@naacpldf.org

/s/ Jess Unger
Bradley E. Heard*
Sabrina Khan*
Jess Unger*
Ahmed Soussi*
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Avenue,
Suite 340
Decatur, GA 30030
(470) 521-6700
bradley.heard@splcenter.org
sabrina.khan@splcenter.org
jess.unger@splcenter.org
ahmed.soussi@splcenter.org

*Attorneys for Plaintiffs*

*\* Admitted Pro Hac Vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of August 2024, I electronically filed the foregoing with the Clerk of Court for the United States District Court for the Northern District of Alabama using the CM/ECF system thereby serving all counsel of record.

/s/ Laurel Hattix
Laurel Hattix (ASB-4592-E20I)
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 420-1756
lhattix@aclualabama.org