FILED
2024 Aug-09 PM 02:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| ALABAMA STATE CONFERENCE OF THE NAACP, *et al.*, | ) ) ) |
| *Plaintiffs*, | ) ) |
| v. | ) ) ) |
| STEVE MARSHALL, in his official capacity as Attorney General of Alabama, *et al.*, | ) ) ) ) ) |
| *Defendants*. | ) |

Case No. 2:24-cv-420-RDP

### DEFENDANTS' POST-HEARING BRIEF IN SUPPORT OF MOTION TO DISMISS (DOC. 42)

During argument on Defendants' motion to dismiss, the Court called for post-hearing briefing. With respect to Plaintiffs' vagueness, freedom of association, and overbreadth claims, Defendants rest on their earlier arguments. SB1 puts a person of ordinary intelligence on notice of what he cannot do with an absentee ballot application. And because the First Amendment does not protect the nonsymbolic use of a government form, it follows that there is no right to associate to do what SB1 criminalizes. The overbreadth claim necessarily falls with the free speech claims.

This brief addresses distinct issues pertaining to Plaintiffs' First Amendment expressive conduct claim, §208 preemption challenge, and HAVA claim. First, using a government form is functional, not symbolic. Even if it were the latter, SB1 is content neutral, so strict scrutiny is not in play. Second, Plaintiffs' (admittedly) "uncomfortably" broad interpretation of §208 would invite the preemption of an untold number of State election laws from New Hampshire to Hawaii. Congress did not enact so intrusive a law that would require States to allow disabled voters to bring

convicted fraudsters, political candidates, foreign agents, or paid operatives into the voting booth with them. Finally, ADAP lacks a right of action to challenge any State election law that allegedly interferes with its aspirational goal of ensuring full participation in the electoral process by disabled persons. Accordingly, this lawsuit should be dismissed in its entirety.

## ARGUMENT

**I.     Using a State form is not a symbolic act protected by the First Amendment.**

The First Amendment protects the spoken and written word along with conduct that "conveys a symbolic meaning." *Nev. Comm'n on Ethics, v. Carrigan*, 564 U.S. 117, 126 (2011) (citing *Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006)). But "nonsymbolic conduct"—think *functional* conduct—"engaged in for an independent … purpose" is not "an act of communication" protected by the First Amendment. *Id*. at 127. In *Carrigan*, the Court distinguished the functional act of voting on a legislative proposal from the symbolic act of burning the American flag in public protest. *Id*. at 126-27 (citing *Texas v. Johnson*, 491 U.S. 397, 406 (1989)). While saluting or even destroying the flag uses visible "[s]ymbolism" as an "effective way of communicating ideas," *W. Va. State Bd. of Ed. v. Barnette*, 319 U.S. 624, 632 (1943), the act of voting "symbolizes nothing," *Carrigan*, 564 U.S. at 126.

Plaintiffs' invocation of their alleged "right to use governmental mechanics"—here, the absentee ballot application—"to convey a message" exemplifies the dispositive difference between functional and symbolic conduct. *Id.* at 127 (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 355 (1997)). And Plaintiffs are not the first to try this play. In *Timmons*, a minor political party alleged a First Amendment right to have "multiple-party" candidates on the ballot in violation of Minnesota's "antifusion" elections laws. 520 U.S. at 355, 365. The Supreme Court was "unpersuaded … by the party's contention that it ha[d] a right to use the ballot itself to send a particularized message, to its candidate and to the voters, about the nature of its support for the

2

candidate." *Id*. at 362-63. The Court reasoned that "[b]allots serve primarily to elect candidates, not as forums for political expression." *Id*. at 363.

Plaintiffs have no First Amendment right to use a government form like an absentee ballot application in any particular way. That application is the State mechanism for providing absentee ballots to eligible voters who want and need them, not "a billboard for political advertising." *Id*. at 365. Thus, distributing, collecting, completing, etc. an absentee ballot application is not an "act of communication" but rather a functional act of using a government form to procure another governmental mechanism—an absentee ballot. *Carrigan*, 564 U.S. at 127. It symbolizes nothing, even though Plaintiffs "would like it to *convey* [their] deeply held personal belief" about the value of voting absentee. *Id.*

Finally, "Plaintiffs' position" on the Court's proposed "flow chart" is simply wrong. DE62 at 140:2. "Plaintiffs posit that even under expressive conduct, strict scrutiny would apply because *Food Not Bombs II* says so." *Id*. at 140:3-4. Not so fast. The Eleventh Circuit simply repeated the age-old rule that "a regulation based on the content of the expression must withstand the additional rigors of strict scrutiny," while a "content neutral" regulation—like the Park Rule in *Food Not Bombs II*—must survive *O'Brien*'s lenient balancing test. *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1291 (11th Cir. 2021) ("*FNB II*"). SB1 is a content neutral regulation of conduct. *See* DE42 at 18; DE58 at 10 n.4. Even assuming that conduct is symbolic, only *O'Brien*'s test would apply.

