## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **ALABAMA STATE CONFERENCE OF THE NAACP, et al.,** } | |
| } | |
| **Plaintiffs,** } | |
| } | |
| **v.** } | **Case No.: 2:24-cv-00420-RDP** |
| } | |
| **STEVE MARSHALL, in his official capacity as Alabama Attorney General, et al.,** } | |
| } | |
| **Defendants.** } | |

## MEMORANDUM OPINION AND ORDER

This matter is before the court on Defendants' Motion to Dismiss. (Doc. # 42). Plaintiffs have responded to the Motion (Doc. # 50), the United States has filed a Statement of Interest Regarding Section 208 of the Voting Rights Act (Doc. # 51), and Defendants have replied in support of their (Doc. # 58). On July 31, 2024, the court heard argument from the parties on the Motion (Doc. # 62) and has now received supplemental briefing (Docs. # 66, 67). As explained in more detail below, Defendants' Motion is due to be granted in part and denied in part.

## I.     Background

Plaintiffs filed this action challenging the lawfulness of certain provisions of Alabama Senate Bill 1 ("SB 1"). That Bill amended Section 17-11-4 of the Alabama Code. Although many Defendants were initially sued, only two remain – Steve Marshall, Alabama's Attorney General, and Wes Allen, Alabama's Secretary of State.[1] Plaintiffs have moved for a preliminary injunction

---

[1] The parties jointly moved to dismiss the forty-two (42) Defendant District Attorneys in order to streamline this litigation. (Doc. # 25). The court granted the motion in a Pro Tanto Dismissal Order. (Doc. # 30).

(Doc. # 34) and Defendants have moved to dismiss this action. (Doc. # 42). This opinion addresses the Motion to Dismiss and whether Plaintiffs' Complaint adequately states actionable claims.

SB 1 was enacted to prevent absentee ballot fraud. (Doc. # 1 at ¶ 156). No one can seriously question the premise that the security of our voting systems are essential to the conduct of fair, free, and trustworthy elections:

> "A State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231 [] (1989). Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy.

*Purcell v. Gonzalez*, 549 U.S. 1, 4, 127 S. Ct. 5, 7, 166 L. Ed. 2d 1 (2006). In regulating election procedures, however, states must act within constitutional and statutory limits. Plaintiffs claim that SB 1 fails to pass muster under those safeguards and violates their federally protected rights.

## A.     The Challenged Act

On March 20, 2024, the Alabama Legislature enacted SB 1, which amended Alabama Code § 17-11-4. (Doc. # 1 at ¶ 1 & n.1). The court's analysis of the parties' positions begins with a review of the statute. As now amended, § 17-11-4 provides:

> (a) The application required in Section 17-11-3 shall be in a form prescribed and designed by the Secretary of State and shall be used throughout the state. The application form shall contain and require all of the following:
>
> (1) That the applicant submit sufficient information to identify the applicant.
>
> (2) The applicant's name, residence address, and such other information as necessary to verify that the applicant is a registered voter.
>
> (3) A list of all felonies of moral turpitude, as provided in Section 17-3-30.1, and a requirement that the applicant declare that he or she is not barred from voting because of a disqualifying felony conviction or, if the applicant was convicted of a disqualifying felony, that the applicant's right to vote has been restored.
>
> (4) An explanation of penalties for violations of this section.

(b)(1) Any applicant may receive assistance in filling out the application as he or she desires, but each application shall be manually signed by the applicant, under penalty of perjury, and if he or she signs by mark, the application shall also include the name of the witness and the witness's signature.

(2) It shall be unlawful for any person to *knowingly distribute an absentee ballot application to a voter that is prefilled with the voter's name or any other information required on the application form*.

(c)(1) Completed applications may be submitted to the absentee election manager in any of the following ways, as further provided by rule of the Secretary of State:

a. The applicant delivering the application in person.

b. The applicant mailing the application by U.S. mail.

c. The applicant sending the application by commercial carrier.

(2) Except in situations governed by Section 17-11-3(f), it shall be unlawful for an individual *to submit a completed absentee ballot application to the absentee election manager other than his or her own application*, except that an application for a voter who requires emergency treatment by a licensed physician within five days before an election pursuant to Section 17-11-3 may be submitted to the absentee election manager by an individual designated by the applicant.

(d)(1) Except in situations governed by Section 17-11-3(f), it shall be unlawful for *a third party to knowingly receive a payment or gift for distributing, ordering, requesting, collecting, completing, prefilling, obtaining, or delivering a voter's absentee ballot application*. Any person who violates this subdivision shall be guilty of a Class C felony.

(2) Except in situations governed by Section 17-11-3(f), it shall be unlawful for *a person to knowingly pay or provide a gift to a third party to distribute, order, request, collect, prefill, complete, obtain, or deliver a voter's absentee ballot application*. Any person who violates this subdivision shall be guilty of a Class B felony.

(e) Any voter who requires assistance to vote *by reason of blindness, disability, or inability to read or write may be given assistance by an individual of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union*.

(f) Voters voting by absentee ballot through the Uniformed and Overseas Citizens Absentee Voting Act are not subject to this section. The Secretary of State shall

provide applications for absentee voting to military and overseas voters in accordance with Section 17-4-35.

Ala. Code § 17-11-4 (emphasis added on the provisions of SB 1).

The Prefilling Restriction criminalizes the act of distributing an absentee ballot application that is prefilled with any required information. Ala. Code § 17-11-4(b)(2). The Submission Restriction criminalizes the act of returning a potential voter's absentee ballot application. Ala. Code § 17-11-4(c)(2). The Payment and Gift Provisions criminalize the act of accepting anything of value from or providing anything of value to a third party for distributing, ordering, requesting, collecting, prefilling, completing, obtaining, or delivering a voter's absentee ballot application. Ala. Code § 17-11-4(d)(1) to (d)(2). However, under SB 1, (1) any applicant may receive assistance in filling out the application as he or she desires, but each application shall be manually signed by the applicant (Ala. Code § 17-11-4(b)(1)), and (2) a person who is blind, disabled, or unable to read or write may be given assistance by an individual of the voter's choice, but not the voter's employer, an agent of that employer, or an officer or agent of the voter's union. Ala. Code § 17-11-4(e); *cf.* 52 U.S.C. § 10508.

### B. The Allegations Of Plaintiffs' Complaint

Plaintiffs' Complaint contains six counts:

1.  Count One asserts a Violation of the First Amendment (Free Speech) claim by all Plaintiffs against all Defendants (Doc. # 1 at ¶¶ 121-133);

2.  Count Two asserts a Violation of the First Amendment (Freedom of Association) claim by all Plaintiffs against all Defendants (*Id*. at ¶¶ 134-142);

3.  Count Three asserts a Violation of the First and Fourteenth Amendments (Void for Vagueness, Denial of Due Process) claim by all Plaintiffs against all Defendants (*Id*. at ¶¶ 143-150);

4.  Count Four asserts a Violation of the First Amendment (Overbreadth) claim by all Plaintiffs against all Defendants (*Id*. at ¶¶ 151-157);

     5.     Count Five asserts a Violation of Section 208 of the Voting Rights Act (Section 208) claim by all Plaintiffs against all Defendants (*Id*. at ¶¶ 158-166); and

     6.     Count Six asserts a Violation of the Supremacy Clause and the Help America Vote Act (HAVA Preemption) claim by Plaintiff ADAP against all Defendants. (*Id*. at ¶¶ 167-173).

(*Id*. at ¶¶ 121-173).

Plaintiffs challenge the Prefilling Restriction (§ 17-11-4(b)(2)), the Submission Restriction (§ 17-11-4(c)(2)), and the Payment and Gift Provisions (§ 17-11-4(d)(1) to (d)(2)). (Doc. # 1 at ¶¶ 62-66). Plaintiffs allege that the challenged provisions violate the First and Fourteenth Amendments to the United States Constitution. They also allege that, although § 17-11-4(f) repeats part of the text of Section 208 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10508, persons asked to assist disabled, blind, or illiterate voters may still violate the Prefilling, Submission, or Payment and Gift Provisions and may be prosecuted. (*Id*. at ¶¶ 158-165). Therefore, Plaintiffs allege, SB 1 is preempted by Section 208 because it would criminalize conduct expressly protected and authorized under the VRA. (*Id*. at ¶ 166). Finally, they contend that, under the Supremacy Clause of the United States Constitution, SB 1 is federally preempted by the Help America Vote Act ("HAVA"), 52 U.S.C. § 10508. (*Id*. at ¶ 166).

Plaintiffs are civic engagement, faith-based, and disability rights organizations that assert they promote broad civic participation by educating and assisting broad swaths of Alabamians with the absentee voting process. (Doc. # 1 at 4). They allege that SB 1 criminalizes constitutionally protected speech and expressive conduct and works to disenfranchise disabled voters, senior citizen voters, voters of color, eligible incarcerated voters, and other Alabamians who depend on assistance to cast a vote. (*Id*. at 4-5 & ¶ 1).

Plaintiffs also assert that voter assistance is a vital means of political expression in Alabama, which allows civic leaders to promote and build political power among historically

disenfranchised communities. (*Id*. at ¶ 3). They contend absentee voters often require third-party assistance in applying for and casting their absentee ballots. (*Id*. at ¶ 4). Plaintiffs allege that family, neighbors, and civic engagement, faith, and disability groups (like Plaintiffs) have long helped assist voters who cannot navigate the voting process alone. (*Id*. at ¶ 4).

In their pleadings, Plaintiffs claim that in providing absentee ballot assistance they seek to communicate with Black voters and voters from other marginalized groups entitled to participate in the political process. (*Id*. at ¶ 5). They assert that by criminalizing certain types of help applying for absentee ballots, SB 1 suppresses and discourages voter education and assistance. (*Id*. at ¶ 6).

### 1.    Plaintiffs And Their Claims

Plaintiff Alabama NAACP asserts that it seeks to empower Black citizens' political participation, and that its civic engagement activities help promote the message that voting should be fully accessible. (*Id*. at ¶ 12). Among other things, Alabama NAACP encourages Black people and other voters to engage in the political process and claims one way it does this is by assisting them with absentee ballot applications. (*Id*. at ¶ 13). At its events, including those held at nursing homes and in jails, Alabama NAACP provides food and materials, such as envelopes and postage, to "assistors" and other attendees to aid them in submitting the applications. (*Id*. at ¶ 14). Alabama NAACP contends that because SB 1 restricts its ability to assist and engage with voters, SB 1 chills its First Amendment speech and expressive activities. (*Id*. at ¶ 15). Because of the limits imposed by SB 1, Alabama NAACP alleges that it must expend time and resources to understand what conduct is and is not prohibited under the law, and to provide guidance to its local branches and members regarding compliance with the law. (*Id*. at ¶ 16).

Plaintiffs League of Women Voters of Alabama and the League of Women Voters of Alabama Education Fund (collectively "LWVAL") allege that they are nonpartisan, nonprofit,

grassroots organizations that seek to encourage informed and active participation in government, work to increase understanding of major public policy issues, and influence public policy through education and advocacy. (*Id*. at ¶ 17). Many of LWVAL's members are over 65 years old and may need (or at least may prefer) assistance with voting, including with completing their absentee ballot applications. (*Id*.). LWVAL asserts that its mission includes working to protect the right to vote and that it considers absentee ballot application assistance to be an expression of this core value. (*Id*. at ¶ 18). At LWVAL's events, including at assisted living facilities, nursing home facilities, and college campuses, LWVAL members, and volunteers print absentee ballot applications, provide envelopes and postage, make photocopies of the voters' photo IDs, and provide detailed instructions on how to fill out the applications. (*Id*. at ¶¶ 19-20). LWVAL argues that, because SB 1's prohibitions are so unclear about which of LWVAL's absentee ballot application assistance is prohibited, SB 1 has a chilling effect on LWVAL's communications. (*Id*. at ¶ 21). LWVAL also contends that SB 1 will result in them having to divert time and resources to understand which conduct is lawful and to train their volunteers. (*Id*. at ¶ 22).

Plaintiff Greater Birmingham Ministries ("GBM") alleges that it seeks to address urgent human rights and social justice needs in the greater Birmingham area. (*Id*. at ¶ 23). As part of its voter assistance activities, GBM says its paid staff and volunteers assist senior citizens, people with disabilities, shift workers, and eligible incarcerated voters to apply for absentee ballots and vote absentee. (*Id*. at ¶ 24). At its events, GBM's paid staff and volunteers print absentee ballot applications, provide pens, envelopes, and postage, and review applications. (*Id*. at ¶ 25). GBM hands out snacks, branded pens, and sometimes t-shirts. (*Id*.). GBM says it does this work to promote civil rights in Alabama, and considers absentee ballot application assistance to be a public expression of its core value that voting helps advance civil rights. (*Id*.). In 2024, GBM was awarded

a grant to conduct voter registration, civic education, and absentee assistance to eligible women incarcerated at Julia Tutwiler Prison for Women. (*Id*. at ¶ 26). GBM argues SB 1 threatens its ability to achieve the grant's objectives by threatening its staff and volunteers with felony prosecution. (*Id*.). It also contends that the law will require it to divert resources to compliance with SB 1 and alter their forms of voter participation assistance and get-out-the-vote efforts. (*Id*. at ¶ 27).

Plaintiff Alabama Disabilities Advocacy Program ("ADAP") alleges that, under various federal laws, it is the duly authorized Protection and Advocacy Program ("P&A") of the State of Alabama. (*Id*. at ¶ 28). ADAP's mission includes a focus on empowering its disabled and blind constituents to vote, and it receives a federally funded grant to undertake this work. (*Id*. at ¶ 29). ADAP has a paid staff member whose primary responsibility is to undertake voter education, promote voting rights for people with disabilities, and assist them with applying for absentee ballots. (*Id*. at ¶ 30). ADAP contends this includes helping voters apply for absentee ballots by navigating the Secretary of State's website, printing out the application, and filling it out with them. (*Id*.). Because of SB 1's potential criminal penalties, ADAP claims it will need to severely limit its voter outreach work (*id*. at ¶ 31), spend staff time and resources that would otherwise be used to serve its disabled and blind constituents to analyze SB 1 (*id*. at ¶ 32), and alter its outreach voter activities. (*Id*.).

## 2.    **Defendants**

In their Complaint, Plaintiffs named forty-four (44) Defendants. (*Id*. at ¶¶ 33-35). Only two remain.[2] Defendant Steve Marshall is the Attorney General of the State of Alabama. (*Id*. at ¶ 33). Marshall is alleged to be responsible for the criminal enforcement of SB 1. (*Id*.). Defendant Wes

---

[2] On April 16, 2024, the court granted the Parties' Joint Motion to Dismiss the District Attorney Defendants. (Doc. # 30).

