## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ALABAMA STATE CONFERENCE<br>OF THE NAACP, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-420-RDP |
| | ) | |
| STEVE MARSHALL, in his official<br>capacity as Attorney General of Alabama, | ) | |
| | ) | |
| *Defendant*. | ) | |

### DEFENDANT'S MOTION TO STAY INJUNCTION PENDING APPEAL

Today, this Court enjoined Defendant Marshall from enforcing portions of Ala. Code §17-11-4 ("SB1"), specifically subsections (c) ("Submission Provision") and (d) ("Compensation Provision"), to the extent those provisions conflict with 52 U.S.C. §10508 ("§ 208"). *See* DE 76. Defendant has appealed that order, *see* DE 77, and now moves this Court to stay its injunction pending appeal. Defendant requests that the Court rule on this motion as soon as possible, or, at the latest, by **Friday, September 27, 2024.**

When Plaintiffs first asked the Court to preliminarily enjoin SB1 as being preempted by § 208, they argued that SB1 irreparably harmed "Plaintiffs' members and constituents and many other Alabamians" by severely burdening, if not "entirely" foreclosing, the "right to vote" of "senior, disabled, blind," and "low literacy" voters. DE 34-1 at 41. The evidence Plaintiffs have proffered since then paints nowhere near so dismal a picture. They have not proven that even one voter whose § 208 right to choose an assistor is so seriously and immediately burdened by SB1 that the "extraordinary and drastic remedy" of a preliminary injunction is warranted. DE 76 at 2. In contrast, the State's and public's interests in preventing voter fraud and confusion are significantly undercut by this injunction. As this Court and others have recognized, and as Defendant's evidence

demonstrates, "voter fraud may be a problem" in Alabama. DE 69 at 42. SB1 installs commonsense protections for all of Alabama's voters, including the vulnerable voters § 208 is meant to protect, while ensuring that § 208 voters' rights to receive necessary and trustworthy assistance remain secure. Defendant respectfully requests that the Court stay its preliminary injunction while the Eleventh Circuit considers this order on appeal.

*

When a court "grants … an injunction," it may still "suspend" that injunction while "an appeal" from its order "is pending." Fed. R. Civ. P. 62(d); *see also* Fed. R. App. P. 8. The relevant considerations are essentially the same as the four factors for a preliminary injunction, *see Alabama v. U.S. Sec'y of Educ.*, 2024 WL 3981994, at *3 (11th Cir. Aug. 22, 2024)—specifically, "(1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of a stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Venus Lines Agency v. CVG Industria Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1313 (11th Cir. 2000) (cleaned up). However, "when the balance of equities … weighs heavily in favor of granting the stay," "the stay may be granted upon a lesser showing of a substantial case on the merits." *League of Women Voters of Fla. V. Fla. Sec'y of State*, 32 F.4th 1363, 1370 (11th Cir. 2022) (quotations omitted). A stay is warranted for the reasons given in Defendant's PI briefing, incorporated here by reference, *see* Doc. 46 at 13-23, and for the reasons that follow.

*        *

Defendant will likely win on appeal. Section 208 states that "any voter" who is disabled, blind, or unable to read or write and who "requires assistance" may choose "a person" to help them exercise their right to vote. 52 U.S.C. § 10508. Under either Defendant's reading of § 208 or this Court's, Plaintiffs' preemption claim should fail.

2

First, the text of § 208 does not contain a "clear statement" that Congress intended to "preempt state law" in an area "of traditional state responsibility." *Bond v. United States*, 572 U.S. 844, 859 (2014); *see also Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 599 (2011) (discussing the primacy of the text in the preemption inquiry); *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (same); *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) (same). At best, § 208's text "is ambiguous," as this Court has repeatedly noted. DE 69 at 50, 51 n.12, 52 ("to be clear, it is" ambiguous); DE 76 at 4. Defendant posits that a congressional intent "to rewrite dozens of state elections laws around the county" cannot be discerned from an ambiguous federal law. *DNC v. Wis. State Legislature*, 141 S. Ct. 28, 35 (2020) (Kavanaugh, J., concurral); *see also Altria Group, Inc., v. Good*, 555 U.S. 70, 77 (2008).