**II.     Section 208 was meant to bolster, not hamstring, the States' efforts to maintain fair, honest, and open elections.**

Section 208 of the VRA states that "any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or … officer … of the voter's union." 52 U.S.C. §10508.

3

The text, purpose, and legislative history of §208 speak with a unified voice: disabled persons navigating the voting process must be allowed to choose a trustworthy assistor. In Alabama, disabled voters retain that "right to choose" under SB1, which prudently removes paid agents from the equation to protect the most vulnerable from intimidation and undue influence. S. Rep. No. 97-417, at 64 (1982).

Plaintiffs argue that §208 forbids Alabama from excluding "any" would-be assistor "except for union and employer representatives." DE62 at 108:22-23. Under that view, Alabama would be powerless to safeguard disabled voters from manipulation by convicted fraudsters, foreign agents, and self-interested candidates. That cannot be right. The logical consequences of this reading, "uncomfortable" even to Plaintiffs, counsel strongly against finding SB1 preempted by §208. DE62 at 124:23-24; *see also id.* at 144:4-6. Indeed, courts should be loath to find that federal and state law conflict absent a "clear statement" to the contrary, especially in "areas of traditional state responsibility," *Bond v. United States*, 572 U.S. 844, 858 (2014), like the "regulation[] of parties, elections, and ballots," *Timmons*, 520 U.S. at 358. Federal preemption of state law is the exception, not the rule. *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009). This Court should reject Plaintiffs' admittedly uncomfortable reading of §208.

**1.** Section 208 is one sentence long, begins with the phrase "*Any* voter," and a few words later uses the phrase "*a* person." 52 U.S.C. §10508 (emphasis added). Plaintiffs read "a person" to mean "any person." DE50 at 45-46. Defendants read "a person" to mean what it says: "a person," i.e. "some undetermined or unspecified" person. DE42 at 45 (quoting *McFadden v. United States*, 576 U.S. 186, 191 (2016)); DE58 at 18-19. Under §208's plain meaning, then, a disabled voter's right to "be given assistance by *a person* of the voter's choice" is not infringed unless the State prevents a disabled voter from selecting *a* trustworthy assistor. That could take a number of shapes,

4

like categorically banning illiterate voters from receiving assistance, qualifying election officials alone as assistors, or limiting the number of permitted assistors such that a disabled voter is effectively left assistor-less. Of course, SB1 nowhere near approaches these schemes long since rooted out by the Voting Rights Act.

As several federal and state courts have recognized, Defendants' reading reflects the plain meaning of §208's text. *See Priorities USA v. Nessel*, 487 F. Supp. 3d 599, 619 (E.D. Mich. 2020) (Section 208's "language suggests that some state law limitations on the identity of persons who may assist voters is permissible."), *rev'd in part on other grounds*, 860 F. App'x 419 (6th Cir. 2001); *see also Ray v. Texas*, 2008 WL 3457021, at *7 (E.D. Tex. Aug. 7, 2008) ("The language of Section 208 allows the voter to choose a person who will assist the voter, but it does not grant the voter the right to make that choice without limitation" nor does it "preclude all efforts by the State to regulate elections by limiting the available choices to certain individuals."); *Qualkinbush v. Skubisz*, 826 N.E.2d 1181, 1197 (Ill. App. Ct. 2004) (upholding Illinois law limiting who may return absentee voter's ballot against §208 preemption challenge); *DiPietrae v. City of Philadelphia*, 666 A.2d 1132, 1135-36 (Pa. Commw. Ct. 1995) (upholding law barring anyone from returning absentee ballots for more than one household).[1]

On the other hand, several courts in the last few years have read §208 as establishing a fixed universe of assistors, forever untouchable by the States. The hot-of-the-press decision in *League of Women Voters of Ohio v. LaRose* joins this short train of cases. 2024 WL 3495332 (July 22, 2024). The *LaRose* court found that §208 preempted an Ohio law that limited who could submit