Allen is the Alabama Secretary of State. (*Id*. at ¶ 35). Allen is alleged to be responsible for instructing election officials how to implement election laws, including with respect to absentee voting. (*Id*.).

### 3. Allegations About Alabama's Historic Voting Restrictions

Plaintiffs offer what they contend are examples of Alabama's long history of enacting voting restrictions to disenfranchise voters of color, including restrictions that target voting assistance. Plaintiffs cite laws that went into effect in 1893, 1901, the 1950s and 1960s, and between 1965 and 2013. (*Id*. at ¶¶ 36-44). In 2018, then-Alabama Secretary of State John Merrill supported a bill that sought to eliminate the witness requirement for absentee voting. (*Id*. at ¶ 45). Plaintiffs allege in their pleadings that Secretary Merrill said that White legislators "killed" this bill because it was sponsored by a Black Democrat. (*Id*.).

Plaintiffs contend that Alabama is one of only four states without early in-person voting. (*Id*. at ¶ 46). It is one of only fourteen states that requires an "excuse" for absentee voting. (*Id*.). Unlike in nearly every other state, in Alabama there is no broad right to vote absentee for those who are over 65 or who have a disability. (*Id*.). Under Alabama law, with limited emergency exceptions, there are few situations in which a voter may cast an absentee ballot. A voter must show that he/she: (i) will be absent from the county on Election Day; (ii) is ill or has a physical disability that prevents a trip to the polling place; (iii) is a registered Alabama voter living outside the county; (iv) is an appointed election officer or poll watcher at a polling place other than their regular polling place; (v) is working a required shift of ten hours or more that coincides with polling hours; (vi) is a caregiver for a family member (to the second degree of kinship) and the family member is confined to their home; or (vii) is incarcerated in prison or jail, but has not been convicted of a felony involving moral turpitude. Ala. Code § 17-11-3; (Doc. # 1 at ¶ 47).

An Alabama voter seeking to apply for an absentee ballot must download and print an online application, physically pick up an application from their county Absentee Election Manager, or send a written request to their Absentee Election Manager to receive the application by mail. (*Id*. at ¶ 48). The voter must then complete the application, obtain a witness's signature if the application is signed by mark, and include a printed copy of the voter's valid photo identification. (*Id*.). The voter must personally submit the application in person or by mail. (*Id*.). Alabama does not provide envelopes or pre-paid postage for returning applications. (*Id*.). Alabama does not offer its absentee ballot applications in Braille or languages other than English. (*Id*.). For any election more than 42 days apart from another election, *e.g*., a primary election and general election, voters must reapply for an absentee ballot. (*Id*.).

The proponents of SB 1 characterized the bill as targeting "ballot harvesting" by "groups or individuals seek[ing] to profit off the absentee voting process." (*Id*. at ¶ 52). Plaintiffs contend, however, that in public hearings legislators could offer no evidence of any widespread voter fraud attributable to absentee voting or so-called ballot harvesting. (*Id*. at ¶ 53). Rather, Plaintiffs allege that legislators referred to a two-page chart showing absentee voting numbers from the 2022 primary election which suggested that there was a higher proportion of absentee voters in certain counties in the Black Belt (including counties with higher senior citizen and disabled populations). (*Id*.).

Legislators heard arguments from Plaintiffs and others about the ways SB 1 would harm the ability of eligible voters to utilize the absentee voting process and the ability of civic engagement organizations, like Plaintiffs, to continue their crucial pro-political participation advocacy. (*Id*. at ¶ 53). Plaintiffs attribute to Alabama State Senator Gudger the statement that

providing an absentee voter "a stamp [or] sticker" in connection with absentee voter assistance would violate the law. (*Id*. at ¶ 60).

SB 1 was signed into law on March 20, 2024. (*Id*. at ¶ 61). After its passage, Secretary Allen issued a press release advising that the law would be effective for the November 2024 general elections. (*Id*.).

### 4.   The Alleged Impacts Of SB 1

The Prefilling Restriction prohibits the distribution of any absentee ballot applications that have any information already filled in. (*Id*. at ¶ 63). That provision makes it "unlawful for any person to knowingly distribute an absentee ballot application to a voter that is prefilled with the voter's name or any other information required on the application form." (*Id*. (citing Ala. Code § 17-11-4(b)(2)).

The Submission Restriction prohibits the submission of anyone else's absentee ballot application, with few exceptions. (*Id*. at ¶ 64). That provision makes it "unlawful for an individual to submit a completed absentee ballot application to the absentee election manager other than his or her own application," unless that person is seeking emergency medical treatment within five days before an election. (*Id*. (citing Ala. Code § 17-11-4(c)(2)).

The Payment and Gift Provisions restrict the distribution of absentee ballot applications by any paid employee of a civic organization (like Plaintiffs) and prohibit anyone from receiving anything of value, in the form of a payment or gift, for having assisted a voter in completing his or her absentee ballot application. (*Id*. at ¶¶ 65-66). The Payment and Gift Provisions make it (1) "unlawful for a third party to knowingly receive a payment or gift for distributing, ordering, requesting, collecting, prefilling, completing, obtaining, or delivering a voter's absentee ballot application" (*id*. (citing Ala. Code § 17-11-4(d)(1)) and (2) "unlawful for a person to knowingly

pay or provide a gift to a third party to distribute, order, request, collect, prefill, complete, obtain, or deliver a voter's absentee ballot application." (*Id*. (citing Ala. Code § 17-11-4(d)(2)).

Plaintiffs allege that SB 1's prohibitions and severe criminal penalties[3] limit Plaintiffs' core political speech, expressive conduct, and associational activities around voting and voter engagement, which they contend are issues of broad social importance. (*Id*. at ¶ 67). Plaintiffs also claim that the Payment and Gift Provisions severely burden their ability to associate with the community because Plaintiffs pay their staff, reimburse volunteers for out-of-pocket expenses, and provide materials to the voters whom they assist. (*Id*. at ¶ 78).

Plaintiffs also allege that SB 1 is vague and overbroad owing to its use of undefined terms like "gift," "payment," "third party," "prefill," "distribute," or "submit." (*Id*. at ¶¶ 80- 86). They allege that SB 1 places severe and undue burdens on individual voters because the process for applying to vote absentee in Alabama requires, among other things, internet access, and ability to use a computer and printer, mailing supplies, the ability to read English, and the ability to complete and physically submit the required paperwork. (*Id*. at ¶ 88). Because of these requirements, the significant numbers of blind, disabled, illiterate or low literacy voters, senior citizens, voters with limited mobility, or incarcerated voters in Alabama who may require assistance with the absentee application process are unable to receive such assistance under SB 1. (*Id*. at ¶¶ 89-105).

Plaintiffs contend that SB 1 does not protect disabled, blind, and low literacy/illiterate voters to the same extent as Section 208 of the VRA, 52 U.S.C. § 10508. (*Id*. at ¶¶ 106-114). Under Section 208, such voters are entitled to assistance with completing their absentee ballot application or the absentee ballot itself, submitting or mailing the application or ballot, and any other "action

---

[3] Violations of the Payment and Gift Provisions are Class B or C felonies, and may result in sentences between 366 days and up to 20 years and fines up to $30,000. The Prefilling and Submission Restrictions impose Class A misdemeanor liability, which can carry a jail sentence of up to one year and a fine of up to $6,000.

necessary to make a vote effective." (*Id*. at ¶¶ 106-108 (citing 52 U.S.C. § 10301(c)(1)). Plaintiffs argue that SB 1 does not contain a similar broad definition of voting and makes clear that no person (even disabled, blind, or low literacy/illiterate voters) may receive the prohibited forms of assistance – *i.e.*, distributing, ordering, requesting, collecting, prefilling, completing, obtaining, or delivering absentee ballot applications – from persons who are paid or who may have been provided a gift by the voter. (*Id*. at ¶¶ 106-14). For these reasons, they claim that certain aspects of SB 1 are preempted by Section 208.

Plaintiff ADAP receives a federal grant under the Payments for Protection and Advocacy Programs ("PAVA"), which requires it to provide voter assistance to people with disabilities, including assistance with absentee ballot applications. (*Id*. at ¶¶ 115-17). ADAP argues that SB 1's exceptions to the Payment and Gift Provisions for people with disabilities do not sufficiently provide it the assurance that its representatives will not be subject to felony charges because SB 1 does not exempt organizations and their paid staff like ADAP, who are authorized by law to provide absentee ballot application assistance. (*Id*. at ¶ 119).

## II.    Standard Of Review

The Federal Rules of Civil Procedure require that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, the complaint must include enough facts "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels and conclusions" or "naked assertion[s]" without supporting factual allegations. *Id.* at 555, 557. In deciding a Rule 12(b)(6)

motion to dismiss, courts view the allegations in the complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556.

In considering a motion to dismiss, a court should "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 F. App'x 136, 138 (11th Cir. 2011) (quoting *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010)). That task is context specific and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense ... to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claims are due to be dismissed. *Twombly*, 550 U.S. at 570.

Complaints that tender "'naked assertion[s]' devoid of 'further factual enhancement'" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (alteration in original). In other words, the complaint must allege enough facts "to raise a

reasonable expectation that discovery will reveal evidence" supporting a claim. *Twombly*, 550 U.S. at 556.

### III.   Discussion

In their Motion, Defendants argue that Plaintiffs' Complaint is due to be dismissed for several reasons:

A.   Plaintiffs' Complaint Is An Impermissible Shotgun Pleading;

B.   Plaintiffs Cannot Establish Standing To Sue Secretary Allen;

C.   SB 1 Does Not Violate Plaintiffs' Free Speech Rights (Count I);

D.   SB 1 Does Not Violate Plaintiffs' Right To Associate (Count II);

E.   SB 1 Is Not Unconstitutionally Vague (Count III);

F.   SB 1 Is Not Unconstitutionally Overbroad (Count IV);

G.   By Exempting from Liability the Exact Assistance That § 208 of the VRA Permits, SB 1 Cannot Violate or Be Preempted by It (Count V); and

H.   ADAP's HAVA Claim Fails Because SB 1 Permits ADAP to Assist Voters, But Regardless They Lack a Cause of Action to Bring This Claim (Count VI).

(Doc. # 42 at 9-47). The court addresses each argument in turn.

### A.   Whether Plaintiffs' Complaint Is An Impermissible Shotgun Pleading

Shotgun pleadings violate Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), by "fail[ing] to one degree or another ... to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1294-95 (11th Cir. 2018) (quoting *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015)).

As the Eleventh Circuit has explained, there are four basic categories of shotgun pleadings: 1) those in which "each count adopts the allegations of all preceding counts"; 2) those that do not re-allege all preceding counts but are "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"; 3) those that do not separate each cause of action or claim for relief into a different count; and 4) those that assert multiple claims against multiple defendants without specifying which applies to which. *Weiland*, 792 F.3d at 1321-23. "The unifying characteristic of all types of shotgun pleadings is that they fail to [] give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1323; *see also Arrington v. Green*, 757 F. App'x 796, 797 (11th Cir. 2018) ("[W]e 'have little tolerance for shotgun pleadings.'").

Defendants argue that Plaintiffs' Complaint is a shotgun pleading of the first type. Yet Plaintiffs' wording does not quite fit the shotgun pleading mold because it does not reallege and incorporate *all* previous allegations. Rather, the first paragraph of each count of Plaintiffs' Complaint states that "Plaintiffs reallege and incorporate by reference *the relevant allegations* contained in the preceding paragraphs, as if fully set forth []herein." (Doc. # 1 at ¶¶ 121, 134, 143, 151, 158, 167).[4] Defendants argue that determining which allegations are relevant is difficult because "large swaths of the complaint aren't relevant at all" such as the "accusations of racial discrimination." (Doc. # 42 at 13). They also assert that "[t]he sheer scope of Plaintiffs' complaint compounds these problems [because it] consists of 71 pages with 173 separately numbered paragraphs." (*Id.* at 14). Defendants propose that Plaintiffs be required "to refile a new complaint that cures the[se] problems." (*Id.* at 15).

---

[4] The court notes that in the first paragraph of the first three counts, the last word of the paragraph is "therein," but in the last three counts the last word of the first paragraph is what the word apparently should have been – "herein."

Although Plaintiffs certainly could have filed a more streamlined Complaint, the court will not order repleading because the Complaint serves its Rule 8 purpose of giving Defendants adequate notice of the claims against them and the grounds upon which each of those claims rests. Fed. R. Civ. P. 8(a)(2). Therefore, to the extent that Defendants move to dismiss Plaintiffs' Complaint as a shotgun pleading, the Motion is due to be denied.

### B.    Whether Plaintiffs Have Standing To Sue Secretary Allen

Defendants contend that Plaintiffs cannot establish the elements of standing as to Defendant Allen. (Doc. # 42 at 13-14). Plaintiffs counter that "Secretary Allen is a proper Defendant in this case" because "Alabama law prescribes the Secretary of State as 'the chief elections official in the state' who 'shall provide uniform guidance for election activities.'" (Doc. # 50 at 15 (quoting Ala. Code § 17-1-3(a)). They note that not only does the Secretary of State have the authority "to tell election officials how to implement election laws," *People First of Ala. v. Merrill*, 467 F. Supp. 3d 1179, 1201 (N.D. Ala. 2020), but also "SB 1 specifies that Secretary Allen is responsible for prescribing the absentee application form and making rules about how absentee applications are submitted." (Doc. # 50 at 15 (quoting Ala Code. §§ 17-11-4(a), (c)(1)).

"Article III standing is a 'bedrock constitutional requirement that [the Supreme] Court has applied to all manner of important disputes.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, No. 23-235, 2024 WL 2964140, at *5 (U.S. June 13, 2024) (quoting *United States v. Texas*, 599 U.S. 670, 675 (2023)). "To establish standing, as [the Supreme] Court has often stated, a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *All. for Hippocratic Med.*, 2024 WL 2964140, at *5 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *Lujan v. Defs. of Wildlife*, 504

U.S. 555, 560-561 (1992)). Stated more succinctly, "[a] plaintiff has Article III standing only if he can demonstrate he suffered (1) an injury in fact that is both (2) fairly traceable to the defendant's conduct and (3) likely redressable by a favorable decision." *Banks v. Sec'y, Dep't of Health & Hum. Serv*s., 38 F.4th 86, 92 (11th Cir. 2022) (citing *Lujan*, 504 U.S. at 560-61). The court addresses these requirements.