Second, on this evidentiary record, Defendant will prevail under the three-prong framework the Court articulated for examining Plaintiffs' § 208 preemption claim. *See* DE 69 at 52-53. Only the third prong is at issue—whether "SB 1's provisions 'unduly burden the right'" "to 'assistance by a person of the voter's choice.'" *Id.* at 53, 55 (quoting S. Rep. No. 97-417, at 63 (1982) and 52 U.S.C. § 10508). Plaintiffs' evidence does not identify any disabled voter whose § 208 right is "unduly burdened" under SB1.

Declarants Louis Courie and Terry McKee, two homebound voters with disabilities, "strongly prefer" voting assistance from their neighbor of "nearly 25 years," a member of the League of Women Voters. DE 74-1 ¶¶ 5-6 (Courie Decl.); DE 74-2 ¶¶ 5-6 (McKee Decl.) (same).[1] Their neighbor has been "gifted pens and t-shirts by the League." DE 74-1 ¶¶ 6-7. Another declarant, Lauren Faraino, "would choose to ask for assistance from [her] mother" but fears her mother

---

[1] The declarations by Courie and McKee are identical except for paragraph 3, where the voters' disabilities are described, and paragraph 8, where the witnesses name the other declarant. Unless otherwise specified, citations to Courie's declaration (74-1) refer to both witnesses' testimony.

would face prosecution for helping. DE 74-3 ¶ 6. Still, there is no indication that the neighbor or the mother have been paid to act upon the declarants' absentee ballot applications or that their assistance can only be induced through compensation. In other words, under SB1, these § 208 voters are free to choose the assistors they prefer.

The fourth declarant, Eric Peebles, "would prefer to choose ADAP" to help him vote absentee. DE 74-4 ¶ 8. Four years ago, ADAP sent him a link to the absentee ballot application and in some unspecified way "assisted" him in completing it. *Id*. ¶ 5. Because of his disability, Mr. Peebles requires assistance with the physical steps necessary to mail the application, which his "assistants—not ADAP—have helped [him] to do" "[i]n the past." *Id*. ¶ 6. Because the only assistance from ADAP consisted of sending a link to an application, it is entirely unclear whether SB 1 prohibits the *person* of Mr. Peebles's choice from helping him vote absentee.

Finally, Nicole Watkins, an employee of Plaintiff ADAP, declares that to date this year she has told "at least 30 people with disabilities that [she] could not help them" "with the absentee voting process." Doc. 74-5. Nowhere does she say what kind of assistance was requested (i.e. whether it was likely prohibited by SB1), why she thinks these people needed help, or whether she would have been these voter's assistor of choice were it not for SB1.

The Supremacy Clause "provides a rule of decision for determining whether federal or state law applies in a particular situation." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020). Thus, any preemption analysis must be conducted "under the circumstances of th[e] particular case." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000). Based on the evidence presented, SB1 "would affect so few" assistors preferred by § 208 voters "that its rule of law" does "not create a legal 'obstacle' to" § 208's objective. *Geier*, 529 U.S. at 885. SB1 erects no barrier for § 208 voters to

receive necessary assistance from spouses, family members, caregivers, neighbors, and volunteers—the people voters actually choose to help them. For example, each of Plaintiffs' declarants have ready and willing assistors, such as personal caregivers, who are not compensated for distributing, collecting, or completing "a voter's absentee ballot application." Ala. Code §17-11-4(d); DE 74-1 ¶ 8; DE 74-2 ¶ 8; DE 74-3 ¶ 6[2]; DE 74-4 ¶ 3. SB1 stands as no obstacle to their right to choose a trustworthy assistor. And as to the Submission Provision, any "voter who requires assistance" with submission can receive it. *See* Ala. Code § 17-11-4(e).