---

[1] The "right to choose" is not without restriction in other familiar contexts. For example, "the Sixth Amendment grants a defendant 'a fair opportunity to secure counsel *of his own choice*,'" but that right "has limits," *Luis v. United States*, 578 U.S. 5, 11 (2016) (plurality opinion) (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932) (emphasis added)), and "is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 169 (1988). The same must be true here.

a disabled voter's ballot to a small pool of "authorized relatives." *Id.* at *2. If no family were available, no one could assist the voter. Spurning the presumption against preemption, the court reasoned that any law "limiting a disabled voter's choice of facilitator is inconsistent with Section 208." *Id.* at *13. That contravenes the text (*see supra*), ignores the statute's legislative history (*see infra*), and leads to intensely "uncomfortable" results (*see infra*). DE62 at 124:23-24. This Court should stick with the plain meaning.

**2.** The relevant legislative history supports Defendants' plain-meaning interpretation. Discussing the newly promulgated §208, the Senate Judiciary Committee Report to the 1982 amendments to the Voting Rights Act found that the right to vote "without fear of intimidation or manipulation" is best protected by permitting a disabled voter "to bring into the voting booth a person whom the voter trusts and who cannot intimidate him." S. Rep. No. 97-417, at 62-63 (1982). Otherwise, the voter might "forfeit their right to vote" or be "misled into voting for someone other than the candidate of their choice." *Id.* at 62. Thus, a State "could not deny the assistance at some stages of the voting process during which assistance was needed, nor could it provide that a person could be denied assistance solely because he could not read or write his own name." *Id.* at 63. But crucially, the Committee recognized that States retain the "legitimate right … to establish necessary election procedures" "designed to protect the rights of voters." *Id.* Thus, "State provisions would be preempted only to the extent that they *unduly burden* the right recognized in this section …." *Id.* (emphasis added).

SB1 imposes little to no burden on a disabled person's right to vote without fear or intimidation; to the contrary, SB1 further safeguards that right. It removes from the available pool of assistors only paid operatives, those who would knowingly accept payment to perform enumerated acts with another voter's absentee ballot application. The State has found that the

6

purchase and sale of voting services, like the purchase and sale of the vote itself, creates a recipe for manipulation, intimidation, and fraud—the very harms §208 protects against. Tellingly, Plaintiffs do not allege that SB1 would impose an undue burden on the right of disabled voters *to choose* an assistor. *See Nessel*, 487 F. Supp. 3d at 619-20 (noting a similar deficiency). Instead, they hang their hat on the notion that with §208, Congress established a "fixed universe" of assistors which the State may never constrict, no matter how slight or how justified. DE50 at 42, 46; DE62 at 104:22, 107:1, 117:7. Nothing in the legislative history supports this notion. Quite the opposite, the Committee Report contemplates that States would continue to enact additional "election procedures" "designed to protect the rights of voters." S. Rep. No. 97-417, at 63. SB1 does just that.

    **3.** Finally, Plaintiffs' "fixed universe" reading would call into question dozens of State election integrity laws designed to protect the rights of disabled voters. These "outcome-pertinent consequences—what might be called textual consequences—are relevant to a sound textual decision. " SCALIA & GARNER, *Reading Law: The Interpretation of Legal Texts* 352 (2012) (listing preemption of State law as one such relevant consequence). At the hearing, the Court asked Plaintiffs' counsel if, under their interpretation, a person convicted of voter fraud could be barred from providing voting assistance: "that wouldn't violate Section 208, would it?" DE62 at 123:23-24. Plaintiffs' counsel dug in, maintaining that "it could violate 208 if there was some voter out there who would have chosen that person to assist him," while proceeding to admit that this view "could create hypotheticals that become uncomfortable." *Id*. at 124:1-2, 23-24. This interpretation, lacking a "limiting principle," "provides little guidance" and will "stop nowhere." *Maracich v. Spears*, 570 U.S. 48, 60 (2013). In addition to its interpretive flaws, this maximally broad reading of §208

flouts the presumption against preemption and welcomes federal court interference in the States' sovereign power to regulate elections.

Courts must be "certain of Congress's intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Bond v. United States*, 572 U.S. 844, 858 (2014) (internal quotation marks omitted). To gain this certainty, courts look for a "clear statement" to support an interpretation that would "alter sensitive federal-state relationships" in "areas of traditional state responsibility." *Id.* at 858, 863. This "unexpressed presumption," *id.* at 857, recognizes that "the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991).