### 1.      Plaintiffs' Injuries Are Not Traceable To Secretary Allen

Defendants point out that Plaintiffs' only allegations about Secretary Allen's involvement with the challenged provisions of SB 1 is that he "has the authority, and indeed the obligation, to tell election officials how to implement election laws." (Doc. # 42 at 15-16 (citing Doc. # 1 at ¶ 35)). They explain that "Secretary Allen has no authority to prosecute violations of the challenged provisions" and "[e]ven Secretary Allen's general rulemaking authority does not establish causation because [he] lacks any authority to force local election officials to follow those rules." (*Id*. at 16 (citing *Nat'l Fed'n of Blind of Ala. v. Allen*, 661 F. Supp. 3d 1114, 1121 (N.D. Ala. 2023)).

As Judge Maze of this court noted when the National Federation of the Blind of Alabama sued Secretary Allen over which absentee voters can legally cast an electronic ballot, "[t]he Alabama Legislature, not the Secretary, passed the law" at issue. *Nat'l Fed'n of Blind of Ala.,* 661 F. Supp. 3d at 1121. And Defendants are correct in pointing out that Secretary Allen has been granted rulemaking authority, but no enforcement authority over applications for absentee ballots. Ala. Code § 17-1-4. Section 17-1-4 simply provides that an absentee ballot application "shall be in a form prescribed and designed by the Secretary of State," Ala. Code § 17-1-4(a), and that the Secretary may specify rules for submitting completed applications to the absentee elections manager. Ala. Code § 17-1-4(c)(1). The only other responsibility that the legislature assigned to

the Secretary was to "provide applications for absentee voting to military and overseas voters in accordance with Section 17-4-35." Ala. Code § 17-1-4(f).

The court agrees with Defendants – Plaintiffs' alleged injuries stemming from SB 1 are not traceable to Secretary Allen. As in *National Federation of Blind of Alabama*, Plaintiffs try to overcome their traceability problem by arguing that the Secretary has rulemaking authority. *Compare* (Doc. # 50 at 15) *with* 661 F. Supp. 3d at 1122. That argument cuts no ice at all. Because Plaintiffs have not plausibly alleged that their injuries are fairly traceable to Secretary Allen, they lack standing to bring their claims against him.

### 2. A Favorable Decision Against Secretary Allen Is Unlikely To Redress Plaintiffs' Injuries

There is another problem with Plaintiffs' standing to sue Secretary Allen. As to redressability, courts must ask "whether a decision in plaintiff's favor would 'significant[ly] increase [] the likelihood' that they would 'obtain relief that directly redresses the injury' that they claim to have suffered." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (quoting *Harrell v. Fla. Bar*, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010)). The point is that "it must be the effect of the court's judgment on the defendant – not an absent third party – that redresses the plaintiff's injury, whether directly or indirectly." *Lewis*, 944 F.3d at 1301 (internal quotation marks omitted).

In their Complaint, as relevant to Secretary Allen, Plaintiffs ask the court to "[p]reliminarily and permanently enjoin Defendants, along with their respective agents, officers, employees, and successors, *from enforcing the Challenged Provisions of SB 1*." (Doc. # 1 at 69) (emphasis added). However, because Secretary Allen has no enforcement duties in reference to SB 1, granting this relief as to him gets Plaintiffs nothing. It is Attorney General Marshall who has been assigned those enforcement duties by the Alabama Legislature. He remains a defendant here.

Again, as in *National Federation of Blind of Alabama*, because Plaintiffs have not shown that the effect a judgment against Secretary Allen would directly or indirectly redress their alleged injury, *see Lewis*, 944 F.3d at 1301, Plaintiffs lack standing to bring their claims against him.

Having resolved the question of Plaintiffs' standing to sue Secretary Allen, the court moves to Defendants' arguments that Plaintiffs' claims are due to be dismissed under Rule 12(b)(6).

### C.  Whether SB 1 Violates Plaintiffs' Free Speech Rights (Count I)

Plaintiffs argue that SB 1 burdens one of the critical protections provided by the First Amendment – their freedom of speech – in two ways. First, they contend that SB 1 restricts their core political speech. Alternatively, they allege that absentee ballot application assistance is expressive conduct and SB 1 restricts that conduct. Further, Plaintiffs assert that SB 1 fails to withstand First Amendment scrutiny. The court addresses these arguments below.

### 1.  The Challenged Provisions

The Challenged Provisions of SB 1 address different and specific activities. The Prefiling Restriction does not criminalize the distribution of absentee ballot applications, but only the distribution of applications that are *prefilled* with any required information. Ala. Code § 17-11-4(b)(2). Nor does it say anything about speech accompanying the distribution of ballot applications. The Submission Restriction criminalizes returning another person's absentee ballot application. Ala. Code § 17-11-4(c)(2). It, too, says nothing about speech related to absentee ballots or the virtues of voting absentee. The Payment and Gift Provisions criminalize accepting anything of value from or providing anything of value to a third party to distribute, order, request, collect, prefill, complete, obtain, or deliver a voter's absentee ballot application. Ala. Code § 17-11-4(d)(1) to (d)(2).

To be clear, Defendants readily agree with Plaintiffs that speaking out on absentee ballots is core political speech protected by the First Amendment. (Docs. # 42 at 18, 22, 26; # 50 at 19; # 58 at 4). Having said that, they point out that none of SB 1's provisions say anything about speech, much less what speech may accompany the proscribed activities. Indeed, the challenged provisions are each silent about speech intended to help voters fill out their own absentee ballot applications, or to encourage the submission of such an application and voting in general. SB 1 allows a host of other activities, in which Plaintiffs may freely engage, that are designed to encourage voters to vote.

Plaintiffs' Complaint is replete with conclusory allegations about the purported legal effects of SB 1 that simply are contrary to the text of the law. (*See, e.g*., Doc. # 1 at ¶¶ 67-72, 76-79) ("The Submission and Prefilling Prohibitions prohibit entire forms of association by prohibiting Plaintiffs from engaging in these activities under threat of a misdemeanor."; "SB 1 severely burdens or eliminates Plaintiffs' ability to associate with members of the community through absentee ballot application assistance."). Plaintiffs characterize SB 1 as criminalizing *assisting* voters in completing their absentee ballot applications. (*Id*.). But, this ignores the fact that § 17-11-4(b)(1), which SB 1 did not amend, provides that "Any applicant may receive assistance in filling out the application as he or she desires, but each application shall be manually signed by the applicant []." Ala. Code § 17-11-4(b)(1). *Assisting* voters is not prohibited by the text of any of the challenged provisions.

The challenged provisions prohibit specific conduct – distributing, ordering, requesting, collecting, prefilling, completing, obtaining, or delivering – in relation to absentee ballot applications. Plaintiffs remain free to communicate any message that encourages voters to engage in the voting process and obtain and submit absentee ballots. They also may instruct voters on how

to fill out their applications. What Plaintiffs cannot do under SB 1 is fill out the application for the potential voter – unless a voter is blind, disabled, or unable to read or write. Ala. Code § 17-11-4(e). And, even in that event, SB 1 only prohibits such assistance given by someone who is paid or provided a gift for doing so. Ala. Code § 17-11-4(d)(1) to (2).

### 2. Whether SB 1 Restricts Core Political Speech

"Whether certain activity or speech is protected by the [F]irst [A]mendment is a question of law for the district court." *Sykes v. McDowell*, 786 F.2d 1098, 1103 (11th Cir. 1986). Plaintiffs allege that SB 1 directly and severely burdens Plaintiffs' freedom of speech by restricting core political speech designed to encourage absentee voting. (Doc. # 1 at ¶ 125). Plaintiffs characterize SB 1 as criminalizing the assistance they give to voters and their speech encouraging voting. A review of the text of SB 1, however, reveals that it does no such thing.

The First Amendment prohibits the enactment of laws that abridge the freedom of speech. *See* U.S. Const. amend. I. Therefore, a state generally "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)). Generally speaking, regulation of speech based on its content – *i.e.*, the topic discussed or the idea or message expressed – is presumptively unconstitutional and may be justified only if the government proves that the regulation is narrowly tailored to serve compelling state interests. *Town of Gilbert*, 576 U.S. at 165 (stating that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech" (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993))).

There is a critical distinction at play here, though. Although "the First Amendment [] bars a state from 'abridging' oral expression (the freedom of 'speech') or written expression (the freedom of the 'press')[] it does not bar the state from restricting conduct." *Lichtenstein v. Hargett*, 83 F.4th 575, 582 (6th Cir. 2023) (citing, *inter alia, Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.* ("*FAIR*"), 547 U.S. 47, 62 (2006)). Plaintiffs allege that SB 1 restricts the message they wish to convey and thus imposes a severe First Amendment burden. Therefore, they argue, the court must examine the challenged provisions under the strict scrutiny test.

Defendants argue SB 1 does not restrict any message. In fact, they wholeheartedly agree that speaking with potential voters about absentee ballot applications is core political speech, but say that SB 1 simply does not limit any such speech. (Doc. # 58 at 4). They contend that SB 1 limits conduct (not speech) and note that the First Amendment generally does not bar a state from restricting conduct. *See FAIR*, 547 U.S. at 62. Defendants also point out that any actual speech intended to give assistance to voters is not prohibited by SB 1 – indeed, it is expressly contemplated by the statute that SB 1 amended. Ala. Code § 17-11-4(b)(1) ("Any applicant may receive assistance in filling out the application as he or she desires[].).

When analyzing whether the First Amendment is implicated by a statute like SB 1, a court should focus on the specific challenged provisions. *See Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388-89 (5th Cir. 2013) (analyzing challenged provisions of a Texas voting law "separately because [] discrete steps of the voter registration drive are in fact separable and are governed by different legal standards"); *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 898-99 (5th Cir. 2012) (explaining that "[b]ecause different legal principles apply to [] discrete actions, it is important to assess regulations on each separately" and to conduct a "discerning regulation-by-regulation analysis").

The allegations of Plaintiffs' Complaint describe a parade of horribles, but a review of their assertions shows most of these are simply unsupported legal conclusions. Without tying their allegations to any text in SB 1, Plaintiffs appear to generally assert that the activities involved in providing absentee ballot assistance are protected speech prohibited by SB 1. However, the court is not bound to accept as true these types of legal conclusions dressed up as factual allegations. *Twombly*, 550 U.S. at 555. It is for this court to "decide for itself what the Law does and does not prohibit." *Lichtenstein v. Hargett*, 2021 WL 5826246, at *6 (M.D. Tenn. Dec. 7, 2021), *aff'd*, 83 F.4th 575 (6th Cir. 2023).

The arguments Plaintiffs present here track with those rejected by the court in *VoteAmerica v. Raffensperger*, 609 F. Supp. 3d 1341 (N.D. Ga. 2022). There, "Plaintiffs argue[d] that their application distribution program constitute[d] core political speech because the application forms [were] 'characteristically intertwined' with the pro-absentee voting message in the accompanying cover information." *Id.* at 1354. The *VoteAmerica* court disagreed. *Id.* at 1355. It determined that "distributing forms prefilled with a prospective voter's own personal information and the ability to send an essentially unlimited number of forms to a prospective voter do not require the type of interactive debate and advocacy that the Supreme Court found constituted core political speech in *Meyer*." *Id.* The same conclusion is warranted here. Nothing in SB 1 burdens anything that "of necessity involves" speech. *Meyer v. Grant*, 486 U.S. 414, 421 (1988). The court agrees with Defendants that SB 1's limits on conduct are not the equivalent of the "speech-throttling law enjoined in *Meyer* [ ]." (Doc. # 58 at 5 (citing *Meyer*, 486 U.S. at 414).

In *Meyer* the Court reviewed Colorado's ban on paying petition circulators. 486 U.S. at 421. The Court found that the "circulation of an initiative petition of necessity involves both the expression of a desire for political change, and a discussion of the merits of the proposed change."

*Id.* This holding followed along the tautological premise that circulators must speak to voters to persuade them to sign a petition. *See Lichtenstein*, 83 F.4th at 585. By limiting the number of people who could present a petition to the public, Colorado's regulation "reduc[ed] the total quantum of speech on a public issue." *Meyer*, 486 U.S. at 423.

In contrast, SB 1 does not abridge anything that "of necessity" burdens speech. The *Lichtenstein* court reached the same conclusion when it reviewed Tennessee's ban on the distribution of absentee ballot applications. 83 F.4th at 586. As the Sixth Circuit observed, in *Meyer* it was the conduct that created the speech and thus the Colorado law restricted "political expression." *Id.* at 585 (citing *Meyer*, 486 U.S. at 421). A key part of soliciting signatures on an initiative petition is "of necessity" tied to the message within the petition. That is, a petition is necessarily an expression of the merits of a particular proposition or a proposed social change advocated for in the petition. *Id.* (citing *Meyer*, 486 U.S. at 421). In *Lichtenstein*, although the Sixth Circuit recognized that Plaintiffs' underlying get-out-the-vote activities – that is, their speech to persuade voters to vote absentee – qualifies as "core political speech" entitled to rigorous First Amendment protection, it held that "the distribution of official absentee-ballot application forms is not a speech 'input.'" *Id.* at 586 (citing *Meyer*, 486 U.S. at 422). Unlike initiative petitions, absentee ballot applications contain no message and do not convey information.

SB 1 targets conduct that has no inherent message. SB 1 is wholly content neutral. Nothing in SB 1 limits Plaintiffs' ability to communicate any message at all. As the Sixth Circuit explained in *Lichtenstein*:

> The Supreme Court has never applied exacting free-speech scrutiny to laws that bar conduct based on the harm that the conduct causes apart from the message it conveys. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 [] (1992). That is true even if the ban on conduct imposes "incidental burdens on speech." *Sorrell v. IMS Health Inc*., 564 U.S. 552, 567 [] (2011); *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 [] (2017). And it is true even if the person engaging

in the conduct "intends thereby to express an idea." [*United States v. O'Brien*, 391 U.S. 367, 376 (1968)].

*Id.* at 583.

Plaintiffs mount a twofold attack on *Lichtenstein*. First, they seek to distinguish it. Granted, Tennessee's law banning distributing ballot applications covers less territory than Alabama's SB 1, which bans distributing, ordering, requesting, collecting, prefilling, completing, obtaining, or delivering them. But that is a distinction without a difference. Plaintiffs have not presented any plausible allegations or made any convincing arguments that the activities barred by SB 1 "of necessity" involve speech.