By contrast, SB1 *does* stand as an obstacle to the paid ballot harvester, like the one lurking about the 2016 mayoral election in the small city of Brundidge, Alabama. DE 73-3 ¶ 7 (Scarbrough Decl.). Likewise, SB1 impedes the paid agent who goes "door-to-door handing out [absentee ballot] applications and instructing voters to contact them when their ballot arrive[s]." DE 73-2 ¶ 15. It removes monetary incentives for "working the absentees," a way of controlling the votes of lower-income voters. *Id.* ¶¶ 21-22. It prevents paid third parties from hijacking the mail-in voting system and producing inexplicably high rates of absentee voting. *Cf.* DE 73-4 ¶ 13. And it protects the right to vote of less educated voters in rural counties who struggle to read or write or may "not understand the process" for absentee voting but "always" make their voices heard on Election Day "at the polls." DE 74-1 ¶ 22. The removal of this obstacle to fraudulent conduct is no "minimal" thing. DE 76 at 7.

Yet this Court found it "obvious" that "Section 208 voters in Alabama would be deprived of the assistors of their choice due to" SB 1's Compensation Provision. DE 76 at 11. But this finding does not follow either from the evidentiary record or "common sense." DE 76 at 9. If SB 1 prohibited only serial fraudsters from assisting voters with the absentee voting process, it would

---

[2] Ms. Faraino does not require a caregiver due to her "proximity to [her] mother."

not be "obvious" that § 208 voters' rights to receive assistance were "unduly burdened." Indeed, one cannot know whether the burden is "undue" without determining what valid goals the burden advances and what alternative forms of assistance remain available to exercise the § 208 right. These are fact-bound questions. *Cf. June Med. Servs. L. L. C. v. Russo*, 591 U.S. 299, 321-22 (2020) ("consider[ing] evidence in the record" to determine if a law constitutes an "undue burden"). Here, the burdens are minimal. The Court accepted that "Section 208 voters perhaps can choose people not within the scope of SB 1 to assist them." DE 76 at 13 n.1. The fact that "[a]lternatives are available" clearly supports "[t]he conclusion that the Act does not impose an undue burden." *Gonzales v. Carhart*, 550 U.S. 124, 164 (2007). Indeed, *anyone* can assist a § 208 voter, just not in exchange for cash or gifts. Thus, even if the § 208 voter has a right to choose a particular assistor, § 208 doesn't give the assistor a right to get paid for that assistance. Ultimately, Plaintiffs have not come close to showing that the potentially millions of unpaid assistors who live in Alabama are somehow so inadequate that SB 1 imposes "a substantial obstacle to the [§ 208] right." *Id.* at 165. Meanwhile, SB1's goals are firmly grounded in Alabama's "legitimate right … to establish necessary election procedures … designed to protect the rights of voters." S. Rep. 97-417 at 63, *see also Purcell v. Gonzales*, 549 U.S. 1, 4 (2006) (per curiam). With Section 208, Congress intended to compliment such laws, not preempt them.

*          *

Absent a stay, Defendant and the people of Alabama will be irreparably harmed. As a State official, Defendant Marshall's "interest and harm merge with the public interest." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020). The "inability to enforce" a "duly enacted" state law "clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *see also New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J.,

in chambers) ("[A]ny time a State is enjoined by a court form effectuating statutes enacted by representatives of the people, it suffers a form of irreparable injury."). Further, the injunction is adverse to compelling public interests advanced by SB1—first and foremost, "preventing voter fraud," intimidation, and manipulation targeting Alabama's most vulnerable.

The public suffers when pernicious actors are permitted to target those in the electorate most susceptible to intimidation and manipulation. This harm is exacerbated in the context of absentee voting, where an assistor taking payment to handle a disabled voter's absentee ballot application may "work the absentee" in seclusion and secrecy. DE 73-2 ¶16. A disabled voter requiring assistance may be unable to speak or "physically mark" paperwork. *Id.* ¶ 11. The public interest is in protecting that vulnerable voter by taking steps to ensure that people with an ulterior motive (e.g., money), are not handling the voter's "absentee ballot application." Ala. Code § 17-11-4(d)(1)-(2).