One such traditional area of state responsibility is the "regulation[] of parties, elections, and ballots." *Timmons*, 520 U.S. at 358. This "power to prescribe the qualifications of its officers, and the manner in which they shall be chosen," *Boyd v. State of Nebraska*, 143 U.S. 135, 161 (1892), "inheres in the State by virtue of its obligation … to preserve the basic conception of a political community," *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973). Courts should be wary of accepting an interpretation of federal law that would "compel federal courts to rewrite state electoral codes." *Clingman v. Beaver*, 544 U.S. 581, 593 (2005).

Yet, Plaintiffs would require just the opposite. Their reading of §208 amounts to a "*de facto* green light to federal courts to rewrite dozens of state election laws around the country." *DNC v. Wis. State Legislature*, 141 S. Ct. 28, 35 (2020) (Kavanaugh, J., concurral). If adopted, this interpretation will cast doubt on ordinary ballot-casting laws nationwide in addition to Alabama's. *See, e.g.*, DEL. STAT. Title 15 §7557 (prohibiting election officials, candidates, and candidate's campaign staff from assisting); GA. CODE ANN. § 21-2-385 (prohibiting candidate and candidate's

8

close relatives from assisting); N.D. CENT. CODE § 16.1-07-08 (same); HAW. REV. STAT. §15-6 (prohibiting candidate from assisting); 10 ILL. COMP. STAT. § 5/19-5 (same); LA. REV. STAT. § 18:1309 (same); MD. ELEC. CODE § 9-307 (same); MISS. CODE ANN. § 23-15-631 (same); UTAH CODE ANN. § 20A-3a-208 (same); W. VA. CODE § 3-3-4 (same); KY STAT. §117.255 (prohibiting election officials from assisting); N.H. REV. STAT. § 657:17 (prohibiting "delivery agent" from delivering "more than 4 absentee ballots in any election").

This invitation for federal takeover, *cf.* Federalist No. 59, cannot be reconciled with the Supreme Court's repeated recognition that "evenhanded restrictions that protect the integrity and reliability of the electoral process itself" are not constitutionally suspect. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189-90 (2008) (plurality op.) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983)); *see also Brnovich*, 141 S. Ct. at 2347 (A "State indisputably has a compelling interest in preserving the integrity of its election process."); *Wis. State Legislature*, 141 S. Ct. at 33 (Kavanaugh, J., concurral) ("The Court has long recognized that a State's reasonable deadlines for registering to vote, requesting absentee ballots, submitting absentee ballots, and voting in person generally raise no federal constitutional issues …."). This makes perfect sense, because "if there are to be fair and honest" elections, "and if some sort of order, rather than chaos, is to accompany the democratic process," "there must be a substantial regulation of elections." *Storer*, 415 U.S. at 730.

Because §208 contains no "exceedingly clear language" that would require such upheaval of the federal-state balance, the presumption against preemption mandates that courts steer clear of expanding §208's reach beyond that which it clearly regulates. *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021). Defendants have articulated the clear meaning of the statute.

### III. ADAP has no right of action under HAVA to ensure full participation for disabled voters.

For the reasons given in Defendants' motion to dismiss and reply brief in support, there is no "actual conflict" between HAVA and SB1. *English v. General Electric Co.,* 496 U.S. 72, 78-79 (1990); DE42 at 46-50; DE58 at 21-22. Thus, HAVA does not preempt SB1.

Additionally, Congress did not grant protection and advocacy (P&A) agencies like ADAP a private cause of action under HAVA to enforce these agencies' so-called "duties" to "ensure full participation in the electoral process for individuals with disabilities." Doc.1 ¶170 (quoting 52 U.S.C. §21061(a)).

"HAVA creates no private cause of action." *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019). "Where Congress has not created a private right of action, courts may not do so." *Id.* (citing *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)). The role played by a federal court is to look to the "text and structure" of the statute for "clear evidence that Congress intended to authorize" private suits. *In re Wild*, 994 F.3d 1244, 1255-56 (11th Cir. 2021) (en banc). That clear evidence is lacking here.

ADAP argues that 52 U.S.C. §21061(a) gives P&A agencies an express right of action to enforce HAVA against State officials. DE50 at 48 ("HAVA *expressly* grants and mandates …" and "PAVA *expressly* provides …") (emphasis added). When Congress creates an express cause of action, as it has done many times, there's no mistaking it. *See, e.g.*, 15 U.S.C. §15(a) ("[A]ny person who shall be injured … by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States."); *see also* 18 U.S.C. §2520(a); 29 U.S.C. §1132(a)(1)(B); 42 U.S.C. §1983; 42 U.S.C. §2000a-3(a).