Plaintiffs' more fundamental argument about *Lichtenstein* is that it was wrongly decided and this court should not apply it. (Doc. # 50 at 19 n.4). After careful review, the court disagrees. *Lichtenstein* is directly on point and its reasoning is utterly sound. The court adopts and applies that correct analysis here. The conduct banned by the challenged provisions is not targeted because of the ideas Plaintiffs may seek to communicate when interacting with potential absentee voters. Thus, rigorous free-speech scrutiny of SB 1's challenged provisions is simply unwarranted.

For these reasons, the court concludes that Plaintiffs have failed to plausibly plead facts that show SB 1 restricts core political speech.

### 3.      Whether SB 1 Restricts Inherently Expressive Conduct

This court's conclusion that SB 1 regulates only conduct, not speech, does not end the court's inquiry. Although the text of the First Amendment forbids only the abridgment of "speech," the Supreme Court has recognized that "conduct may be 'sufficiently embedded with elements of communication to fall within the scope'" of the First Amendment's free speech protection. *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974)). Some "speechless" acts may properly be characterized as protected speech. For example, burning

a flag, *Johnson*, 491 U.S. at 404; or wearing certain garb that contains a message, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969); *Schacht v. United States*, 398 U.S. 58 (1970), may enjoy First Amendment protection. *See also One World One Fam. Now v. City of Miami Beach*, 175 F.3d 1282, 1285 (11th Cir. 1999) ("In determining whether the [state] has violated free speech rights, the initial inquiry is whether the speech or conduct affected by the [state] action comes within the ambit of the First Amendment."). As explained below, however, the activities prohibited by SB 1 simply do not fit into the expressive conduct mold.

Previous decisions by the Supreme Court and the Eleventh Circuit guide courts in discerning when an activity (conduct) becomes an expression (speech). In *FAIR*, the plaintiffs challenged a statute that penalized schools for refusing to allow United States military recruiters on their campuses because of the military's then-current "don't ask, don't tell" policy. 547 U.S. at 51. The law at issue was the Solomon Amendment, which provides that, for a law school and its university to receive federal funding, the law school must offer military recruiters the same access to its campus and students that it provides to nonmilitary recruiters receiving the most favorable access. *Id.* at 55-56. The Court ruled that the federal government could withhold funds from schools who refuse to give military recruiters access to their campuses without running afoul of the First Amendment because the schools' prohibition of military recruiters was not inherently expressive speech. As the Court explained:

> Prior to the adoption of the Solomon Amendment's equal access requirement, law schools "expressed" their disagreement with the military by treating military recruiters differently from other recruiters. But these actions were expressive only because the law schools accompanied their conduct with speech explaining it.

*Id.* at 66. As the Supreme Court noted in *FAIR*, "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.*

27

Thus, there are limits on the varieties of conduct that may be considered expressive. *United States v. O'Brien*, 391 U.S. 367, 370 (1968). "To determine 'whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play,' the two-part *Johnson* test asks: (1) 'whether "[a]n intent to convey a particularized message was present,"' and (2) whether 'the likelihood was great that the message would be understood by those who viewed it.'" *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1336 (11th Cir. 2021) (quoting *Johnson*, 491 U.S. at 404 (in turn, quoting *Spence*, 418 U.S. at 410-11)). The court examines the *Johnson* factors below.

  **a.**  **Do Plaintiffs Intend To Convey A Particular Message By Engaging In The Activities Prohibited By SB 1?**

As to the first *Johnson* factor, Plaintiffs have not plausibly alleged facts indicating that the conduct prohibited by SB 1 is intended to convey any particular message. In their response to Defendants' arguments on this issue, Plaintiffs point to the allegations under Count One of the Complaint to show that they have sufficiently alleged inherently expressive conduct. (Doc. # 50 at 6, citing Doc. # 1 at ¶¶ 125, 127-29).[5] The allegations comprising Count One fall far short of plausibly alleging that SB 1 prohibits any expressive conduct.

Paragraph 125 alleges:

> Plaintiffs' absentee ballot activities are characteristically intertwined with informational and persuasive speech. Plaintiffs' absentee ballot application assistance involves providing information to voters and offering provisions to encourage and facilitate absentee voting, among other speech.

(Doc. # 1 at ¶ 125). These allegations show there are two components to what Plaintiffs wish to do. First, they wish to communicate to potential voters information about the benefits of voting, describe how to vote absentee, and encourage them to take advantage of this process. This is

---

[5] At oral argument, Counsel also pointed to paragraphs 12, 14, 18-20, 25-26 and 29-30, all of which describe Plaintiffs and their missions. (Doc. # 1 at ¶¶ 12, 14, 18-20, 25-26, and 29-30).

protected speech. But it is not prohibited by SB 1. Second, Plaintiffs wish to engage in conduct that SB 1 prohibits, including providing potential voters with applications that are prefilled with required information, submit absentee ballot applications for voters, and provide things of value to others to distribute, order, request, collect, prefill, complete, obtain, or deliver absentee ballot applications. As noted in *FAIR*, combining speech and conduct is insufficient to turn the conduct into expressive conduct. 547 U.S. at 66.

The allegations in Paragraph 127 are actually a legal argument dressed up as a purported fact:

> Like the circulation of an initiative petition for signatures, engaging and assisting voters with the absentee ballot application process is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 421-22. Whether a citizen should participate in an election and exercise their right to vote by absentee ballot is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking" sanctions or other penalties. *See id.* at 421; *see also Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 186-87 (1999) (quoting *Meyer*, 486 U.S. at 422).

(Doc. # 1 at ¶ 127). Not only is this not a plausible factual allegation, but the court has already explained why that assertion about *Meyer* misses the mark.

Paragraph 128 is also conclusory. It alleges:

> Additionally, the act of assisting voters with absentee ballot activities is expressive conduct. "Constitutional protection for freedom of speech does not end at the spoken or written word. The First Amendment guarantees all people the right to engage not only in pure speech, but expressive conduct as well." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (citing *Texas v. Johnson*, 491 U.S. 397, 404 (1989)); *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (internal quotation marks omitted).

(Doc. # 1 at ¶ 128). As discussed above, the court is not bound to accept as true these types of legal conclusions dressed up as factual allegations. *Twombly*, 550 U.S. at 555.

Paragraph 129 fares no better. That paragraph alleges:

> Plaintiffs' absentee ballot application assistance is sufficiently expressive and intended to convey the importance of voting, and the reasonable observer

understands that Plaintiffs intend to express their pro-voting message through absentee ballot application assistance. *See Fort Lauderdale Food Not Bombs*, 901 F.3d at 1242; *Johnson*, 491 U.S. at 404.

(Doc. # 1 at ¶ 129). Like the previous two paragraphs of the Complaint, Paragraph 129 is merely conclusory. It merely tracks the two elements of expressive conduct – asserting that their offered assistance is intended to convey the importance of voting, and that the reasonable observer would understand that Plaintiffs are expressing a pro-voting message through that assistance.

Paragraph 130 comes the closest to making non-conclusory allegations about expressive conduct, but even it falls short because the allegations are divorced from the text of SB 1. Paragraph 130 alleges:

> Plaintiffs promote civic participation by, among other things, educating and assisting voters with submitting absentee ballot applications as an expression of their core values that every eligible voter should be able to cast their ballot. By assisting voters with their absentee ballot applications, Plaintiffs are expressing the message that political participation is worth the effort and that voters should take advantage of the voting options available to them. The individuals they assist, likewise, understand Plaintiffs' assistance to convey the message that voting is important and that they should use the means of voting available to them. Accordingly, the act of assisting voters with absentee ballot applications is a form of expressive political speech which is entirely eliminated by the terms of SB 1.

(Doc. # 1 at ¶ 130).

SB 1 does not prohibit Plaintiffs from communicating their message. SB 1 prohibits them from distributing, ordering, requesting, collecting, prefilling, completing, obtaining, or delivering a voter's absentee ballot application. Moreover, Alabama Code § 17-11-4(b)(1) provides that "[a]ny applicant may receive assistance in filling out the application as he or she desires, but each application shall be manually signed by the applicant[]."

For these and other reasons explained below, the court concludes that Plaintiffs have not adequately or plausibly alleged that SB 1 targets expressive conduct.

In both their Complaint and in their briefing, Plaintiffs rely on the Eleventh Circuit's decision in *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, to support their argument that providing absentee ballot application assistance is expressive conduct. 901 F.3d 1235 (11th Cir. 2018). That reliance is misplaced. In *Food Not Bombs*, a municipal regulation restricted food providers from operating in Fort Lauderdale's public parks without a permit. *Id*. at 1238-39. The regulation was applied to prohibit Food Not Bombs ("FNB"), a nonprofit organization, from hosting weekly events at a public park where its members shared food at no cost with those who gathered to join in the event. *Id.* at 1237-39. FNB challenged the ordinance as applied under the First Amendment arguing that it prohibited inherently expressive conduct. The Eleventh Circuit held that "*on this record* [the] outdoor food sharing is expressive conduct protected by the First Amendment." *Id*. at 1243 (emphasis added). But the record evidence in *Food Not Bombs* is distinguishable from the allegations here. It takes little imagination to understand why sharing free meals with the underprivileged during a rally championing the idea of feeding the homeless rather than building war apparatus is expressive conduct intertwined with the rally's message. While communicating with voters during an absentee ballot drive involves speech, that is not activity prohibited by SB 1. What is prohibited by SB 1 – distributing, ordering, requesting, collecting, prefilling, completing, obtaining, or delivering a voter's absentee ballot application – is simply not expressive conduct.

Several courts have rejected similar attempts to spin bans on conduct associated with ballot harvesting as barring expressive conduct. *See, e.g.*, *VoteAmerica v. Raffensperger*, 609 F. Supp. 3d 1341, 1357-58 (N.D. Ga. 2022) ("Plaintiffs have not shown that the act of sending ballot application packages is expressive conduct subject to First Amendment protections."); *New Ga. Proj. v. Raffensperger*, 484 F. Supp. 3d 1265, 1300 (N.D. Ga. 2020) ("[C]ollecting ballots does

not qualify as expressive conduct."); *Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018) (rejecting the assertion that "the conduct of collecting ballots would reasonably be understood by viewers as conveying [] symbolic message of any sort"); *Voting for Am. v. Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (determining there is "nothing 'inherently expressive' about receiving a person's completed application and being charged with getting that application to the proper place"); *Voting for Am. v. Andrade*, 488 F. App'x 890, 898 (5th Cir. 2012) (same); *Feldman v. Arizona Sec'y of State's Off.*, 840 F.3d 1057, 1084 (9th Cir. 2016) ("[A] viewer would reasonably understand ballot collection to be a means of facilitating voting, not a means of communicating a message."); *League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1319 (S.D. Fla. 2008) (concluding that "the collection and handling of voter registration applications is not inherently expressive activity"); *DCCC v. Ziriax*, 487 F. Supp. 3d 1207, 1234-35 (N.D. Okla. 2020) ("[C]ompleting a ballot request for another voter, and collecting and returning ballots of another voter, do not communicate any particular message…."); *Lichtenstein v. Hargett*, 489 F. Supp. 3d 742, 769 (M.D. Tenn. 2020) (noting "receipt and delivery of completed voter registration forms is not inherently expressive conduct" and finding "not a single case … in which the act of distributing absentee-ballot applications was treated as within the scope of the First Amendment"), *aff'd,* 83 F.4th 575 (6th Cir. 2023). Today, the court aligns itself with these well-reasoned decisions.

> **b.    Is There A Great Likelihood That Those Who View Plaintiffs Engaging In Conduct Prohibited By SB 1 Would Understand That A Message Is Being Communicated?**

The second *Johnson* factor presents a more significant challenge for Plaintiffs. That factor asks whether there is a great likelihood that those who view the conduct would reasonably understand that it is intended to convey a message. *Johnson*, 491 U.S. at 404; *see Spence*, 418 U.S.

at 410-11. This is the *Johnson* factor that has received the most attention from both the Supreme Court and our circuit. *Burns*, 999 F.3d at 1337. Expressive conduct may have a "communicative" element, "but only insofar as it, 'in context, would reasonably be understood by the viewer to be communicative.'" *Id.* (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984)). Of course, "[i]t is possible to find some kernel of expression in almost every activity a person undertakes." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). Yet "a kernel is not sufficient to bring the activity within the protection of the First Amendment." *Id.* The question is whether "the likelihood [is] *great*" that observers would infer "a *particularized* message" from Plaintiffs' conduct. *Johnson*, 491 U.S. at 404 (emphasis added).

The inquiry here is whether a reasonable person would interpret distributing, ordering, requesting, collecting, prefilling, completing, obtaining, or delivering ballot applications as some sort of message (other than let us do this for you).[6] Although SB 1 permits all types of expressive conduct, it does not allow Plaintiffs under any circumstances to prefill or return absentee voters' ballots or for paid staff to distribute, order, request, collect, prefill, complete, obtain, or deliver a voter's absentee ballot application. However, nothing about those activities communicates a particularized message about voting. Those activities do not express a message that is not already communicated by Plaintiffs' "protected speech" about the values and virtues of voting generally,

---

[6] As counsel for Amici the Republican National Committee and the Alabama Republican Party put it:

Some observers could conceivably intuit Plaintiffs' intended pro-voting message: "that voting is important and accessible, and that every eligible voter should exercise their right to vote regardless of senior citizen status, disability, or incarceration." [Doc. # 34] at 17. But many will hear other, very different messages, such as: "We think you are incapable of filling out simple forms," or "You need a sophisticated organization to guide you because absentee voting is not 'accessible,'" or "We think you will vote for our favored candidates so we are targeting you." And some will infer no message at all.

(Doc. # 49 at 6).

and absentee balloting in particular. To be clear, while complying with SB 1, Plaintiffs remain free to "[e]ncourage others to vote or engage in the political process." *Raffensperger*, 2023 WL 6296928, at *9.

In *Burns*, the panel noted that the Eleventh Circuit's earlier decision in *Food Not Bombs* had distilled "five contextual factors" to guide the court's inquiry into whether there is a great likelihood that observers would infer a message from purportedly expressive conduct: (1) whether the conduct involves public displays; (2) whether the activity is open to everyone; (3) whether the activity takes place in a traditional public forum; (4) whether the activity addressed an issue of public concern; and (5) whether the activity "has been understood to convey a message over the millennia." 999 F.3d at 1343-45 (analyzing *Food Not Bombs*, 901 F.3d at 1240).