There is a long history of ballot brokers targeting absentee voting—"a source of fraud and voter manipulation in Alabama." DE 73-1 ¶ 5 (Biggs Decl.); *see also* DE 42 at 7-9 (collecting examples of fraud convictions and successful elections contests). Houston County Circuit Clerk Carla Woodall has witnessed numerous instances of fraud, manipulation, or otherwise troubling behavior infecting the absentee voting process in Dothan, Alabama. DE 73-2 ¶¶ 13-16, 21-22. The same goes for Pike County Circuit Clerk Jamie Scarbrough in Troy, Alabama. DE 73-3 ¶¶6-9. Between October 1995 and April 2001, former Alabama Assistant Attorney General Gregory Biggs successfully prosecuted voter fraud cases in Wilcox, Greene, Hale, and Winston Counties, all of which involved absentee ballots. DE 73-1 ¶ 3. In his experience, high absentee voting percentages are a marker of fraud. *Id.* ¶ 6.

Data for the elections immediately preceding the Legislature's enactment of SB1 contain such markers. In the 2024 Primary Election, 1.91% of the total ballots cast in Alabama were absentee. DE 74-4 (Elrod Decl.) ¶ 8. However, absentee ballots accounted for 8.39% of total ballots in Wilcox County, 8.88% in Marengo County, 9.21% in Bullock County, and a whopping 21.22% in Perry County. *Id*. These abnormally high and inherently suspicious rates cannot be easily explained by a disproportionate number of disabled persons residing in these counties.[3] For instance, Bullock County's disability rate of 11.2% is substantially lower than the 16.9% disability rate for Alabama's total population. DE 75-1 at 6.

The counties with abnormally high absentee voting percentages also show abnormally skewed absentee results by party. For example, in Bullock County, in-person voting favored the Democratic over the Republican ticket by a 5.8 to 1 margin, while absentee ballots broke for Democrats at a ratio of 27 to 1. In Perry County, where the share of absentee voting was ten-fold higher than in the state as a whole, in-person voting reflected a 4.4 to 1 advantage for Democrats, while absentee ballots broke for Democrats at a staggering rate of *95 to 1*. ¶ 13.[4]

As Defendant's evidence shows, Alabama's elections will be less secure and the voting rights of the State's most vulnerable voters less protected if SB1's injunction remains in place. To be sure, the Court held that the "injunction does not in any way prevent Alabama from prosecuting voter fraud when it occurs." DE 76 at 12. But voter fraud was already illegal when the Legislature

---

[3] In Wilcox, Marengo, and Perry counties, U.S. Census Bureau data reports the following disability rates, respectively: 21.2%, 22.6%, and 25.2%. DE 73-10 at 6 (Wilcox); DE 73-11 at 6 (Marengo); DE 73-9 at 6 (Perry). That the percentage of disabled persons in Wilcox County, for example, is about 1.25 times greater than the statewide average does not explain why the percentage of absentee ballots cast in Wilcox County is *4.4* times greater than the statewide average.

[4] For comparison, the 2022 General Election results in Pickens County showed that the Democrat-to-Republican ratio for in-person votes was 1 to 1.4, while the same ratio for absentee ballots was 1:1. *Id*. ¶ 1. In Dale County for the same election, the Democrat-to-Republican ratio for in-person votes was 1 to 4, compared to a 1 to 3.5 for absentee ballots. *Id*.

determined, based on the historical record, that proactive and preventative measures were also needed. Likewise, "bribery laws and narrowly drawn disclosure requirements" were available to "deal[] with proven and suspected quid pro quo arrangements" with public officials, yet the Supreme Court upheld campaign contribution limits under a "rigorous standard of review." *Buckley v. Valeo*, 424 U.S. 1, 27, 29 (1976). The Court recognized that "laws making criminal the giving and taking of bribes deal with only the most blatant and specific attempts of those with money to influence governmental action," and so an additional, prophylactic protection was justified. *Id.* at 27-28. The same is true of SB 1. Whatever burdens it imposes on the § 208 right are not "undue"— certainly not based on this preliminary record. Thus, the irreparable harms enjoining SB 1 will impose on the public weigh strongly in favor of a stay pending appeal.