The first sentence in §21061(a) contains no such express right to sue. It simply directs the Secretary of HHS to fund State-designated P&A agencies, who provide specific services ("including registering to vote, casting a vote and accessing polling places") in furtherance of a general mission ("ensuring full participation in the election process for individuals with disabilities").

The second sentence in §21061(a) states that P&A agencies "shall have the same general authorities as they are afforded under … the Developmental Disabilities Assistance and Bill of Rights Act of 2000" (DDA). Recently, a district court in Texas helpfully summarized these "general authorities":

> (1) "pursue administrative, legal, and other appropriate remedies" on behalf of individuals with disabilities or mental illness,
> (2) access facilities that provide care or treatment to individuals with mental illness,
> (3) access any location that "services, supports, and [provides] other assistance" to any individual with disabilities, and
> (4) access records related to their clients.

*Disability Rights Texas v. Pacillas*, 690 F. Supp. 3d 654, 661 (W.D. Texas 2023) (citations omitted). Thus, under the DDA, P&A agencies may sue on behalf of disabled individuals (category 1) or to enforce their own statutory rights to access facilities and records (categories 2, 3, and 4). *See Va. Office for P&A v. Stewart*, 563 U.S. 247, 251 (2011) ("And in addition to pressing its own rights, a P&A system may pursue … remedies on behalf of those it protects.").

Here, ADAP does not bring a "right to access" suit, which are fairly common and which it has brought before. *See ADAP v. SafetyNet Youthcare*, 65 F. Supp. 3d 1312, 1324 n.7 (S.D. Ala. 2014) (collecting cases)[2]; *see also Ind. P&A Servs. v. Ind. Family and Soc. Servs. Admin.*, 603 F.3d 365, 375 (7th Cir. 2010) (concluding, after much discussion, that P&A agencies have a cause of

---

[2] In their Response, ADAP misleadingly quotes from the *SafetyNet Youthcare* case the excerpt "P&A agencies have almost universally prevailed in litigation based on access." DE50 at 48. The "access" referenced is a P&A agency's authority to access records and facilities, not a disabled individual's right to "access." *Id.* at 1324.

action to sue for access to facilities and records). Nor does ADAP sue "to enforce the federal rights of voters with disability." *Disability Rts. N.C. v. N.C. State Bd. of Elections*, No. 5:21-CV-361, 2022 WL 2678884, at *1 (E.D.N.C. July 11, 2022) (P&A plaintiff brought suit *under §208* of the VRA); *cf* DE1 ¶¶169-70.[3] Instead, ADAP attempts to enforce its own alleged duty to "ensure full participation in the electoral process for individual with disabilities." 52 U.S.C. §21061(a). Congress has not authorized a P&A agency to initiate such a suit, which is confirmed further by ADAP's admission that this would be the first ever since the PAVA provisions of HAVA were promulgated over two-decades ago. DE62 at 44:15-22.

## CONCLUSION

The Court should dismiss Plaintiffs' Complaint.

    Steve Marshall
      *Attorney General*

    Edmund G. LaCour Jr. (ASB-9182-U81L)
      *Solicitor General*

    James W. Davis (ASB-4063-I58J)
      *Deputy Attorney General*

    *s/ Soren Geiger*
    Soren Geiger (ASB-0336-T31L)
    Dylan Mauldin (ASB-3281-Z11M)
      *Assistant Solicitors General*

    Brenton M. Smith (ASB-1656-X27Q)
    Charles A. McKay (ASB-7256-K18K)
      *Assistant Attorneys General*

    OFFICE OF THE ATTORNEY GENERAL
    STATE OF ALABAMA
    501 Washington Avenue
    P.O. Box 300152
    Montgomery, Alabama  36130-0152
    Telephone: (334) 242-7300
    Fax: (334) 353-8400
    Edmund.LaCour@AlabamaAG.gov

---

[3] In other words, HAVA can function as "a vehicle" for a P&A agency to vindicate the substantive federal voting rights of its disabled constituents. DE62 at 134:16. But HAVA does not create any new federal rights, and ADAP does not argue to the contrary.

Soren.Geiger@AlabamaAG.gov
Dylan.Mauldin@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov
***Counsel for Defendants***

## CERTIFICATE OF SERVICE

I certify that on August 9, 2024, I electronically filed the foregoing notice with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

<u>*s/ Soren Geiger*</u><br>*Counsel for Defendants*