In their briefing, Plaintiffs barely touch on these factors. Perhaps this is because it is not altogether clear that the panel in *Food Not Bombs* intended to create a multifactor test to be applied in every First Amendment expressive conduct case. Rather, it appears that the *Food Not Bombs* panel discussed five "surrounding circumstances" that it viewed as unique factual matters in the *Food Not Bombs* record[7] that put the food sharing event "on the expressive side of the ledger." 901 F.3d at 1242. The *Burns* panel noted that, in *Food Not Bombs,* the court had "examined five contextual factors to determine whether there was a great likelihood some sort of message would be understood by those who viewed a group sharing a meal with the homeless in a city park." *Burns*, 999 F.3d at 1343 (citing *Food Not Bombs*, 901 F.3d at 1242-43). The *Burns* panel then addressed the five factors in the appeal before it, but specifically noted "[w]e do not hold and have not said" that the *Food Not Bombs* "factors are 'exclusive.'" *Id.*

---

[7] More than once, the *Food Not Bombs* panel made clear that its conclusions were based "[o]n this record." *Food Not Bombs*, 901 F.3d at 1240, 1243.

When the *Burns* and the *Food Not Bombs* panels applied the five factors to the different records before them, they reached different conclusions about whether the conduct in question deserved First Amendment protection. In *Food Not Bombs*, the court found that an organization, which historically has contended that government should spend money on food for the homeless rather than bombs to be used against its enemies, was engaging in expressive conduct when it (in fact) provided food to the homeless and others at its public rallies. *Food Not Bombs*, 901 F.3d at 1245. On the other hand, in *Burns*, it was clear that a rich property owner who wanted to construct an enormous house – even one that featured midcentury modern architecture – was not engaging in expressive conduct in doing so. *Burns*, 999 F.3d at 1352. Assuming without deciding that the court should review the *Food Not Bombs* factors here, analyzing Plaintiffs' allegations[8] under those factors points to the inevitable conclusion that the conduct at issue simply is not inherently expressive.

First, decisions in which courts have found inherently expressive activity have involved public displays. *See, e.g.*, *Tinker*, 393 U.S. at 504 (publicly displaying a black armband at school during the Vietnam War); *Spence*, 418 U.S. at 410 (publicly displaying an American flag with a peace symbol taped over it by hanging it upside down out of an apartment); *Johnson*, 491 U.S. at 404 (publicly burning an American flag); *Food Not Bombs*, 901 F.3d at 1240 (publicly sharing food). Plaintiffs have not plausibly alleged that absentee ballot assistance involves any "public display." *Id.* at 1338.

Second, Plaintiffs have not plausibly alleged that the absentee ballot assistance they wish to undertake would be "open to everyone." *Id.* Conducting an open event is designed to attract the attention of the public (*e.g.*, passersby). For example, the food-sharing event in *Food Not Bombs*

---

[8] The factors (particularly the fourth and fifth ones) do not neatly fit into an analysis of the allegations here.

had "social implications" that encouraged participation by those who encountered the activity. *Id*. at 1242. The rallies were held in a public park and were open to all. In contrast, Plaintiffs have alleged that they direct their assistance efforts at individuals in specific demographic groups, but have not alleged that their events are open to the public. (*See* Doc. # 34-1 at 19-20). It is hard to see how activities that are "shielded … from public view," that are not "open to everyone," or that are not a general invitation to "the public," could be understood by a reasonable person as conveying a particular message. *Burns*, 999 F.3d at 1344.

Third, Plaintiffs have not plausibly alleged that their absentee ballot assistance would generally take place in a traditional public forum. Although some of them might, and "the choice of location alone is not dispositive, it is nevertheless an important factor in the 'factual context and environment' that [courts] must consider." *Food Not Bombs*, 901 F.3d at 1242. Plaintiffs do not allege what proportion of their activities take place in traditional public fora, such as in parks or on sidewalks.

Fourth, Plaintiffs have characterized their concerns at a high level: "protecting the right to vote." (Doc. # 1 at 5). That is an issue of public concern. Yet, distributing prefilled absentee ballot applications and returning other voters' applications are not matters of any public concern. Nor are actions like distributing, ordering, requesting, collecting, completing, prefilling, obtaining, or delivering a voter's absentee ballot application. The conduct prohibited by SB 1 is not necessary to educate others about the right to vote and encourage absentee voting. Plaintiffs are simply barred from engaging in certain conduct in relation to voters' absentee ballot applications.

Fifth, the conduct Plaintiffs allege they are prohibited from engaging in cannot be "understood to convey a message over the millennia." *Burns*, 999 F.3d. at 1344-45. Plaintiffs have not and cannot plausibly allege that the distributing, ordering, requesting, collecting, completing,

prefilling, obtaining, or delivering a voter's absentee ballot application has historically been used to convey any particular message. *Food Not Bombs*, 901 F.3d at 1243; *Burns*, 999 F.3d at 1345 (chronicling the historic ways that sharing meals with others is a form of expression).

Analysis of these five factors makes clear that distributing, ordering, requesting, collecting, completing, prefilling, obtaining, or delivering a voter's absentee ballot application shares none of the hallmarks that make public meal sharing protected expressive conduct. Nothing prohibited by SB 1 is even arguably "inherently expressive." Nowhere in their pleadings have Plaintiffs alleged that the conduct prohibited by SB 1's challenged provisions could reasonably be understood by an observer to communicate a particular message. It is no answer that Plaintiffs have made the conclusory allegation that because these desired activities run alongside speech about the virtues of voting (or absentee voting), they are thereby transformed into inherently expressive conduct. "In short, conduct that lacks inherent expression is not transformed into protected First Amendment speech merely because it is combined with another activity that does involve protected speech." *VoteAmerica*, 609 F. Supp. 3d at 1357; *see also FAIR*, 547 U.S. at 66 ("[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it.").

In *FAIR*, the Supreme Court instructed lower courts not to consider the speech that accompanies conduct in determining whether someone would understand that the conduct itself communicates a message. *See FAIR*, 547 U.S. at 66. So, the court must divorce any message that may be communicated along with the activities at issue here – *e.g.* "voting is important" or "you can exercise your right to vote by voting absentee" – from the activities themselves. Like the conduct at issue in *FAIR*, in the absence of any speech explaining what the activities of distributing, ordering, requesting, collecting, completing, prefilling, obtaining, or delivering a voter's absentee

37

ballot application meant, nobody would connect that message to the desired (but prohibited) conduct. Distributing, ordering, requesting, collecting, completing, prefilling, obtaining, or delivering a voter's absentee ballot application is not "inherently expressive," and thus falls outside the bounds of what is protected by the First Amendment.

For all these reasons, the court concludes that SB 1 does not restrict inherently expressive conduct; it targets only simple conduct.

### 4.    Application Of The Appropriate Level of Scrutiny

The Supreme Court has developed different standards of review applicable to voting laws and claims that speech has been abridged by those laws. Strict scrutiny, the strictest level of review, is applied to content-based or viewpoint-based laws. When it is determined that rigorous free-speech analysis is not required, the Supreme Court has applied the "relatively lenient" test adopted in *United States v. O'Brien*, 391 U.S. 367 (1968). *See Johnson*, 491 U.S. at 407.[9]

### a.    Strict Scrutiny

Plaintiffs argue that the court must apply strict scrutiny to the challenged provisions. That argument misses the mark by a wide margin. As discussed in detail above, SB 1 imposes no limits

---

[9] Some courts evaluate restrictions on the mechanics of voting under the *Anderson-Burdick* balancing test, named after the Supreme Court decisions *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992). Here, neither party has suggested that this is the appropriate test to apply. Indeed, Defendants affirmatively contend that, although the *Anderson-Burdick* balancing test is often employed in election law challenges, it does not apply here because Plaintiffs do not bring voting rights or ballot access claims. Plaintiffs do not challenge this assertion. Plaintiffs do not even cite *Anderson* or *Burdick*, and do not mention the *Anderson-Burdick* framework. (Doc. # 50).

Additionally, "[b]ecause the *Anderson-Burdick* test 'emphasizes the relevance of context and specific circumstances,' it is particularly difficult to apply at the motion to dismiss stage." *Fla. State Conf. of NAACP v. Lee*, 566 F. Supp. 3d 1262, 1286 (N.D. Fla. 2021) (quoting *Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1346 (11th Cir. 2020) *and citing Duke v. Cleland*, 5 F.3d 1399, 1405 (11th Cir. 1993); *Bergland v. Harris*, 767 F.2d 1551, 1555 (11th Cir. 1985)). "And any court foolhardy enough to attempt such a stunt is liable to find itself 'in the position of Lady Justice: blindfolded and stuck holding empty scales.'" *Fla. State Conf. of NAACP*, 566 F. Supp. 3d at 1286 (quoting *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 736 (9th Cir. 2015) (McKeown, J., concurring)). For these reasons, the court declines to apply *Anderson-Burdick* here.

on Plaintiffs' speech or expression. "The Supreme Court has never applied exacting free-speech scrutiny to laws that bar conduct based on the harm that the conduct causes apart from the message it contains." *Lichtenstein*, 83 F.4th at 583 (citing *R. A. V. v. City of St. Paul*, 505 U.S. 377 (1992)). That is the case even when a "ban on conduct imposes 'incidental burdens on speech.'" *Id*. (quoting *Sorrell v. IMS Health Inc*. 564 U.S. 552, 567 (2011)); *see also Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017). And, it is also the case even if a person engaging in the conduct at issue "intends thereby to express an idea." *O'Brien*, 391 U.S. at 377.

Even where a regulation regulates expressive conduct, the appropriate level of First Amendment scrutiny depends on whether the statute or regulation at issue "is content neutral or content based." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1291 (11th Cir. 2021) ("*FNB II*"). In *FNB II*, the law-of-the-case doctrine established that the regulation at issue prohibited expressive conduct. *Id*. at 1291. Although the regulation regulated expressive conduct, because it was content neutral, the court "only appl[ied] intermediate scrutiny." *Id*.[10]

The court has already explained why the conduct prohibited by SB 1 does not involve core political speech. For these same reasons, SB 1's ban on certain conduct – distributing, ordering, requesting, collecting, completing, prefilling, obtaining, or delivering a voter's absentee ballot application – does not trigger rigorous free-speech analysis. *See Lichtenstein*, 83 F.4th at 583. This is not a close call.[11]

---

[10] When addressing a "content neutral" regulation, courts apply the intermediate scrutiny from *O'Brien*. *Id*.

[11] The declaration of Dr. Joseph Bagley does not affect this analysis. Dr. Bagley offers his view that "providing voters with assistance has historically been, and continues to be, political free speech and expression, protected by the [] Constitution []." (Doc. # 45-1 at 13). But, what constitutes speech that falls within the ambit of the First Amendment is a question of law. *Sykes*, 786 F.2d 1103. "Experts" may not opine on questions of law. *See, e.g.*, *Freund v. Butterworth*, 165 F.3d 839, 863 n.34 (11th Cir. 1999) (en banc); *see also Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013) (whether certain conduct is protected by the First Amendment is a question of law; it is "not a matter subject to expert testimony.").

b.      The *O'Brien* Test

Defendants argue that SB 1 easily satisfies the *O'Brien* test. Plaintiffs do not even address *O'Brien*. Again, they assert only that the challenged provisions fail to satisfy strict scrutiny. (Doc. # 50 at 29-32). As noted above, that argument cuts no ice at all. *O'Brien* supplies the correct legal test here.

*Lichtenstein*, discussed above, involved a free speech challenge to a law making "it a crime for anyone other than election officials to distribute the State's official form for applying to vote absentee." 83 F.4th at 579. The Sixth Circuit applied "the 'relatively lenient' test" from *O'Brien*. *Id*. (citing *Johnson*, 491 U.S. at 407). "When a ban does not target conduct because of its message, this deferential review applies because the ban leaves open 'ample alternative channels' to convey a message—by actually speaking." *Id*. at 592.

To satisfy the more lenient test found in *O'Brien*, all a state must do is identify a "substantial interest" that would not be furthered as effectively in the absence of the law. *FAIR*, 567 U.S. at 66. *See also Johnson*, 491 U.S. at 407; *United States v. Albertini*, 472 U.S. 675, 679 (1985). SB 1 easily passes muster under *O'Brien*. SB 1 does not directly or indirectly target political speech and is content neutral. Nor does it target the prohibited conduct because of any "idea" that Plaintiffs purport to express. *Lichtenstein*, 83. F.4th at 586. Nothing in SB 1 limits Plaintiffs in any way from speaking or writing about encouraging voting and the benefits of absentee voting.

In *Lichtenstein*, the court refused to apply strict scrutiny despite the plaintiffs' protest that the law would make "it harder to achieve their *bottom-line goal* of increasing absentee voting." *Id*. at 587 (emphasis in original). In other words, those plaintiffs claimed that the Tennessee law would diminish the effectiveness of their speech. The *Lichtenstein* panel disagreed. It concluded that such

an effects-based argument that strict scrutiny applies would have "no stopping point." *Id.* SB 1 imposes, if anything, only an incidental burden on Plaintiffs' speech.

Under the *O'Brien* test, an "incidental burden on speech [] is permissible [] so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Albertini*, 472 U.S. at 689. Although they do not mention *O'Brien*, Plaintiffs' position appears to be that SB 1 was enacted with the stated purpose of deterring "purported 'ballot harvesting'" by "groups or individuals seek[ing] to profit off the absentee voting process." (Doc. # 1 at ¶ 52). Defendants argue that:

> SB 1 furthers several "general interests that are obviously important," *Lichtenstein*, 83 F.4th at 597, including combatting voter fraud, *see Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 194 (2008) (lead opinion), maintaining "public confidence in the integrity of the electoral process," *id.* at 197, and "protecting voters from confusion and undue influence," *Burson v. Freeman*, 504 U.S. 191, 199 (1992); *see also Jenness v. Fortson*, 403 U.S. 431, 442 (1971).

(Doc. # 42 at 27).

Plaintiffs' attack on this justification falls flat. They argue that "legislators could offer no evidence of any widespread voter fraud attributable to absentee voting or so-called ballot harvesting." (Doc. # 1 at ¶ 53). Eleventh Circuit "precedent, [however,] does not require evidence of voter fraud [much less widespread fraud] to justify adopting legislation that aims to prevent fraud." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State ("LWVF")*, 66 F.4th 905, 925 (11th Cir. 2023). "[T]he Supreme Court has already held that deterring voter fraud is a legitimate policy on which to enact an election law, even in the absence of any record evidence of voter fraud." *Id.* at 925 (citing *Greater Birmingham Ministries v. Sec'y of State for the State of Ala.*, 992 F.3d 1299, 1334 (11th Cir. 2021)); *see also Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 686 (2021) (holding, in a Voting Rights Act case, that "it should go without saying that a State

41

may take action to prevent election fraud without waiting for it to occur and be detected within its own borders."). Thus, the challenged provisions promote a substantial government interest.