By contrast, Plaintiffs will suffer little to no injury under the status quo; indeed, they have not shown that they are suffering irreparable harm *now.* At the moment, Plaintiffs can educate voters about the absentee election process, and disabled voters have ample time to secure whatever assistance they may require to vote in November. Plaintiffs have not proven that anyone will face the "denial of an opportunity to cast a vote that a person may otherwise be entitled to cast." DE 76 at 6 (quoting *Gonzalez v. Kemp*, 470 F. Supp. 3d 1343, 1351 (N.D. Ga. 2020)); *cf. Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country …."). Plaintiffs' own evidence suggests that no disabled voter is "suffering serious harm or facing imminent injury." *Siegel v. LePore*, 234 F.3d 1163, 1177 (11th Cir. 2000). Every declarant with a disability has someone nearby, such as a neighbor, mother, or caregiver, who can help them navigate the absentee voting process. The relative ease with which disabled voters can apply to vote absentee is corroborated by the absentee election managers' declarations. Voters residing in assisted living or nursing home facilities commonly receive voting assistance from nurses, staff, and other residents.

DE 73-2 ¶¶17-18; DE 73-3 ¶¶14. Others receive help from a family member, friend, caregiver, or volunteer at a regional Area Agencies on Agency like SARCOA. DE 73-2 ¶¶9, 11, 19, DE 73-3 ¶¶13-14, 16. Of course, every county's absentee election manager and his or her staff are always available and willing to assist with the absentee voting process. DE 73-2 ¶¶20-21; DE 73-3 ¶¶11-12.[5]

In sum, the compelling interests advanced and protections afforded by SB1 are substantial, while the "injuries" SB1 allegedly would inflict on Plaintiffs and § 208 voters remain unsubstantiated.

Finally, this Court should have held an evidentiary hearing. Credibility issues and disputes of material fact abound. For example, declarant Nicole Watkins states that she has told "at least 30 people with disabilities that [she] could not help them" "with the absentee voting process." Doc. 74-5. Are we to understand from this testimony that but for SB1, she would be these 30 callers' assistor of choice? What questions did the callers ask, or did Ms. Watkins end the calls as soon as she heard the phrase, "help with the absentee voting process"? *Id.* How does Ms. Watkins know that these callers *needed* assistance? The Court held that it could "fully and properly analyze whether SB 1's procedure denies 'assistance at some stages of the voting process during which assistance was needed.'" DE 76 at 11 (quoting S. Rep. 97-417 at 63). But a factual finding is necessary to determine whether "assistance was needed." Similarly, whether necessary assistance could be obtained by someone other than a paid operative without imposing an undue burden on

---

[5] Also, Jeff Elrod, Election Manager for the Secretary of State, appends to his declaration the short, simple, online form a person can submit to receive an absentee ballot application. DE 73-4 at 71 (Elrod Ex. P). As of September 11, 2024, the Secretary of State's Office had fulfilled over 17,000 requests for absentee ballot applications.

the voter's § 208 rights is a question of fact. In short, the Court appeared to "accept one construction of the evidence and reject the other without the benefit of an evidentiary hearing." *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 265 F.3d 1193, 1207 (11th Cir. 2001). The Court "was not at liberty to make such a credibility determination or inferential leap on this contested issue without the benefit of an evidentiary hearing." *Id.* Thus, at the least, this Court should stay its injunction while the Eleventh Circuit considers whether to remand the case for an evidentiary hearing.

\*     \*     \*

This Court should grant Defendant's motion.

Respectfully submitted,

Steve Marshall
 *Attorney General*

*s/ Edmund G. LaCour Jr.*
Edmund G. LaCour Jr. (ASB-9182-U81L)
 *Solicitor General*

James W. Davis (ASB-4063-I58J)
 *Deputy Attorney General*

Soren Geiger (ASB-0336-T31L)
Dylan Mauldin (ASB-3281-Z11M)
 *Assistant Solicitors General*

Brenton M. Smith (ASB-1656-X27Q)
Charles A. McKay (ASB-7256-K18K)
 *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Soren.Geiger@AlabamaAG.gov
Dylan.Mauldin@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov
***Counsel for Defendant***

11

**CERTIFICATE OF SERVICE**

I certify that on September 24, 2024, I electronically filed the foregoing notice with the

Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

*s/ Edmund G. LaCour Jr.*
*Counsel for Defendant*