The argument that fraud is not widespread or that it does not pose an acute problem goes to the wisdom of the Legislature's action, not its authority to enact laws. The Alabama Legislature is free to look to other states, see fraud concerns in those jurisdictions, and determine whether that voter fraud may spread to Alabama. *Greater Birmingham Ministries*, 992 F.3d at 1305. Highly respected judges in this district and the Middle District have also recognized that voter fraud may be a problem. *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 284 F. Supp. 3d 1253, 1257 (N.D. Ala. 2018) (Coogler, J.); *Ala. State Conf of NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1305 n.51 (M.D. Ala. 2020) (Watkins, J.). The problem is neither indigenous to Alabama, *see. e.g.*, *League of Women Voters of Fla., Inc.*, 66 F.4th at 926, nor a recent problem, *see, e.g.*, *Crawford v. Marion Cnty Election Bd.*, 553 U.S. 181, 194 (2008) (noting "that flagrant examples of such fraud in other parts of the country have been documented throughout this Nation's history by respected historians and journalists, that occasional examples have surfaced in recent years, and that not only is the risk of voter fraud real but that it could affect the outcome of a close election."). Thus, the argument that combatting voter fraud is an insufficient reason to enact absentee voter security measures is wholly groundless.

Because the proponents of SB 1 identified a 'substantial' 'interest' that would not be furthered as 'effectively' without the ban, SB 1 satisfies the *O'Brien* test. Because SB 1 does not violate Plaintiffs' free speech rights, Count I of Plaintiffs' Complaint is due to be dismissed.

### D.   Whether SB 1 Violates Plaintiffs' Right To Associate (Count II)

In Count Two of Plaintiffs' Complaint, Plaintiffs allege that "SB 1 directly and severely burdens Plaintiffs' associational rights by restricting or preventing Plaintiffs from banding together

with others to engage potential voters and assist community members to further participate in the civic community through absentee voting." (Doc. # 1 at ¶ 136). These allegations, however, are simply not plausible.

As the Eleventh Circuit recently explained,

the Constitution does not by its terms protect the freedom of association. Rather, association has been characterized as a right "implicit" in the First Amendment. There are two types of constitutionally protected association—intimate and expressive. Here, we deal with the right to expressive association, which the Supreme Court initially recognized in *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 [] (1958). There, the Court held that "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *Id*. at 460[].

In *Roberts v. U.S. Jaycees*, the Supreme Court explained that the freedom of expressive association is instrumental to, and protective of, other constitutional rights: "[T]he Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment." 468 U.S. 609, 618 [] (1984). "The Constitution guarantees freedom of association of this kind," the Court continued, "as an indispensable means of preserving other individual liberties." *Id*.

*O'Laughlin v. Palm Beach Cnty*., 30 F.4th 1045, 1053 (11th Cir. 2022).

"Efforts that expend resources to broaden the electorate to include allegedly under-served communities[ ] qualify as expressive conduct which implicates the First Amendment freedom of association." *Raffensperger*, 2023 WL 6296928, at *11 (quoting *VoteAmerica v. Schwab*, 576 F. Supp. 3d 862, 975 (D. Kan. 2021) (in turn quoting *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 223 (M.D.N.C. 2020))) (internal quotations omitted). "An organization's attempt to broaden the base of public participation in and support for its activities is conduct 'undeniably central to the exercise of the right of association.'" *Raffensperger*, 2023 WL 6296928, at *11 (quoting *Schwab*, 576 F. Supp. 3d at 975 (in turn quoting *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1202 (D.N.M. 2010))) (some internal quotations marks omitted). But, SB 1 does not restrict any of these efforts by Plaintiffs.

The *Lichtenstein* court cataloged the ways in which a state can abridge the associational rights of groups.

> A government can burden the right to associate in a "number" of ways. *Ams. for Prosperity Found.*, 141 S. Ct. at 2382 (quoting *Roberts*, 468 U.S. at 622). It might compel a group (say, the Boy Scouts) to accept members with whom the group does not want to associate (say, openly gay individuals) because the group believes that this membership will dilute its message (say, disapproval of non-heterosexual conduct). *See Dale*, 530 U.S. at 653. The government also might compel a group (say, the NAACP) to disclose its list of members to a hostile audience (say, the segregated south) and so deter individuals from joining the group out of fear of harassment. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 461-63 (1958). Or the government might discriminate against a group (say, the Students for a Democratic Society) by refusing to give it a generally available benefit (say, access to a college's facilities) that groups generally use to air their points of view. *See Healy v. James*, 408 U.S. 169, 181 (1972). Or it might prohibit a group (say, the NAACP) from soliciting individuals (prospective clients) to associate with the group's lawyers for litigation purposes. *See NAACP v. Button*, 371 U.S. 415, 429-37 (1963); *see also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 911-12, 924-26 (1982).

*Lichtenstein*, 83 F.4th at 602-03 (parallel citations omitted). In distinguishing the restriction before it, the Sixth Circuit quickly dispensed with the plaintiffs' freedom-to-associate claim.

> Here, however, we do not see how paragraph (c)(3) affects the Plaintiffs' ability to associate with others in order to create or convey a message, even after accepting their complaint's allegations as true. Nothing in paragraph (c)(3) requires the Plaintiffs to accept certain members who would contradict their message. *See Rumsfeld*, 547 U.S. at 69-70; *cf. Dale*, 530 U.S. at 653. Nothing bars them from associating with anyone. *See Button*, 371 U.S. at 429-37. Nothing threatens legal punishment or practical harm for those who decide to join the Plaintiffs. *Cf. Elrod v. Burns*, 427 U.S. 347, 355-56 (1976) (plurality opinion); *Patterson*, 357 U.S. at 462. So nothing discourages individuals from becoming members. And nothing denies the Plaintiffs or their members a benefit that Tennessee broadly makes available to others. *Cf. Healy*, 408 U.S. at 181-82. To the contrary, the law neutrally applies to all groups and individuals. The Plaintiffs' complaint thus asserts no facts that plausibly allege that this law "directly or indirectly" affects their "group membership" in a way that undermines their message. *Miller*, 622 F.3d at 538.

*Id.* at 603 (parallel citations omitted). The same conclusion applies here.

The arguments Plaintiffs advance to support this claim are simply a rebranding of their free speech arguments and go too far beyond the text of SB 1 to be plausible. SB 1 prohibits distributing

prefilled absentee ballot applications, returning anyone else's absentee ballot application, and accepting or providing anything of value to or from a third party to distribute, order, request, collect, prefill, complete, obtain, or deliver a voter's absentee ballot application. These restrictions do not prohibit them from engaging potential voters in any setting and encouraging community members to participate in the civic community through absentee voting. As discussed above, all SB 1 prohibits is conduct, *i.e.*, doing things for the voter that the voter can generally do for themselves. Plaintiffs remain free to associate with potential voters to help promote the importance of voting.

"[T]he freedom of association [i]s 'the exercise of one's right to choose one's associates.'" *O'Laughlin*, 30 F.4th at 1053-54 (quoting *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 548 (1987)). Plaintiffs have not plausibly alleged that SB 1 denies them that right. Nor does SB 1 in any way significantly burden group expression or group association. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Whether as a group or individually, Plaintiffs may still engage with whom they chose and are free to communicate their messages about voting with anyone they choose. Therefore, Plaintiffs' Freedom of Association claim fails to state a claim and is due to be dismissed.

### E.     Whether SB 1 Is Unconstitutionally Vague (Count III)

Count Three of Plaintiffs' Complaint alleges that the Payment and Gift Provisions of SB 1 are unconstitutionally vague because they do not define "payment," "gift," "third party," "prefill," "distribute," or "submit." (Doc. # 1 at ¶¶ 81-86, 147). Plaintiffs allege that, because of these "vague provisions, SB 1 fails to give reasonable notice of what constitutes prohibited conduct." (*Id.* at ¶ 148).

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Eleventh Circuit recently elaborated on the due process principles applicable to a void for vagueness claim:

> Under due-process principles, a law or regulation is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 [] (1972). Unconstitutionally vague laws fail to provide "fair warning" of what the law requires, and they encourage "arbitrary and discriminatory enforcement" by giving government officials the sole ability to interpret the scope of the law. *Id.* at 108-09[]. The First Amendment context amplifies these concerns because an unconstitutionally vague law can chill expressive conduct by causing citizens to "steer far wider of the unlawful zone" to avoid the law's unclear boundaries. *Id.* at 109[]. To prevent these problems, due process "insist[s] that laws give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.* at 108[]. Yet despite this concern, we do not "expect mathematical certainty from our language." *Id.* at 110[].

*Keister v. Bell*, 29 F.4th 1239, 1258-59 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 1020 (2023).

"The plain meaning of a statute controls our interpretation of that statute unless the language is ambiguous or would lead to an absurd result." *United States v. Estrada*, 969 F.3d 1245, 1264 (11th Cir. 2020) (citing *United States v. Ortega-Torres*, 174 F.3d 1199, 1200 (11th Cir. 1999)). And, "[i]f there is an interpretation of the statute that makes the statute constitutional, we accept that interpretation." *Estrada*, 969 F.3d at 1264 (citing *Skilling v. United States*, 561 U.S. 358, 405-06 (2010)). This case presents a pre-enforcement challenge and there is no evidence that the law has been (or will be) enforced in a discriminatory manner or that its aim is to inhibit some constitutionally protected conduct. *Cf. K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). Thus, the court can zero in on the statutory text to rule on this question.

The terms "payment," "gift," "third party," "prefill," "distribute," and "submit" are not defined in SB 1. But, none of these are complicated terms. They each have plain and ordinary meanings that are clearly understandable to persons of ordinary intelligence. *See United States v.*

46

*Panfil*, 338 F.3d 1299, 1301 (11th Cir. 2003) (rejecting contention that statute was void for vagueness for failing to define "entice" and "induce" and "sexual activity for which any person can be charged with a criminal offense" as "without merit because the terms cited by [plaintiff] have plain and ordinary meanings"). Without question, the terms that passed muster in *Panfil* are more complicated that the simple, straightforward terms used in SB 1. SB 1 is not unconstitutionally vague. Plaintiffs' tortured reading of the plain text of SB 1 does not present a void for vagueness problem. SB 1's language makes clear what is prohibited – distributing, ordering, requesting, collecting, prefilling, completing, obtaining, or delivering another voter's absentee ballot application. Nor does Plaintiffs' parade of hypotheticals move the needle. To constitute criminal behavior, the prohibited conduct of SB 1 must be *knowingly* undertaken.

The court concludes that SB 1 is "sufficiently clear to provide notice to ordinary persons about the conduct that is prohibited and to guide law enforcement." *Estrada*, 969 F.3d at 1265; *see also Grayned*, 408 U.S. at 108. Thus, Plaintiffs' claim that SB 1 is unconstitutionally vague fails to state a claim and is due to be dismissed.

### F.      Whether SB 1 Is Unconstitutionally Overbroad (Count IV)

Count Four of Plaintiffs' Complaint alleges that SB 1 is unconstitutionally overbroad because it regulates a sweeping amount of noncommercial political speech and constitutionally protected expressive conduct. (Doc. # 1 at ¶ 153). Plaintiffs also allege that the Payment and Gift Provisions, in particular, lack any reasonable bounds and that the Submission and Prefilling Restrictions go beyond a reasonable limit. (*Id*. at ¶ 154).

"The overbreadth doctrine prohibits the [g]overnment from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002). "An overbreadth challenge is unusual." *United States v.*

*Hansen*, 599 U.S. 762, 769 (2023). Under the doctrine, if a "challenger demonstrates that the statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep,' then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid." *Id.* at 769 (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)); *see also Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 890 (11th Cir. 2023), *certified question answered sub nom, DeSantis v. Dream Defs.*, 2024 WL 3058653 (Fla. June 20, 2024). As the Supreme Court has clarified,

> Because it destroys some good along with the bad, "[i]nvalidation for overbreadth is '"strong medicine"' that is not to be 'casually employed.'" *Williams*, 553 U.S. at 293[]. To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep. *New York State Club Assn., Inc. v. City of New York*, 487 U.S. 1, 14 [] (1988); *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800-801 [] (1984).

*Hansen*, 599 U.S. at 770. But the "'mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.'" *Raffensperger*, 2023 WL 6296928, at *13 (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)).

"In analyzing an overbreadth claim, it is necessary for the Court to analyze whether the statute penalizes a substantial amount of speech that is constitutionally protected." *Id*. at *13. As discussed in detail above, SB 1 regulates *conduct*. It does not regulate any speech associated with the prohibited conduct. Properly understood, SB 1 simply "does not 'prohibi[t] a substantial amount of protected speech' relative to its 'plainly legitimate sweep.'" *Hansen*, 599 U.S. at 781 (quoting *Williams*, 553 U.S. at 292). To the extent that SB 1 may minimally burden Plaintiffs' speech, "[s]peech intended to bring about a particular unlawful act has no social value; therefore, it is unprotected." *Id*. at 783 (quoting *Williams*, 553 U.S. at 298).

Plaintiffs have not plausibly alleged that SB 1 penalizes a substantial amount of speech that is constitutionally protected. Therefore, their overbreadth challenge to SB 1 in Count Four fails to state a claim and is due to be dismissed.

G.    **Whether SB 1 Violates Section 208 Of The Voting Rights Act (Count V)**

Plaintiffs allege that, although SB 1 repeats the text of Section 208, it does not actually operate to exempt from liability under the Challenged Provisions assistors who act pursuant to Section 208, and further does not expressly incorporate Section 208's protections. Thus, Plaintiffs argue SB 1 violates Section 208 by unduly and impermissibly burdening the rights of blind, disabled, and illiterate voters to receive assistance from an assistor of their choice. (Doc. # 1 at ¶¶ 162-66). Plaintiffs' Section 208 allegations present a classic conflict preemption claim. (*Id*. at ¶ 166) ("SB 1 would criminalize conduct expressly protected and authorized under the VRA. SB 1 thus creates an impermissible barrier to accomplishing the full purposes and goals of Congress under the statute [and a]ccordingly, SB 1 is federally preempted.").

"[W]hether Section 208 of the VRA preempts [SB 1] is a pure legal question." *Priorities USA v. Nessel*, 628 F. Supp. 3d 716, 732 (E.D. Mich. 2022) (citing *Mich. Consol. Gas Co. v. Panhandle E. Pipe Line Co*., 887 F.2d 1295, 1299 (6th Cir. 1989)). There is a presumption against preemption of state laws in "areas of traditional state responsibility," *Bond v. United States*, 572 U.S. 844, 858 (2014), such as the "regulation[] of parties, elections, and ballots," *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). Thus, absent a "clear statement" to the contrary, the presumption against preemption holds. *Bond*, 572 U.S. at 858.

Section 208 provides such a clear statement by directing that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that

employer or officer or agent of the voter's union." 52 U.S.C. § 10508. That is, the VRA directs

that *any* voter with a disability or who lacks literacy may have assistance from a person of their

choice. *Id*.

There can be no genuine dispute that the voter assistance contemplated by Section 208

extends to applications for absentee ballots. The VRA defines the terms "vote" and "voting" to

include:

> [A]ll action necessary to make a vote effective in any primary, special, or general
> election, including, but not limited to, registration, listing pursuant to this chapter,
> or other action required by law prerequisite to voting, casting a ballot, and having
> such ballot counted properly and included in the appropriate totals of votes cast
> with respect to candidates for public or party office and propositions for which
> votes are received in an election.

52 U.S.C. § 10310. "'To vote,' therefore, plainly contemplates more than the mechanical act of

filling out the ballot sheet.'" *La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 533

(W.D. Tex. 2022) (quoting *OCA-Greater Houston v. Texas*, 867 F.3d 604, 615 (5th Cir. 2017))

(quotation marks removed). The court concludes that a Section 208 voter may exercise rights under

the statute to choose someone to assist with the task of applying for an absentee ballot.

At the outset, this court notes that the Section 208 language, "a person of the voter's

choice," is ambiguous. The parties have debated how the court should read Section 208, focusing

on the meaning of the indefinite article "a" followed by the restrictive clause "person of the voter's

choice." (Doc. # 66 at 21-22 & 21 n.10; Doc. # 67 at 4-6). Defendants argue that the "plain

meaning" of the word "a" in Section 208 "suggests that some state law limitations on the identity

of persons who may assist voters is permissible." (Doc. # 67 at 5) (quoting *Priorities USA*, 487 F.

Supp. 3d at 619). Plaintiffs argue that the *Priorities USA* court got it wrong by "fail[ing] to give

vitality to the 'of the voter's choice' clause in Section 208." (Doc. # 66 at 21 n.21) (citing *League

of Women Voters of Ohio v. LaRose*, 2024 WL 3495332, at *14 (N.D. Ohio 2024)).

This court is not convinced that Defendants' interpretation of Section 208's "plain meaning" is correct or that the statutory text is even *plain*. Indeed, courts in other districts have split on the question of how to interpret the meaning of Section 208's language. *Compare Priorities USA*, 487 F. Supp. 3d at 619 *and Ray v. Texas* 2008 WL 3457021, at *7 (E.D. Tex. 2008), *with League of Women Voters of Ohio*, 2024 WL 3495332, at *11. Several courts have highlighted that because Section 208 already contains two exceptions (a "voter's employer or … agent of the voter's union," 52 U.S.C. § 10508), it impliedly prohibits states from introducing other exceptions. *See, e.g.*, *Ark. United v. Thurston*, 626 F. Supp. 3d 1064 (Sept. 7, 2022) ("where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent") (quoting *Hillman v. Maretta*, 569 U.S. 483, 496 (2013)). Further, when examining whether a federal statute preempts a state statute, the proper inquiry is whether compliance with both federal and state law is impossible or whether the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). Given the substantial disagreement about how to interpret Section 208,[12] as well as the inquiry into the "purposes and objectives of Congress" required of a conflict preemption analysis, *id.*, the court turns to the legislative history of Section 208. This is particularly

---

[12] The most recent case to address Section 208 in the context of a state election statute is *LaRose*, which attempts to explain why the indefinite article "a" could be synonymous with "any." *See* 2024 WL 3495332, at *10. The court is not so sure. In its analysis, the *LaRose* court includes the following quote from *United States v. Alabama*: "In common terms, when 'a' or 'an' is followed by a restrictive clause or modifier, this *typically* signals that the article is being used as a synonym for either 'any' or 'one.'" *Id.* (quoting 778 F.3d 926, 932 (11th Cir. 2015) (emphasis added)). Of course, typically does not mean uniformly. For example, the Chicago Manual of Style explains that an indefinite article such as "a" "points to a nonspecific object, thing, or person that is not distinguished from the other members of a class." The Chicago Manual of Style § 5.76. This would support the *LaRose* and *United States v. Alabama* reasoning that the article "a" could be used as a synonym for "any." But, the Manual also acknowledges that "[i]n a few usages, the indefinite article provides a specific reference," offering the example "I saw a great movie last night." *Id*. at § 5.77. So, while an indefinite article like "a" *typically* is synonymous with "any," it is not always. The need to examine context to determine whether "a" in Section 208 is being used in a typical or atypical manner means that this text is ambiguous, and examination of the legislative history of Section 208 is warranted.

appropriate where, as here, the court is assessing conflict preemption. Even if the text of Section 208 is not ambiguous (and, to be clear, it is), that text does not plainly indicate how this federal statute should operate with state laws governing election procedures (like SB 1) in the area of conflict preemption. But the legislative history of the statute contains a "clear statement" of intent to preempt certain state laws that would contravene a Section 208 voter's right to assistance. *See* S. Rep. No. 97-417, at 63 (1982).

The fact that the Senate report, which accompanied the 1982 VRA amendments that included the "new" Section 208, specifically addressed the issue of preemption shows two things. First, the Senate Judiciary Committee was well aware that there may be situations in which state law conflicts with the federal rights created by the new statute. Second, the committee also contemplated a particularized approach to dealing with preemption issues and expressly stated that there would be only a limited scope of preemption. The committee "recognize[d] the legitimate right of any state to establish necessary election procedures, subject to the overriding principle that such procedures shall be designed to protect the rights of voters." *Id.* The report then suggested the rule for preemption in the Section 208 context: "State provisions would be preempted only to the extent that they *unduly burden* the right recognized in this section, with that determination being a practical one dependent upon the facts." *Id.* (emphasis added). This legislative history certainly informs the question of how the court should apply the doctrine of conflict preemption here, and also how the court should navigate the presumption against preemption. *See Bond*, 572 U.S. at 858.

Reviewing this legislative history, along with case law dealing with the presumption against preemption, the court concludes that Plaintiffs may overcome the presumption if any of the following are true: (1) the state in enacting SB 1 was *not* exercising its "legitimate right … to

establish necessary election procedures," (2) SB 1's procedures are *not* "designed to protect the rights of voters," or (3) SB 1's provisions "unduly burden the right recognized in [Section 208]." *Id.*

With these principles in mind, the court addresses each of SB 1's challenged provisions below.

### 1.     The Prefilling Restriction

SB 1's Prefilling Restriction criminalizes the act of distributing an absentee ballot application that is prefilled with any required information. Ala. Code § 17-11-4(b)(2). This survives the first Section 208 preemption prong because Alabama is exercising its "legitimate right … to establish necessary election procedures" by regulating how assistors and others may distribute absentee ballots. This also passes muster under the second Section 208 preemption prong because this procedure is "designed to protect the rights of voters" by avoiding the perceived problems of ballot harvesting, *i.e.*, potential inaccuracy or manipulation that could occur when prefilled ballots are used. And, this provision also satisfies the third Section 208 preemption prong because the Prefilling Restriction does not prevent a voter from obtaining assistance from a person of the voter's choice. The Restriction merely directs that a person not prefill an absentee ballot application before becoming the voter's choice to provide assistance. Therefore, the presumption against preemption stands.

### 2.     The Submission Restriction

SB 1's Submission Restriction criminalizes the act of returning another person's absentee ballot application. This restriction is consistent with the first preemption prong because Alabama is exercising its "legitimate right … to establish necessary election procedures" by regulating how assistors may submit absentee ballots. This also passes muster under the second Section 208

preemption prong because this procedure is "designed to protect the rights of voters" by avoiding potential deception that could occur if a non-voter submits a voter's ballot.

However, the Submission Restriction fails the third Section 208 preemption prong. SB 1's Submission Restriction criminalizes the act of returning *anyone* else's absentee ballot application. There is no exception made for blind, disabled, or illiterate voters. § 17-11-4(c)(2). How, then, are blind voters or disabled voters with mobility restrictions to return their absentee ballot applications? Under SB 1's Submission Restriction, *no one* can assist them in this way. In *Carey v. Wisconsin Elections Commission*, the court considered a Section 208 challenge to a Wisconsin statute prohibiting voters from obtaining assistance from a third party to return an absentee ballot. 624 F. Supp. 3d 1020 (W.D. Wis. 2022). The court reasoned that a prohibition on voters obtaining assistance in returning their absentee ballots conflicted with the VRA. *Id.* at 1032. As the court explained, "[t]he VRA gives plaintiffs the [] right to obtain third-party assistance in mailing or delivering an absentee ballot." *Id.* at 1033. It concluded, therefore, that the VRA preempts the applicable Wisconsin statute "to the extent it prohibits third-party ballot-return assistance to disabled voters who require such assistance." *Id.* SB 1's Submission Restriction flatly prohibits third-party ballot-return assistance to disabled voters needing such assistance. Therefore, under the same logic as that of *Carey*,[13] the Submission Restriction unduly burdens the right to assistance protected under Section 208, and thus the presumption against preemption is rebutted.

### 3.    The Payment And Gift Provisions

SB 1's Payment and Gift Provisions criminalize distributing, ordering, requesting, collecting, prefilling, completing, obtaining, or delivering a voter's absentee ballot application by

---

[13] Other courts have reached this same legally and logically supported conclusion. *See, e.g.*, *Disability Rights N.C. v. N.C. State Bd. of Elections*, 602 F. Supp. 3d 872, 879 (E.D. N.C. 2022); *Democracy N.C. v. N.C. State Bd. of Elections*, 590 F. Supp. 850, 872 (M.D. N.C. 2022); *League of Women Voters of Ohio*, 2024 WL 3495332, at *15.

anyone who has been paid or given a gift to do so. § 17-11-4(d)(1), (d)(2). As to the first Section 208 preemption prong, the Payment and Gift Provisions are an exercise of Alabama's "legitimate right … to establish necessary election procedures." S. Rep. No. 97-417, at 63 (1982). Plaintiffs' Complaint recognizes that SB 1 proponents in the Alabama legislature characterized SB 1 as targeting "ballot harvesting" by "groups or individuals seek[ing] to profit off the absentee voting process." (Doc. # 1 at ¶ 52). Separate from the question of whether this was a legitimate *concern* (and, to be clear, Plaintiffs contest that it is) (*see id.* at ¶ 53), this was an exercise of Alabama's legitimate *right* to establish procedures it deems necessary for free and fair elections.

As to the second Section 208 preemption prong, SB 1's Payment and Gift Provisions are "designed to protect the rights of voters." S. Rep. No. 97-417, at 63 (1982). The Senate Report accompanying Section 208 expressed the concern that "[b]ecause of their need for assistance, members of these groups [the blind, the disabled, and those lacking literacy] are more susceptible than the ordinary voter to having their vote unduly influenced or manipulated." *Id.* at 62. As Defendants have noted, the Alabama legislature enacted SB 1 to "safeguard[]" the right of those with disabilities to "vote without fear or intimidation." (Doc. # 67 at 6). Specifically, the Payment and Gift Provisions are designed to protect voters with disabilities from selecting an assistor who is receiving some payment or gift by a third party to render that assistance because such persons may have nefarious incentives to manipulate or unduly influence the voter.

The third Section 208 preemption prong is where SB 1's Payment and Gift Provisions fail. Again, the third prong asks whether state provisions "unduly burden the right recognized in [Section 208]." S. Rep. No. 97-417, at 63 (1982). The right recognized in Section 208 is the right to "assistance by a person of the voter's choice." 52 U.S.C. § 10508. At least one other court has held that "a State law that limits a voter's choice does not automatically flout Section 208."

*Priorities USA*, 487 F. Supp. 3d at 733. "At its core, Section 208's natural effect allows some wiggle room: a voter may select '*a* person' to assist them, but not *the* person of their choice."[14] *Id.* (quoting 52 U.S.C. § 10508) (emphasis added). But this concept of "wiggle room" does not alter or add to the Senate Judiciary Committee's "unduly burden" test; rather, it complements the test. The essential question remains whether SB 1 unduly burdens a voter's right to "assistance by a person of the voter's choice." 52 U.S.C. § 10508.

The determination of whether a state provision "unduly burdens" a voter's right to choose an assistor is "a practical one dependent upon the facts." S. Rep. No. 97-417, at 63 (1982). At the motion to dismiss stage, where there are well-pleaded factual allegations, this court must "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Am. Dental Ass'n*, 605 F.3d at 1290. At minimum, Plaintiffs must speak in more than "generalities." The court cannot say it is enough for them to express concern that a state provision would "depress the vote among persons [the organization] is targeting for engagement," or that the organization "plans to" engage in assistance prohibited under a state provision. *Priorities USA*, 487 F. Supp. 3d at 619-20. Rather, they should "offer … examples of instances in which such voters have been deprived of voting assistance," *id.* at 620, or allege plausible facts indicating that the state law's application would unduly burden a voter's selection of a person to assist them in voting. *See Democracy N.C.*, 590 F. Supp. 3d at 871.

The court concludes that Plaintiffs have sufficiently pled to this minimum standard and have stated a claims that Section 208 preempts the Payment and Gift Provisions. Plaintiffs allege that they have members with disabilities covered by Section 208 or have members and staff who

---

[14] This is the argument Defendants advance. As noted above, at best, the argument simply suggests that there is some ambiguity as to exactly what Section 208 rights are at play here and to what extent Section 208 would preempt SB 1.

serve voters in those populations. (Doc. # 1 at ¶¶ 13, 19, 24, 28-31, 112). Plaintiffs also allege that they currently pay members and staff who serve as assistors (*id.* at ¶¶ 25, 30, 111) or have a practice of providing "gifts" to assistors (and voters) to help with the ballot application process—including gas money, food, pens, stamps, and stickers (*id.* at ¶¶ 14, 19-20, 25, 111). Those actions clearly sweep Plaintiffs into the reach of the Payment and Gift Provisions. *See* Ala. Code §17-11-4(d)(1)-(2). Finally, Plaintiffs allege that "[v]oters who are disabled, blind, or illiterate regularly choose to receive assistance from organizations like Plaintiffs," but because of a fear of criminal liability, Plaintiffs "*will* limit [the provision of] their assistance." (Doc. # 1 at ¶ 112) (emphasis added). These factual allegations are not "generalities." Rather, they specify how SB 1 unduly burdens the right of Alabama's Section 208 voters to choose an assistor of their choice. Plaintiffs have alleged that in the absence of SB 1's penalties, some Section 208 voters would choose Plaintiffs as their assistors.

These factual allegations are plausible. Applying for an absentee ballot is a necessary action to secure a ballot and make a vote effective. 52 U.S.C. § 10310. A blind, disabled, or illiterate voter may require assistance ordering, requesting, obtaining, completing, and returning or delivering an absentee ballot application. Such assistance is guaranteed by Section 208, but it is now criminalized under SB 1 when done by an assistor paid or given anything of value to do so, or when the assistor provides any gift or payment to a voter. Although SB 1 repeats the text of Section 208, it does not provide an exception for blind, disabled, or illiterate voters. The only exceptions to the Payment and Gift Provisions are (1) where Alabama Code § 17-11-3(f) (which relates to states of emergency) operates or (2) where an individual has a medical emergency within five days of an election.

This means that if Plaintiffs continue to pay assistors, reimburse volunteers for out-of-pocket expenses, or provide materials to assistors and voters, they (and the assistors) may be guilty of a Class B or C felony. A defendant's conviction under this state law could result in a jail sentence between 366 days and 20 years and fines up to $30,000. It is plausible that Plaintiffs would stop assisting voters rather than face the prospect of these criminal penalties. Plaintiffs have also plausibly alleged that those designated to assist voters would stop assisting if Plaintiffs cannot provide payments and gifts. For an organization like ADAP, which has a paid staff member who is tasked with assisting voters with disabilities (Doc. # 1 at ¶ 30), terminating the staff member would mean ADAP would no longer be able to assist Section 208 voters. For an organization like GBM, which reimburses volunteers with gas stipends and provides them with pens and paper (*id.* at ¶ 25), cutting off these "gifts" could significantly reduce the number of people willing to provide Section 208 assistance. The only people who could volunteer for GBM would be those with the financial resources to cover their own additional costs related to this volunteer work. And for organizations like the NAACP or the LWVAL, which provide voters with envelopes and postage for submitting absentee ballot applications (*id.* at ¶¶ 14, 19), ceasing the provision of these "gifts" could mean they cannot help assist Section 208 voters when asked to do so.

In sum, Plaintiffs have plausibly alleged that SB 1's Payment and Gift Provisions will restrict their ability to help Section 208 voters. Therefore, SB 1's Payment and Gift Provisions are in direct conflict with Section 208 because their restrictions would unduly burden the rights of blind, disabled, or illiterate voters to obtain third-party assistance in all actions necessary to make their votes effective. *Carey*, 624 F. Supp. 3d at 1033; *Democracy N.C.*, 476 F. Supp. 3d at 235-36; *Ark. United*, 626 F. Supp. 3d at 1085.

Case law from other jurisdictions supports this analysis. The Middle District of North Carolina has "concluded that a state law prohibiting a person from assisting more than six people with an absentee ballot was preempted by the VRA because it restricted the voter's choice of [an assistor] more sharply than the VRA permits." *Carey*, 624 F. Supp. 3d at 1032 (citing *Democracy N.C.*, 476 F. Supp. 3d at 235-36). The court in *Arkansas United* also concluded that an Arkansas statute providing that "[n]o person other than [poll workers] shall assist more than six (6) voters in marking and casting a ballot at an election" "conflicts with § 208 of the VRA and is preempted." 626 F. Supp. 3d at 1085. And most recently, the court in *LaRose* concluded that Section 208 preempted an Ohio statute providing that "[n]o person shall knowingly … [r]eturn the absent voter's ballot of another" unless they are an authorized relative, a U.S. postal worker, or a private carrier. 2024 WL 3495332, at *2, *15. In so holding, the *LaRose* court emphasized that "Section 208 does not say … that disabled voters are limited to 'a person of the voter's choice *from a list to be determined by the several states*.'" *Id.* at *11 (emphasis in original).

The court finds this case law instructive and similarly concludes that, although Section 208 provides states some "wiggle room," *Priorities USA*, 628 F. Supp. 3d at 733, at the very least Section 208 preempts state laws that unduly burden the right to an assistor of a Section 208 voter's choice. Because SB 1's Payment and Gift Provisions unduly burden this right, they fail on the third preemption prong.

Because SB 1's Submission Restriction and Payment and Gift Provisions prohibit assistance guaranteed by Section 208 of the VRA, Plaintiffs have stated a claim that these provisions of SB 1 are preempted.[15] The same cannot be said for the Prefiling Restriction, as it does not conflict with Section 208.

---

[15] The court only addresses the preemptive effect of Section 208 in the context of those who receive payment and gifts to provide such assistance to Section 208 voters. Unless the assistance is provided to a voter covered by

Therefore, to the extent that Defendants' Motion seeks to dismiss Plaintiffs' claim in Count V of the Complaint based on the Prefiling Restriction of SB 1, it is due to be granted. To the extent that it seeks to dismiss the claims that the Submission Restriction and the Payment and Gift Provisions of SB 1 violate Section 208 of the VRA, it is due to be denied.

### H.        Whether SB 1 Violates The Supremacy Clause Or The Help America Vote Act

Plaintiff ADAP alleges that it is the duly authorized Protection and Advocacy Program of the State of Alabama. (Doc. # 1 at ¶ 168). Under 52 U.S.C. § 21061(a), the protection and advocacy program who has received the money must use the sums to "ensure full participation in the electoral process for individuals with disabilities, including registering to vote, casting a vote and accessing polling locations." (*Id*. at ¶ 169). ADAP alleges that the Payment and Gift Provisions of SB 1 (Ala. Code § 17-11-4(d)(1) to (d)(2)) could criminalize conduct expressly protected and authorized under HAVA[16] and that therefore those provisions violate the Supremacy Clause. (Doc. # 1 at ¶¶ 170, 173).

Defendants argue that Plaintiffs lack an avenue to bring this claim because "HAVA creates no private cause of action." (Doc. # 42 at 47 (quoting *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 1992)). Plaintiffs do not respond to this argument head on; rather, they assert that, under the Protection and Advocacy for Voting Access Program Inclusion Act of 2002 ("PAVA"), Protection and Advocacy (P&A) programs "shall have the same general authorities as they are afforded under subtitle C of title I of the Developmental Disabilities Assistance and Bill of Rights Act of 2000"

---

Section 208 – that is, a voter who is blind, disabled, or illiterate –Section 208 has no preemptive effect on the Payment and Gift Provisions provided for by SB 1.

[16] In 2000, Congress passed the Help America Vote Act of 2002 ("HAVA"). Pub. L. No. 107-252, 116 Stat. 1666 (codified as amended at 52 U.S.C. §§ 20901-21145 (2012)); *Bellitto v. Snipes*, 935 F.3d 1192, 1199 (11th Cir. 2019).

("DDA"), including the right to bring suit to enforce rights protected by the DDA. (Doc. # 50 at 47-48).

First, as to the supremacy arguments presented here, as another court in this circuit has recognized, the Supreme Court has unambiguously held that the Supremacy Clause itself provides no private right of action:

> [T]he Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action. It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so.

*Georgia Voter All. v. Fulton Cnty.*, 499 F. Supp. 3d 1250, 1255 (N.D. Ga. 2020) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015)).

Count Six of Plaintiffs' Complaint asserts that SB 1 conflicts with HAVA. It is titled "Violation of the Supremacy Clause and the Help America Vote Act of 2002 U.S. Const. art. VI, cl. 2; 52 U.S.C. § 20901, et seq. (HAVA Preemption)." (Doc. # 1 at 67). Yet, "'Congress established only two HAVA enforcement mechanisms: (1) a civil action brought by the Attorney General, and (2) a state-based administrative complaint procedure.'" *Wisconsin Voter All. v. Millis*, 2024 WL 1092092, at *5 (E.D. Wis. Mar. 13, 2024) (quoting *Bellitto*, 935 F.3d at 1202 (in turn, citing 52 U.S.C. §§ 21111-12))). As the court explained in *Wisconsin Voter Alliance*,

> "Congress's creation of specific means of enforcing a statute indicates that it did not intend to allow an additional remedy—a private right of action—that it did not expressly mention at all." *Boswell v. Skywest Airlines, Inc.*, 361 F.3d 1263, 1270 (10th Cir. 2004); *see also* [*Ohio Republican Party v. Brunner*, 555 U.S. 5, 6 (2008)] (vacating TRO requiring Ohio Secretary of State to update Ohio's statewide Voter Registration Database to comply with § 303 of HAVA on the ground that respondents were not likely to prevail on the question whether Congress authorized a district court to enforce § 303 in an action brought by a private party). It thus follows that Congress did not create a private right of action for individuals who wish to enforce the substantive provisions of HAVA in federal court. That has been the consistent holding of other courts that have addressed the issue. *See Tex. Voters Alliance v. Dallas Cnty.*, 495 F. Supp. 3d 441, 458-61 (E.D. Tex. 2020); *Oels v. Dunleavy*, [] 2023 WL 3948289 (D. Alaska June 12, 2023).

*Id.*; *see also Arkansas Voter Integrity Initiative, Inc. v. Thurston*, 2023 WL 4745538, at *2 (E.D. Ark. July 25, 2023) ("HAVA does not create a private right of action." (citing *Oels v. Dunleavy*, 2023 WL 3948289, at *2 (D. Alaska June 12, 2023)).

Other courts have noted that "courts have disagreed as to whether HAVA provides a private right of action." *Voto Latino v. Hirsch*, 2024 WL 230931, at *14 (M.D.N.C. Jan. 21, 2024) (citing *Am. Civil Rights Union v. Phila. City Comm'rs*, 872 F.3d 175, 181 (3d Cir. 2017) ("HAVA does not include a private right of action that allows aggrieved parties to sue nonconforming states."); *Crowley v. Nevada ex rel. Nev. Sec'y of State*, 678 F.3d 730, 735 (9th Cir. 2012) (recognizing there is no private right of action under the HAVA, and foreclosing a Section 1983 suit)); *Colon-Marrero v. Velez*, 813 F.3d 1, 22 (1st Cir. 2016) (permitting private right of action through Section 1983); and *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 572 (6th Cir. 2004) (same)). But, in the face of any split, this court is bound to follow the Eleventh Circuit's pronouncement on this issue: "HAVA creates no private cause of action." *Bellito*, 935 F.3d at 1202. As the Eleventh Circuit further explained:

> Congress established only two HAVA enforcement mechanisms: (1) a civil action brought by the Attorney General, and (2) a state-based administrative complaint procedure. 52 U.S.C. §§ 21111, 21112. "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 [] (2001). Where Congress has not created a private right of action, courts may not do so, "no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id*. at 287[]. "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id*. ACRU does not – and indeed could not reasonably – argue that Congress intended to create a private right of action in HAVA.

*Id*. at 1202-03.

More recently, the Eleventh Circuit explained that "[i]n determining whether any federal statute empowers a would-be plaintiff to file suit to vindicate her rights, our lodestar is *Alexander*

*v. Sandoval*, in which the Supreme Court (reversing an erroneous decision of ours) unequivocally 'swor[e] off' its old 'habit of venturing beyond Congress's intent' to liberally 'imply' private rights of action in favor of a rigorous attention to statutory text and structure." *In re Wild*, 994 F.3d 1244, 1255 (11th Cir. 2021) (quoting 532 U.S. 275, 287 (2001)). "[A] reviewing court may not plumb a statute's supposed purposes and policies in search of the requisite intent to create a cause of action; rather, the inquiry both begins and ends with a careful examination of the statute's language." *Id.* at 1255 (citing *Sandoval*, 532 U.S. at 288). "[I]mportantly here[,] '[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'" *Id*. (quoting *Sandoval*, 532 U.S. at 290).

Under its Enforcement subchapter, HAVA specifically provides for an action to be brought by the Attorney General:

> The Attorney General may bring a civil action against any State or jurisdiction in an appropriate United States District Court for such declaratory and injunctive relief (including a temporary restraining order, a permanent or temporary injunction, or other order) as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under sections 21081, 21082, and 21083 of this title.

52 U.S.C.A. § 21111. That subchapter also requires that "[i]f a State receives any payment under a program under this chapter, the State shall be required to establish and maintain State-based administrative complaint procedures []." 52 U.S.C. § 21112. HAVA is silent on a private right of action, which strongly suggests Congress intended to preclude private enforcement of HAVA. *Sandoval*, 532 U.S. at 290; *In re Wild*, 994 F.3d at 1255. Applying binding precedent, the court concludes that Plaintiffs do not "have a" private right of action under HAVA. ADAP's purported HAVA claim in Count Six of the Complaint fails to state a claim and must be dismissed.

At oral argument, counsel for ADAP argued that its HAVA claim in Count Six is actually a claim "that SB 1 is preempted by federal law, specifically PAVA[.]" (Doc. # 62 at 38). "PAVA

provides funds to the protection and advocacy system of each state[.]" (*Id*. at 40). ADAP argues that, under PAVA, ADAP has the right "to file lawsuits to enforce their rights and to protect their constituents." (*Id*. at 43). But the claim they have asserted in the Complaint is that SB 1 is preempted by HAVA. (Doc. # 1 at 67).

The parties appear to agree that no authority recognizes a claim such as the one brought by Plaintiffs here. (Doc. # 62 at 44) ("I agree with Mr. LaCour that no one else has brought a lawsuit under HAVA to try and enjoin a similar statute."). The court's independent research has not revealed any such authority either. Thus, the question is whether Plaintiffs have plausibly alleged in their Complaint that the challenged provisions of SB 1 are preempted by HAVA (or PAVA). They have not.

## IV.    Conclusion

For all these reasons, Defendants' Motion to Dismiss (Doc. # 42) is **GRANTED IN PART AND DENIED IN PART**. It is **ORDERED** as follows:

1.    Plaintiffs' claims in Counts One, Two, Three, Four, and Six fail to state a claim and are **DISMISSED WITH PREJUDICE**.

2.    To the extent that Count Five of Plaintiffs' Complaint asserts that the Prefiling Restriction of SB 1 Violates Section 208 of the Voting Rights Act, it fails to state a claim and is **DISMISSED WITH PREJUDICE**.

3.    To the extent that Count Five asserts that the Submission Restriction and the Payment and Gift Provisions of SB 1 violate Section 208 of the VRA, that portion of Count Five states a claim and Plaintiffs may proceed on that claim.

**DONE** and **ORDERED** this August 21, 2024.

**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE